**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SECURITY CAPITAL ASSURANCE,
LTD. SECURITIES LITIGATION

07 Civ. 11086 (DAB)

**JURY TRIAL DEMANDED**

**CONSOLIDATED AMENDED CLASS ACTION**
**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

August 6, 2008

**BERNSTEIN LIEBHARD & LIFSHITZ,**
**LLP**
Stanley D. Bernstein (*bernstein@bernlieb.com*)
Rebecca M. Katz (*katz@bernlieb.com*)
Christian Siebott (*siebott@bernlieb.com*)
Ann M. Lipton (*lipton@bernlieb.com*)
10 East 40th Street
New York, New York 10016
(212) 779-1414

**ADLER POLLOCK & SHEEHAN P.C.**
James R. Oswald (*joswald@apslaw.com*)
One Citizens Plaza, 8th floor
Providence, Rhode Island 02903
(401) 274-7200

*for Lead Plaintiff Employees' Retirement*
*System of the State of Rhode Island*

(*add'l counsel on signature page*)

I.      SUMMARY OF THE COMPLAINT...................................................................1

II.     JURISDICTION AND VENUE ........................................................................5

III.    PARTIES ..........................................................................................................6

IV.     PLAINTIFFS' CLASS ACTION ALLEGATIONS........................................11

V.      SUBSTANTIVE ALLEGATIONS .................................................................13

        a.      Background Facts.................................................................................13

        b.      Mortgage Industry and Securitization.................................................20

        c.      SCA's Structure ..................................................................................30

        d.      SCA's Business and Accounting .........................................................33

        e.      SCA Aggressively Enters Market for ABS CDOs ..............................36

                i.   Market Deteriorates Further; The Truth Is Slowly Revealed.............56

VI.     FALSE AND MISLEADING STATEMENTS  AND OMISSIONS
        DURING THE CLASS PERIOD ....................................................................59

        a.      SCA's 2006 Form 10-K.......................................................................59

        b.      April 23, 2007 Form 8-K and April 24, 2007 Analyst Call..................63

        c.      May 14, 2007 Form 10-Q ....................................................................64

        d.      May 16, 2007 Secondary Public Offering  Registration Statement
                and May 17, 2007 Conference ..............................................................66

        e.      July 23, 2007 Form 8-K and July 24, 2007 Conference Call ...............68

        f.      August 3, 2007 Conference Call and PowerPoint Presentation............76

        g.      August 10, 2007 Form 10-Q ................................................................85

        h.      September 5, 2007 Conference and PowerPointPresentation...............85

        i.      October 16, 2007 Form 8-K.................................................................91

        j.      October 25, 2007 Form 8-K and  October 26, 2007 Conference
                Call.......................................................................................................94

        k.      Further Deterioration in the Market  for Mortgage-Backed
                Securities............................................................................................101

l.      November 14, 2007 Form 10-Q .......................................................................102

m.    November 18, 2007 S-4/A ...........................................................................105

n.    The Full Truth is Revealed .................................................................108

VII.    POST-CLASS PERIOD EVENTS ................................................................112

VIII.    DEFENDANTS' FALSE AND MISLEADING FINANCIAL
STATEMENTS...............................................................................................113

a.      Defendants' Failure To Timely Record Material Provisions to
Increase Unallocated Reserves ............................................................116

b.      Defendants' Failure To Timely Record  Material Provisions to
Case Basis Reserves..............................................................................121

c.      Defendants' Failure To Properly Value Credit Default Swaps ..........................123

IX.    SCIENTER ALLEGATIONS...............................................................................128

X.    APPLICABILITY OF PRESUMPTION OF  RELIANCE: FRAUD-ON-
THE-MARKET DOCTRINE ..........................................................................131

XI.    CLAIMS FOR RELIEF .........................................................................................133

FIRST CLAIM Violation of Section 11 of the Securities Act Against  SCA, Shea,
Giordano, and the Secondary Public Offering Underwriter Defendants ...................................133

SECOND CLAIM Violation of Section 11 of the Securities Act Against  SCA,
Shea, Giordano, and the Preferred Share Underwriter Defendants .................................135

THIRD CLAIM Violation of Section 12(a)(2) of the Securities Act Against  SCA,
Individual Defendants, and the Secondary Public Offering Underwriters ....................137

FOURTH CLAIM Violation of Section 12(a)(2) of the Securities Act Against
SCA, Individual Defendants, and the Preferred Share Underwriters .............................138

FIFTH CLAIM Violation of Section 15 of The Securities Act Against  the
Individual Defendants, XL Insurance and XL Capital ....................................................140

SIXTH CLAIM Violation of Section 10(b) of the Exchange Act and SEC Rule
10b-5 Against SCA and the Individual Defendants.........................................................141

SEVENTH CLAIM Violation of Section 20(a) of the Exchange Act Against  the
Individual Defendants and XL Capital ..........................................................................145

JURY TRIAL DEMANDED .....................................................................................147

ii

This is a complaint for violations of the federal securities laws.  Lead Plaintiff Employees' Retirement System of the State of Rhode Island ("ERSRI") and Plaintiff New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund ("NYHTC"), through their attorneys, bring this action on behalf of themselves and all others similarly situated, on personal knowledge as to themselves and their activities, and on information and belief as to all other matters based on investigation conducted by counsel, including, among other things, review of United States Securities and Exchange Commission ("SEC") filings by Security Capital Assurance, Ltd. ("SCA"), SCA press releases and other public statements, conversations with former SCA employees, securities analysts' reports and advisories, newspaper articles and media reports, court documents, and consultations with forensic accounting experts.

## I.    SUMMARY OF THE COMPLAINT

1.    This class action is for violations of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a *et seq*., and the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq*.  Plaintiffs bring this action on behalf of themselves and all other persons who purchased or otherwise acquired the common stock of SCA between March 15, 2007 and March 17, 2008, inclusive (the "Class Period"), including those who purchased or otherwise acquired shares in SCA's secondary public offering on or about June 7, 2007, and those who purchased or otherwise acquired Fixed/Floating Rate Series A Perpetual Non-Cumulative Preference Shares 6.88% 12/31/49-17 (the "Preferred Shares").   Plaintiffs complain of a fraudulent scheme and deceptive course of business that injured purchasers of SCA securities during the Class Period.

2.    Defendant SCA is a Bermuda-domiciled corporation formed in 2006 as a holding company for two subsidiaries that sell financial guaranty insurance.  As a financial guaranty

insurer, SCA, through its subsidiary XL Capital Assurance Inc. ("XLCA"), insures debt

securities against the risk of default.  In that capacity, SCA promises that if the issuer of the

security defaults on its obligation, it will pay the interest and principal to the security holder.

SCA also sells reinsurance through its subsidiary XL Financial Assurance Ltd. ("XLFA").  In

that capacity, SCA promises to indemnify other financial guaranty insurers against their

obligations to their own policyholders.

       3.      After its initial public offering in 2006, SCA and its management made the

decision to aggressively enter the market for insuring "collateralized debt obligations," or CDOs.

CDOs are debt securities that pay principal and interest to the security holder, with hundreds of

other securities serving as underlying collateral.  These hundreds of other securities can

themselves be backed by a variety of assets but, as relevant here, the CDOs insured by SCA were

ultimately backed by the interest and principal payments due on residential home mortgages.

       4.      SCA chose a particularly risky time to increase its exposure to residential home

mortgage debt.  Before this decision, as SCA knew, booming housing prices had resulted in an

overheated mortgage market.  The number of subprime loans — loans issued to risky borrowers

— was skyrocketing, and lenders were freely offering new types of especially risky loans that,

among other things, did not require documentation, down payment, or payment of any principal

for a prolonged period of time.  By the time SCA began ramping up its exposure to residential

mortgage debt, housing prices had already begun to tumble and mortgage delinquency rates — a

result of prevalent risky loan practices — had been steadily increasing for several years.

       5.      SCA also did not have internal data systems capable of assessing and monitoring

the risks associated with its mortgage-backed CDO exposure.  According to high-level former

employees of SCA, the data on SCA's computer systems had significant errors throughout the

Class Period, and often did not have basic information, such as SCA's exposure to subprime loans. Moreover, though SCA tried to evaluate the risks associated with each CDO it insured, it made no attempt to assess the cumulative risks associated with signing a total of nineteen similar deals in a roughly eighteen-month period. SCA gave no consideration to the fact that because these deals were backed by similar types of collateral, there was a high likelihood that if one suffered losses, they would all suffer losses simultaneously, thus severely taxing SCA's capital resources. As late as September 2007, the team responsible for underwriting SCA's deals first learned that ratings agencies like Fitch and Moody's considered SCA's entire book of business, and not just individual deals, to determine SCA's financial strength.

6.      Because of SCA's failure to maintain internal data systems capable of analyzing its increasingly risky book of business, SCA was incapable of properly quantifying and accounting for the probable losses inherent in its portfolio. As a result, SCA overvalued its contracts to insure mortgage-backed CDOs and failed to record appropriate "reserves" — i.e., liabilities for probable losses — throughout the Class Period. Moreover, SCA's failure to correctly calculate reserve liabilities was exacerbated by the fact that despite SCA's increased exposure to mortgage-backed securities, it continued to base its calculation of reserves on the book of business it maintained in 2004, a time when SCA was skewed heavily toward less-risky public finance securities. SCA's failure to appropriately account for these contracts caused SCA to falsely inflate its reported income, and understate its liabilities, until SCA finally disclosed losses of nearly $1.2 billion at the end of the Class Period.

7.      To make matters worse, with respect to a set of seven CDOs insured in 2007, SCA agreed to insure a non-senior tranche. CDOs issue thousands of notes backed by their underlying assets; these notes are divided into "tranches" based on seniority. The junior tranche

notes pay the highest interest, but are also the riskiest, because they absorb the first of any losses experienced if the underlying collateral falters. The senior tranche pays the least interest, and is the least risky, because it has first priority on any payment. With respect to these seven CDOs — more than half the total number of mortgage-backed CDO contracts SCA signed in 2007 — SCA did not insure the senior tranche, but instead insured the second most senior tranche. In conference calls and presentations to analysts throughout the year, however, SCA repeatedly, and falsely, insisted that it only insured senior tranches. When SCA finally announced $1.2 billion in losses for 2007, almost entirely due to its CDO exposure, more than half of the losses were caused by these non-senior tranches.

        8.      Finally, SCA consistently understated its exposure to subprime loans backing its CDOs. The CDOs involved in this action were collateralized by securities that themselves were backed by thousands of individual mortgage loans. Aware that investors were concerned about risks associated with subprime loans, specifically, SCA repeatedly assured market analysts that the CDOs it insured had strict limits on the amount of subprime loans that could be used as collateral. At various points throughout the Class Period, SCA disclosed the amount of subprime collateral backing its CDOs in order to demonstrate that SCA was not overly exposed to subprime mortgages. In so doing, SCA told investors that it defined "subprime" to mean borrowers with Fair, Isaac & Company ("FICO") scores below 640. However, as SCA would not reveal until after the end of the Class Period, when it had disclosed the amount of its subprime exposure, it had actually included only borrowers with FICO scores below 625. By leaving out borrowers with FICO scores between 625 and 640, SCA was able to materially understate its subprime exposure. So, for example, at the end of the second quarter of 2007, SCA

stated it had a roughly $2.7 billion exposure to subprime loans within its CDOs.  In fact, the true

exposure was closer to $4.2 billion.

9.      As SCA began to slowly reveal losses it was incurring on its mortgage exposure,

its stock price began to decline.  Ultimately, when SCA revealed over $1 billion in mortgage-

related losses, its stock price plunged from a Class Period high of $34.52 to a low of $0.60.  SCA

has since, for the most part, traded at prices under $1 per share and has warned that it will

consider whether it can continue as a going concern.

## II.    <u>JURISDICTION AND VENUE</u>

10.     The claims asserted in this complaint arise pursuant to sections 11, 12(a)(2), and

15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o), and pursuant to sections 10(b) and

20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule l0b-5 (17 C.F.R. §

240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to

section 22 of the Securities Act (15 U.S.C. § 77v), section 27 of the Exchange Act (15 U.S.C. §

78aa), and 28 U.S.C. § 1331.

12.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications and the facilities of the national securities

markets.

13.     Venue is proper in this District pursuant to section 22 of the Securities Act,

section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance

of the alleged fraud or its effects have occurred within this District, SCA conducts substantial

business in this District, and many transactions in SCA securities are believed to have occurred within this District.

### III.    PARTIES

14.    Lead Plaintiff Employees' Retirement System of the State of Rhode Island ("ERSRI") purchased shares of SCA at artificially inflated prices during the Class Period and has been damaged as a result.  The certification of Lead Plaintiff has previously been filed with the Court.

15.    Plaintiff New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund ("NYHTC") is a Taft-Hartley pension fund located at 305 West 44th Street, New York, New York.   As set forth in the accompanying certification, NYHTC purchased Preferred Shares on or about March 29, 2007, pursuant and traceable to a private placement that was completed on April 5, 2007.  The NYHTC exchanged the private placement Preferred Shares for registered Preferred Shares pursuant to an Offer to Exchange filed with the SEC on Form S-4/A on or about November 19, 2007 ("Exchange Offer").  On or about November 28, 2007, NYHTC purchased $450,000 face value of the Preferred Shares pursuant and/or traceable to the Exchange Offer.

16.    Defendant SCA is a Bermuda corporation with executive offices located at 26 Reid Street, Hamilton, Bermuda.  SCA provides financial guaranty insurance and reinsurance through its wholly-owned subsidiaries XLCA and XLFA, the former of which conducts business at 1221 Avenue of the Americas, New York, NY 10020-1001.  Throughout the Class Period, SCA securities were actively traded on the New York Stock Exchange under the symbol "SCA."

17.    Defendant Paul S. Giordano ("Giordano") was, at all relevant times, SCA's president, chief executive officer ("CEO"), a director, and chairman and CEO of XLCA.

18.     Defendant David P. Shea ("Shea") was, at all relevant times, SCA's chief financial officer ("CFO"), principal accounting officer and executive vice president.

19.     Defendant Edward B. Hubbard ("Hubbard") was, at all relevant times, SCA's executive vice president and chief operating officer, president and chief operating officer of XLCA, and a member of SCA's executive committee.

20.     Defendant Richard Heberton ("Heberton") was, at all relevant times, senior managing director and chief credit officer of XLCA.

21.     Defendant XL Capital, Ltd. ("XL Capital") is a global provider of insurance and reinsurance coverage with offices at XL House, One Bermudiana Road, Hamilton HM11, Bermuda.

22.     Defendant XL Insurance Ltd. ("XL Insurance") is a wholly-owned subsidiary of XL Capital and sold in excess of 9.6 million shares of SCA in the secondary public offering.

23.     Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("ML"), Goldman, Sachs & Co. ("Goldman Sachs") and J.P. Morgan Securities Inc. ("J.P. Morgan") served as financial advisors and assisted in the preparation of SCA's secondary public offering.  These Defendants are collectively referred to as the "SPO Underwriter Defendants."

24.     Defendants Lehman Brothers ("Lehman") and Wachovia Securities ("Wachovia"), along with ML, served as financial advisors and assisted in the offering of SCA's Preferred Shares.   Defendants Lehman, Wachovia, and ML are collectively referred to as the "Preferred Share Underwriters Defendants."

25.     Defendants Giordano, Shea, Hubbard, and Heberton are referred to collectively as the "Individual Defendants."

26. During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of SCA and/or XLCA, was privy to confidential and proprietary information concerning SCA's operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning SCA, as discussed in detail below. Because of their positions with SCA, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects through internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees and through reports and other information provided to them in connection therewith. Each of the Individual Defendants signed SCA financial statements that were filed, and required to be filed, with the Securities and Exchange Commission, or spoke on behalf of SCA. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified in this complaint had not been disclosed to, and were being concealed from, the investing public, including Plaintiffs, and that materially and affirmatively false and misleading statements as specified in this complaint were being made to the public.

27. Each of the Defendants is liable as a direct participant in the wrongs complained of in this complaint. In addition, the Individual Defendants and Defendant XL Capital, by reason of their status as executive officers, substantial shareholders, and/or directors were each a "controlling person" within the meaning of section 20 of the Exchange Act and had the power and influence to cause SCA to engage in the unlawful conduct. Because of their positions of control, the Individual Defendants and Defendant XL Capital were able to and did, directly or indirectly, control the conduct of SCA's business, and controlled or possessed the authority to

control the contents of SCA's reports, press releases, SEC filings, and presentations to securities analysts (and, through these analysts, to the investing public, including Plaintiffs). The Individual Defendants and Defendant XL Capital were provided with copies of SCA's reports, filings and press releases that are alleged to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, each of the Individual Defendants and Defendant XL Capital had the opportunity to commit the fraudulent acts alleged in this complaint, and is liable for the misrepresentations contained in those documents.

28.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in SCA's public filings, press releases, and other publications are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers and directors of SCA and/or XLCA, by virtue of their high-level positions with SCA, directly participated in the management of SCA, was directly involved in the day-to-day operations of SCA at the highest levels, and was privy to confidential proprietary information concerning SCA and its business, operations, growth, financial statements, and financial condition. The Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged in this complaint, knew or recklessly disregarded that the false and misleading statements were being issued regarding SCA, and approved or ratified these statements, in violation of the federal securities laws.

29.    As officers, directors, and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual

Defendants and Defendant XL Capital each had a duty to promptly disseminate accurate and truthful information with respect to SCA's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the SCA's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' and Defendant XL Capital's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30. The Individual Defendants and Defendant XL Capital participated in the drafting, preparation, or approval of the various public and shareholder and investor reports and other communications complained of in this complaint and were aware of, or recklessly disregarded, the misstatements and omissions, and were aware of their materially false and misleading nature. Because of their board membership, substantial ownership, or executive and managerial positions with SCA or XLCA, each of the Individual Defendants and Defendant XL Capital had access to the adverse undisclosed information about SCA's business prospects and financial condition and performance as particularized in this complaint and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about SCA and its business issued or adopted by SCA materially false and misleading.

31. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of SCA securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding SCA's business, operations, management,

earnings, and the intrinsic value of SCA securities; and (ii) caused Plaintiffs and other members of the Class to purchase SCA securities at artificially inflated prices.

## IV.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

32.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of SCA between March 15, 2007 and March 17, 2008, inclusive (the "Class Period") and who were damaged thereby (the "Common Shares Class"), and all those who purchased or otherwise acquired Preferred Shares pursuant and/or traceable to: (1) the Private Placement completed on or about April 5, 2007; or (2) the Exchange Offer and who were damaged thereby (the "Preferred Shares Class") (together, the Common Shares Class and Preferred Shares Class are referred to as the "Class").  Excluded from the Class are Defendants, the officers and directors of SCA at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

33.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SCA had between about 64.1 million and about 65.2 million shares of common stock outstanding, which were actively traded on the NYSE. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SCA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law.

35.    Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class action and securities litigation.

36.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts;

    (b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of SCA; and

    (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

37.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

V.    **SUBSTANTIVE ALLEGATIONS**

      a.  **Background Facts**

38.    Financial guaranty insurers, such as SCA, protect against the risk of default by the issuer of a particular debt security.  The financial guarantor issues a policy for a particular security, such as a bond or a note, and promises to pay the security holders their principal or interest if the issuer of the bond defaults on its obligations.  Typically, the security's issuer or underwriter buys insurance from the financial guaranty insurer when the security is first created and sold to the public, either to make the security more attractive to investors (and thus lower the interest rates that the issuer must pay to investors), or to protect the underwriter against the risks inherent in its own retained holdings of the security.

39.    Financial guaranty insurers depend on maintaining high credit ratings with the major credit ratings agencies: Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's ("S&P"), and Fitch, Inc. ("Fitch").  These agencies determine the "financial strength" of the insurer by examining the securities that are the subject of the insurance policies.  They first consider the current economic environment (the "base case"), and examine the likely performance of the security under current economic conditions.  They then hypothesize different, and more unfavorable, economic environments to determine how the security performs under less favorable conditions ("stress testing").  Using the results of the stress tests, they compare the risks of the security's default — and thus the risks that a claim will be made on the insurance policy — to the insurer's available capital.  The insurer then receives a rating that represents its ability to meet its obligations in the event that there are claims on the policies.  A high rating means that the insurer is in a position to pay projected claims; a low rating means the insurer is not, in the ratings agency's judgment, able to pay likely claims.  Thus, in general, an insurer who

insures riskier securities must maintain more capital available to pay claims if it wants to receive

high financial strength ratings.  And, because anyone seeking to buy financial guaranty insurance

will only do business with insurers that have sufficient capital to pay claims in the event of

default, it is critical that a financial insurer maintain high financial strength ratings simply to

attract clients.  Indeed, as SCA explained in its 2006 Report on Form 10-K, issued just before the

beginning of the Class Period:

> The maintenance of our triple-A ratings is essential for us to
> continue to operate in the triple-A financial guarantee insurance
> and reinsurance markets.  As of December 31, 2006, our financial
> guarantee insurance and reinsurance subsidiaries have been
> assigned a "AAA" (Extremely Strong) financial strength rating
> from S&P, a "Aaa" (Exceptional) financial strength rating from
> Moody's and a "AAA" (Exceptionally Strong) financial strength
> rating from Fitch, the highest rating categories used by each of
> these rating agencies.
>
> Any decrease in the ratings of any of our insurance or reinsurance
> subsidiaries below current levels by any of the rating agencies
> would have a material adverse effect on our ability to compete
> with other large monoline financial guarantee companies, which
> are our principal competitors, all of which currently have triple-A
> ratings from S&P, Moody's and Fitch.

40.    XLCA and XLFA are SCA's two operating subsidiaries.  XLCA provides direct

insurance; XLFA reinsures obligations taken on by other financial guaranty insurers.  XLCA and

XLFA were originally established in 2000 and 1999, respectively, as subsidiaries of Cayman

Islands insurance company XL Capital.  In March 2006, XL Capital formed SCA as a holding

company for XLCA and XLFA, in anticipation of spinning off its financial guaranty business as

a separate entity.  SCA held its initial public offering on August 4, 2006, at which time XL

Capital sold a portion of its interest in SCA, leaving it with 63% of SCA's common stock.

41.    XLCA provides insurance on a number of different types of debt securities, such

as securities backed by commercial loans, and US municipal bonds.  As relevant here, XLCA

- 14 -

also provides insurance on a type of asset backed security ("ABS") known as residential mortgage-backed securities ("RMBS") and on CDOs.

42.     When a mortgage loan company, such as Countrywide Financial Corp. ("Countrywide"), issues a mortgage, it will typically sell ownership of the loan to an investment bank.  Countrywide, or another company, will continue to "service" the loan by collecting payments and dealing directly with borrowers, but payments on the loan will be transferred to the investment bank.  A RMBS is created when the investment bank packages thousands of individual residential mortgage loans into a pool and then transfers ownership of the pool to a trust.  The trust issues debt securities, which are then purchased by investors, and the mortgages in the pool serve as collateral.  The monthly interest and principal payments from the loan pool are used to make monthly interest and principal payments to the security holders.  Each RMBS contains thousands of underlying loans that serve as collateral for the securities issued by the trust.  If enough of the individual loans in the pool default, the purchaser of the security may not receive scheduled interest or principal payments.

43.     Typically, the trust issues several different classes, or "tranches," of RMBS, representing different risk levels.  Investors who purchase the riskiest class are paid the highest amount of interest to compensate them for the risk, while the investors purchasing the least risky, or senior, tranche are paid the least amount.  According to an SEC report titled "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies," dated July 8, 2008, investment banks try to structure any particular pool so as to have the largest possible senior tranche, because the low interest payments make the senior class the cheapest for the investment bank to issue.

44.     The risk associated with a particular tranche depends on the degree of "credit enhancement" it is provided.  Credit enhancement is created in three different ways.  First, credit enhancement is provided through seniority: the senior tranche has first priority on payments made by individual borrowers.  For example, for the first few years, principal payments may go only to the senior tranche, while interest payments are divided among the tranches.  The amount of protection afforded a tranche through this mechanism is known as its degree of "subordination."  Subordination of 10%, for example, means that the entire RMBS must experience losses of 10% before that tranche will experience losses.  If an insurer provides protection for that tranche, it is said to have "attached" at the 10% level, meaning that the insurer becomes responsible for covering losses when the 10% loss level is breached.

45.     Credit enhancement is also provided through "overcollateralization," meaning that the principal due from loans in the pool exceeds the principal balance of a particular RMBS tranche.  Typically, in the event of some specified number of loan defaults or deterioration of the underlying collateral such that overcollateralization falls below specified levels, any additional payments by the borrowers may be paid only to the senior tranche, with the junior tranches receiving payment only after the senior tranches have been paid.  This sort of safety mechanism is known as an "overcollateralization trigger."  Consequently, the senior tranche would not incur any loss until all the lower tranches have absorbed losses from the underlying loans.

46.     Finally, credit enhancement is provided through "excess spread," meaning that the interest payments due from the individual mortgage holders is greater than the interest payments due to a particular tranche.

47.     Ratings agencies evaluate the loans held by the RMBS as well as the structure of the RMBS in light of market conditions, and issue ratings for each RMBS tranche.  The rating

represents the degree of risk of nonpayment.  As with the agencies' ratings of financial insurers, a high rating reflects a high likelihood of repayment.  It is common for the investment bank to work with the ratings agency to develop a tranche structure that will ensure the highest ratings for the senior tranches.

48.     Collateralized debt obligations, or "CDOs," are created in the same way that RMBS are created.  The difference is that instead of using loans as collateral for the securities issued by the trust, a CDO uses other securities backed by loans — such as RMBS, or other securities backed by consumer loans such as auto loans, student loans, and credit card loans.  Thus, whereas an RMBS may be backed by 5,000 loans, a CDO may ultimately be backed by many times that number, packaged in the form of various securities.  So, for example, the CDOs insured by SCA that are at issue in this litigation typically contained 150 different securities, each backed by thousands of individual loans, and, in addition to those, also held other CDOs, each of which themselves contained many more thousands of individual loans.

49.     It is because CDOs contain so many other securities, each of which has its own structure and collateral pool, that they are considered extremely opaque and difficult to evaluate.  As Gretchen Morgenson wrote in a February 2007 article for the *New York Times*:

> Relying on rating agencies to analyze the risk in collateralized debt obligations may be unwise, however. Back in May 2005, Alan Greenspan noted the complexity of collateralized debt obligations and the challenges they pose to "even the most sophisticated market participants." He warned investors not to rely solely on rating agencies to identify the risks in these securities.
>
> THAT is also the view of Joshua Rosner, a Managing Director at Graham & Fisher & Company, and Joseph R. Mason, associate professor of finance at Drexel University's LeBow College of Business. The pair published a paper last week, "How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?" analyzing C.D.O.'s. The Hudson Institute, a

- 17 -

nonpartisan policy research organization in Washington, financed their research.

Mr. Mason and Mr. Rosner find that insufficient transparency in the C.D.O. market, significant changes in asset composition, and a credit rating industry ill-equipped to assess market risk and operational weaknesses could result in a broad financial decline. That ball could start rolling as the housing industry weakens, the authors contend.

"The danger in these products is that in changing hands so many times, no one knows their true make-up, and thus who is holding the risk," Mr. Rosner said in a statement. Recent revelations of problem loans at some institutions, he added, "have finally confirmed that these risks are much more significant than the broader markets had anticipated."

50.      For example, in July 2007, SCA explained that when it insured RMBS, it took care to exclude certain nonperforming loans from the pool of loans it insured.  However, such precautions are not possible with a CDO, because there is so little visibility and control over the individual loans that ultimately back the security.  Indeed, as described further below, on an August 3, 2007 conference call with market analysts, SCA admitted that because a single CDO may ultimately be backed by tens of thousands of securities, it was not capable of examining all of the collateral backing the CDOs it insured.

51.      CDOs are made even harder to evaluate because their contents change.  The managers of the investment pool collateralizing the CDO are typically empowered to buy and sell trust assets, so long as they remain within specified guidelines regarding the types of securities they may buy and the ratings of such securities.  Thus, the securities that serve as collateral for a CDO at the time of its creation may not be the same securities that collateralize the security at a later date.

52.      According to the SEC's July 2008 report, because it is so hard to evaluate and monitor the assets serving as collateral for the various CDO tranches, during the Class Period,

ratings agencies typically evaluated the performance of a CDO by determining whether any of its "overcollateralization" triggers had been breached. However, these trigger mechanisms, by themselves, are poor means of evaluating performance. Because each asset in a pool is a security containing thousands of loans — including, in SCA's case, roughly 21% of other CDOs — losses can build for an extended period of time before triggers are breached, without the observer becoming aware of it. If the assets contain similar types of collateral, the CDO is particularly vulnerable; each asset may simultaneously experience faltering performance —  such as individual loan defaults — without breaching any triggers, until defaults reach a point where multiple assets fail, simultaneously.

53.     There are other reasons that triggers make for a poor mechanism for monitoring collateral performance. As explained above, CDOs provide credit enhancement by maintaining collateral values in excess of liabilities due to security holders. These collateral values are based on the amounts due from the individual borrowers, and not the trading price of the actual collateral in the market. According to S&P's March 21, 2002 "Structured Finance" report, CDO managers may be tempted to keep the degree of overcollateralization within required levels (and thus avoid tripping a trigger) by purchasing discounted or lower-rated securities that will improve collateral values in the short-run, but threaten the long-run credit quality of the portfolio. In so doing, the manager may delay the early trip of an overcollateralization trigger, but at the risk of more severe future losses.

54.     Additionally, overcollateralization triggers are not tripped when an underlying loan in a pool has been modified due to the borrower's inability to make scheduled payments. In June 2007, Fitch released a report observing that mortgage lenders often allow subprime borrowers to modify the terms of their loan to avoid a foreclosure. Fitch explained that there is

no way to tell how well a loan will perform after such a modification; thus, the mere fact that the borrower was unable to meet the terms of the original loan may be a powerful indicator of the likelihood of a future default.  However, such modifications are not categorized as defaults for the purposes of a CDO, and thus do not affect overcollateralization triggers.  In other words, loan modifications may substantially increase the risk profile of the collateral without tripping a trigger.

### b.  Mortgage Industry and Securitization

55.    In the lending industry, consumers are segmented according to their credit-risk profiles.  "Prime" borrowers are the most stable, and "subprime" borrowers have weaker or damaged histories that render them a credit risk; "midprime" represents a middle category.  Although many lenders have internal models that they use to segment consumers, industry standards are set by various criteria, including the scores created by the commercial entity Fair, Isaac & Company.  Fair, Isaac scores, or FICO scores, operate on a scale from 300 to 850.

56.    Beginning in the mid-1990s, there was a drastic increase in mortgage lending and in particular subprime mortgage lending.  From 1994 to 2005, the subprime home loan market grew from $35 billion to $665 billion, and from 1998 to 2006, the subprime share of total mortgage originations climbed from 10 % to 23%.

57.    In overall dollars, subprime loans grew from $150 billion in 2000 to $529 billion in 2004.  The growth of the subprime market spawned a host of new types of home loans targeted to risky borrowers.

58.    The adjustable-rate mortgage ("ARM") features an interest rate that is periodically adjusted based on a variety of indices.  The adjustment can be sharp, and result in a "payment shock," where a borrower is suddenly confronted with a much larger payment than

they had been making. ARMs accounted for 1.3% of all loans in 2003, but that number jumped to 4.3% for 2004 and 10.3% for 2005 while the percentage of fixed rate mortgages ("FRM") dropped from 43.3% to 26.1%.

59.    An interest only mortgage ("IOM") permits the borrower to pay only interest for a fixed period of time, usually five to ten years. As a result, borrowers do not draw down on the principal for that period and earn no equity. IOMs are targeted to borrowers, like those whose finances are tight or who expect fluctuating incomes, who want lower initial payments. A negative amortization mortgage is a type of IOM that features a periodic minimum payment that is less than the interest charged for that period. The result is that the outstanding principal grows. The low payments entice buyers into more costly homes.

60.    An "option-ARM" is an ARM that permits the borrower to choose how large a payment they will make from among options offered by the lender. The options include features like interest only or negative amortization. And a hybrid mortgage starts out as a fixed rate mortgage with a short term "teaser" rate but converts to an ARM after a specific time. These are especially attractive to people who plan to sell before the fixed rate period expires. Option-ARMs frequently result in "payment shock" when there is a sudden and sharp increase in payment.

61.    Coincident with the growing prevalence of these risky loans, lenders also made it easier for borrowers to qualify for loans, including the reduction or complete elimination of down payments (high loan to value), and no verification of employment, income and asset data (also known as liar's loans or stated income loans). Variations include the "low-doc" loan, where income is not verified and "no-doc" loan, where income, assets and employment are all not verified. From 2001 to 2006, about 50% of all first mortgages had a loan-to-value (LTV) ratio

greater than 80% (in other words, less than 20% down), and these loans are more than three times as likely to default as loans with a LTV ratio below 80%. And by the end of summer 2006, First American LoanPerformance reported that stated income loans accounted for a third of new loans.

62.     These issues were not isolated to the subprime market. So-called alternative-A, or Alt-A mortgages also became more common place. Alternative-A, or Alt-A, mortgages are those where the borrowers may have relatively good credit, but the loan standards used, such as high LTVs or no income verification, do not conform with agency mortgages — ones guaranteed by the government-sponsored enterprises Fannie Mae and Freddie Mac. In 2006, interest-only loans, 40-year mortgages and option-ARMs comprised more than 75% of Alt-A issuance.

63.     New types of risky loans infiltrated the prime market as well. In addition to primary mortgages, many people who took out mortgages on high priced properties during the housing boom used a home equity line of credit ("HELOC") to finance the down payment. A home equity line of credit is a revolving credit line with a limit proportionate to the homeowner's equity in their property. However, these HELOCs resulted in a high rate of delinquencies—as of the end of the third quarter 2007, delinquencies on HELOCs were up 47% year over year.

64.     Also, piggyback loans — where borrowers simultaneously take out a second loan for the down payment on a mortgage — experienced an exponential rise in 2005, with Home Mortgage Disclosure Act reports filed by 8,850 lenders that year showing an 84% increase in piggyback loans. In 2006, S&P reported that these piggyback loans were 43% more likely to default than a standard mortgage.

65.     A further problem with these non-traditional loans was the absence of performance history. Commenting on subprime mortgages, William Apgar, a senior scholar at Harvard University's Joint Center for Housing Studies stated in a March 2007 *Boston Globe*

article that it's "a whole class of mortgages that have never been tested in a down market," and that there is "a potential for quite a dramatic increase in foreclosures." In October 2006, then Managing Director at Moody's, Mark DiRienz, stated in an article for *Mortgage Banking* that because there is "no large database of historical performance data for new mortgage products such as option-ARMs" Moody's had to make assumptions and analyze how, for instance, an interest only loan will perform in a subprime arena based on the performance of higher LTV loans.

66.    During a conference call in May 2007, described further below, SCA would admit that "You cant look, especially in subprime when a lot of these products didn't even exist 15 years ago, and rely on historical data to make a quantitative analysis."

67.    As these increasingly risky and new forms of mortgages were packaged into peculiarly opaque securities like CDOs and RMBS, ratings agencies did a booming business in evaluating them. However, according to the SEC's July 2008 report, the ratings agencies did not thoroughly investigate these securities before awarding them high ratings.

68.    For example, according to the SEC, between 2002 and 2006, the number of RMBS and CDOs being packaged and sold to investors dramatically increased. The ratings agencies largely added staff commensurate with the increases in volume for RMBS, but did not do so for CDOs, hobbling their efforts to properly evaluate CDO securities. The SEC found that internal documents at the agencies themselves reflected analysts' awareness that they had not properly evaluated the risk associated with numerous deals. For example, one internal email, dated December 2006, said, "Let's hope we are all wealthy and retired by the time this house of cards falters.;o)." Another, from April 2007, noted that the firm's model did not capture "half" the deal's risk, and remarked, "it could be structured by cows and we would rate it."

69.    The SEC also found that the agencies had subjective and undisclosed criteria for evaluating securities, or internal criteria at odds with published criteria.  For example, one agency publicly stated that in rating RMBS, it evaluated the mortgage lender and mortgage servicer.  In fact, the agency had ceased conducting such reviews.  On numerous occasions, the agencies' models would predict various loss levels, but the loss levels were then adjusted by analysts with no explanation for or documentation of the change.

70.    The SEC also concluded that the agencies did not devote resources to monitoring RMBS and CDOs once they had been rated initially.  Even when the models for RMBS and CDOs changed, the agencies rarely reevaluated securities that had been rated under the original models using the new criteria, unless there had been an obvious performance deficiency.  As one email from July 2005 put it:

> I think the history has been to only re-review a deal under new assumptions/criteria when the deal is flagged for some performance reason. I do not know of a situation where there were wholesale changes to existing ratings when the primary group changed assumptions or even instituted new criteria. The two major reasons why we have taken the approach is (i) lack of sufficient personnel resources and (ii) not having the same models/information available for surveillance to relook [sic] at an existing deal with the new assumptions (i.e., no cash flow models for a number of assets).

71.    Finally, the SEC noted that the agencies often operated under a conflict of interest because their fees were determined by the securities' issuer.  As the SEC concluded, "Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."

72.    By the beginning of the Class Period, the problems with ratings agencies were well known.  For example, in September 2006, Congress passed the Credit Rating Agency

Reform Act, granting the SEC oversight over the agencies.  Senator Richard Shelby was quoted in *CFO Magazine* as saying that the statute was needed because "The dominant rating agencies failed millions of investors by neglecting to lower their ratings on Enron, WorldCom and other companies headed for bankruptcy."  However, the provisions of the Act did not take substantive effect until the latter half of 2007, after the SEC promulgated implementing regulations.

73.    As the market for CDOs grew, analysts and market participants grew concerned about the high ratings these securities received.  On November 1, 2006, *Marketwatch* reported:

> Most banks have passed on a lot of risk to the credit markets,
> having sold most risky mortgages as mortgage-backed securities
> (MBSs). However, many banks turn around and also buy MBSs,
> along with complex instruments to hedge their bets. These
> securities have not seen any major downgrades in their credit
> ratings either, though some credit ratings analysts have confessed
> they do not have much empirical data for the new exotic types of
> mortgages that have been sold to homeowners who didn't qualify
> under previously stricter lending standards.

74.    Similarly, Morgenson's February 2007 *New York Times* piece reported:

> One of the arguments for why mortgage loan pools have held up
> even as the subprime mortgage industry has collapsed is that their
> collection of a wide array of debt obligations provides a margin of
> safety. In addition, downgrades on these loans from the major
> rating agencies have been relatively modest.

> This is puzzling, given the wreckage in the subprime market—
> lenders going bankrupt, stocks of issuers falling, default rates on
> new loans well above historical averages….

> "Seeing weaknesses in collateral or subprime loans, we have
> increased our loss expectations by 25 to 30 percent," said
> Debashish Chatterjee, a senior analyst in the residential mortgage-
> backed securities area at Moody's. "We see the ratings outstanding
> on deals securitization in 2005 and 2006 and have taken steps to
> provide credit enhancement on them."

> But credit enhancement does not necessarily involve cash. Instead,
> the cushion can be additional mortgages or loans, which may also
> become vulnerable.

75.    Making matters worse, because these loans had been issued so recently, they were "unseasoned."  Lenders are familiar with the concept of "seasoning," which means that after a loan is first issued, it takes some time, often at least several months, before the lender can get a sense of how the loan is performing.  This is because loans cannot become delinquent until some time has passed without the borrower paying amounts due and, often, even risky borrowers may manage to make the first few payments before becoming delinquent.  Seasoning is a particularly important concept when it comes to loans with balloon payments or sudden interest rate changes, like option-ARMs, because borrowers who may be able to make timely payments at low interest rates may find themselves unable to pay when the interest rates increase.  It is for this reason that an October 2006 article in the *Denver Post* likened option-ARMs to "ticking bombs," writing:

> **Option ARMs: a ticking bomb? Experts say the risky home loans could fuel a future wave of foreclosures**
>
> Borrowers in option ARMs typically have four payment options each month: a 30-year loan term; a 15-year loan; an interest-only loan; and a minimum-payment option that adds unpaid interest to principal - also known as negative amortization….
>
> As recently as 2003, fewer than one out of 200 new mortgages carried a negative amortization option, according to Loan Performance, a San Francisco company that tracks the payment performance of 50 million mortgages each month.
>
> Through the first half of this year, more than one out of 10 new mortgages carried a negative amortization option. In Colorado, 6.4 percent of mortgages made in the first half of the year fit that category. …
>
> About seven out of 10 borrowers use the minimum-payment option, according to investment bank UBS.
>
> The unpaid interest is added back to principal. Once principal exceeds 110 percent or 115 percent of the original loan, the minimum- payment option goes away. Borrowers are then faced with a payment double or triple the minimum.
>
> Too many borrowers who take out option ARMs think they are getting a low fixed-rate loan and don't realize that their principal

- 26 -

will grow, said William Klaess, a Vice President with American
Guaranty Mortgage in Greenwood Village.

'This loan is a dangerous loan,' Klaess said. 'I can see the storm
clouds forming from the foreclosures that this loan is going to
create.'

76.     Because there were so many new types of loans, issued to borrowers with

increasingly poor credit history, the lack of seasoning made these types of loans especially

unpredictable.  In February 2007, *The Economist* reported:

> An over-reliance on unseasoned risk models is also partly to blame
> for bad underwriting. Subprime and alternative mortgages belong
> to "uncharted territory", says Sheila Bair, head of the FDIC,
> making "modelling credit performance exceptionally difficult".
> The chief executive of HSBC, Michael Geoghegan, admitted as
> much in a conference call last week: "You've got to have history
> for analytics...the fact of the matter is there [isn't history] for the
> adjustable-mortgage rate business when you've had 17 jumps in
> US interest rates."
>
> Should loan losses climb, investors in mortgage-backed securities
> will also get burnt, especially those holding the riskier, higher-
> yielding bonds. Financial engineers worked their mysterious magic
> with these securities, turning the junkiest mortgages into high-
> grade, sometimes AAA-rated, securities. They could do this only
> with the blessing of credit-ratings agencies, which made a
> profitable business out of rating these securities. *But critics say the
> agencies got complacent, and doubt the pooled loans were
> sufficiently diverse, or sliced up with sufficient art truly to have
> dispersed risk. One possible blind spot is that the dodgiest
> mortgages all behave similarly in times of stress. Another is that it
> is hard to avoid heavy exposure to mortgages from California, the
> biggest market in America, where alternative products were
> popular.*

(emphasis added).

77.     SCA itself demonstrated its understanding of seasoning when discussing its

insurance of RMBS directly.  During a conference call in October 2007, SCA identified various

RMBS deals of vintages between 2004 and 2006.  Despite the fact that these deals were actually

much *older* than much of the ABS CDO portfolio — and despite the fact that neither deal

- 27 -

involved ARMs which, by definition, result in a sudden increase in required payments — SCA stated that there was a "high degree of uncertainty due to limited seasoning" for these two deals.

78.    By early 2007, insiders involved in packaging loans and reselling them as securities were well aware of the direction of the mortgage market. As early as summer of 2005, numerous forecasters saw the inevitability of the housing market crash. For instance, according to *The Economist* article titled "The Global Housing Boom: In Come The Waves," dated July 18, 2005, the housing market crash was certain, due to riskier forms of mortgage finance and rising interest rates. On July 21, 2005, a story published in *Forbes*, "The Pin That Bursts The Housing Bubble," predicted that the existence of such factors as low mortgage rates, lax lending standards, speculation, and increasing inventories will trigger a "downward price spiral." These concerns were addressed by Alan Greenspan, then the chairman of the Federal Reserve Board. In August of 2005, Greenspan warned that the risk of crash was certain if American homebuyers continued to drive property prices higher. *The Times* story "US Heading For House Price Crash, Greenspan Tells Buyers," dated August 27, 2005, noted that according to Greenspan, "the US house-price spiral had become an economic imbalance, threatening stability…."

79.    By fall 2006, the concerns about the housing market crash materialized. According to Stephen Roach, chief economist at Morgan Stanley, "America's housing bubble finally appears to be bursting." D.R. Horton and Toll Brothers Inc., the largest homebuilders, cut their 2006 outlook due to the increased inventory and low demand of homes on the market and a decline in buyer confidence. On October 15, 2006, an article published by *Home Equity Wire*, titled "Moody's Sees 'Crash,'" discussed an October 2006 report released by Moody's ("Housing at the Tipping Point"). According to the report, the downward spiral of the housing market was in "full swing" "with nearly 20 metropolitan areas set to 'crash'" in the near future. And in October

2006, the Center for Responsible Lending forecast that nearly 20% of vintage 2005 and 2006 subprime mortgages would end in foreclosure.

80.     Even Federal Reserve Board chairman, Ben Bernanke admitted that the decline in the housing market was worse than anticipated.  November 19, 2007, Reuters' "Timeline – The Credit Crunch of 2007" stated that the last quarter of 2006 was marked by the sharp slowing of the housing market, the increasing delinquency rates on subprime loans, foreclosures,[1] and a resulting wave of bankruptcies.

81.     On March 19, 2007, a *Businessweek* article with the headline, "Mortgage Meltdown: Who will get shredded?" opened with the line, "The canaries in the coal mine are keeling over fast."   The article continues:

> After years of easy profits, the $1.3 trillion subprime mortgage industry has taken a violent turn: At least 25 subprime lenders, which issue mortgages to borrowers with poor credit histories, have exited the business, declared bankruptcy, announced significant losses, or put themselves up for sale. And that's just in the past few months.
>
> Now there's evidence that the pain is spreading to a broad swath of hedge funds, commercial banks, and investment banks that buy, sell, repackage, and invest in risky subprime loans. According to Jim Grant of *Grant's Interest Rate Observer*, the market is starting to wake up to the magnitude of the problem, entering what he calls the "recognition stage." Says Terry Wakefield, head of the Wakefield Co., a mortgage industry consulting firm: "This is going to be a meltdown of unparalleled proportions. Billions will be lost."

---

[1] The 2006 foreclosure rate was up 42% from 2005 according to a RealtyTrac Press Release dated January 25, 2007.

82.     According to a Reuters story entitled, "FUND VIEW-CDO Market To See 'Massive Default Cycle'-F&C," dated March 30, 2007, "'[a] massive wave of defaults is set to hit the CDO (collateralised debt obligation) market following the sub-prime mortgage meltdown in the U.S., although this could take a year to play out,' a fund manager told Reuters."

83.     Indeed, after two Bear Stearns executives were indicted on June 18, 2008 for misrepresenting the risks associated with mortgage-backed securities held by Bear Stearns' hedge funds, it was revealed that the executives had known since March 2007 that the market was headed for a crash.  One of the executives predicted a "melt down" in the subprime mortgage marked in March 2007 based on their observations of the performance of their mortgage-backed CDOs, telling a colleague that, "the worry for me is that sub prime losses will be far worse than anything people have modeled."  After receiving reports of their CDOs' performance in the first quarter, the other executive wrote an email that said, "If we believe the [CDOs report is] ANYWHERE CLOSE to accurate I think we should close the funds now. The reason for this is that if [the CDO report] is correct then the entire subprime market is toast. . . ."

### c.   SCA's Structure

84.     As explained above, SCA was formed as a holding company to house XLCA and XLFA.  According to a former Vice President of SCA who worked with the Capital Modeling Group from shortly after the start of the Class Period through the end of the Class Period (the "Vice President"), though SCA's executive office was in Bermuda, SCA's senior executives resided in New York and conducted business out of XLCA's New York headquarters.  Little distinction was made between the personnel of the two companies: as the Vice President put it, "All of the decision making on the XLCA side was all done with, kind of at the same time, with SCA as well.  I mean it was all one functioning team."

85.    SCA had a total of 170 employees across all of its subsidiaries.  At a conference for market analysts and investors on May 17, 2008, XLCA's Head of Origination, Wynne Morris ("Morris"), described it as a "small" company.  SCA and XLCA organized the direct insurance business into several groups of specialists.  One group was devoted to "production" (i.e., generating and underwriting new business) in the area of Consumer Asset-Backed Securities, or "ABS" — that is, proposals to insure securities backed by consumer loans (including RMBS) as well as credit card loans, auto loans, student loans, and the like.  Another group was devoted to generating new CDO business.  In its handling and evaluation of CDOs, SCA distinguished between CDOs backed by consumer loans, including RMBS ("ABS CDOs") and other types of CDOs.  At the May conference, Morris explained that in originating new business, the relevant production staff "work[s] closely with the approximately 15 credit officers, the quantitative analysts housed in our credit group to underwrite new business here at XLCA."

86.    Other groups were devoted to analyzing proposed new insurance deals and to monitoring the deals that were in place.  As SCA explained at the May conference, SCA contained a Credit Department staffed with eight senior professionals, and headed by Heberton. The Credit Department was responsible for assessing the amount of risk inherent in each proposed new transaction.  Among other things, when SCA considered whether to insure a particular CDO tranche, the Credit Department examined the collateral underlying the CDO and the amount of credit enhancement in the tranche.  The Credit Department's analysis was then considered by SCA's and XLCA's "Credit Committee."  The Committee reviewed every deal; no contract could be signed without obtaining a certain number of "yes" votes from Committee members.  The Committee was chaired by Heberton.  In addition to Heberton, Hubbard (who, as SCA's executive VP, reported directly to Giordano), as well as Wynne Morris, SCA's Chief

Production Officer, were standing members of the Committee.  Other SCA and XLCA employees rotated through service on the Committee.  Both Heberton and Hubbard had the power to veto any proposed contract.  According to the Vice President, Giordano would sometimes attend Committee meetings; when he did not, Heberton or Hubbard would report to him what had occurred.

87.    SCA and XLCA also had a Surveillance Group, headed by Drew Hoffman and staffed with 12 employees, tasked with monitoring the performance of securities SCA had agreed to insure, and with determining likely losses in the event that a security performed poorly.  Three of the 12 employees focused on CDOs.  According to the Vice President, the Surveillance Group received quarterly or monthly "trustee reports" showing the performance of the underlying collateral.

88.    Additionally, SCA had a Quantitative Analysis Group that examined the structure of particular deals and ran various internal models (i.e., "base case" and "stress tests") to determine how the security would be likely to perform under various hypothetical, unfavorable market conditions.  The Capital Modeling Group, headed by Claude LeBlanc ("LeBlanc"), an SCA executive Vice President and member of the Executive Committee, was also responsible for "stress testing" securities that SCA insured or considered insuring; however, instead of using SCA's internal models, the Capital Modeling Group used models provided by the three ratings agencies in order to determine whether SCA had sufficient capital to maintain its own financial strength ratings under various unfavorable economic scenarios.  The Capital Modeling Group contained three employees.

### d.  SCA's Business and Accounting

89.     SCA, like many financial guaranty insurers, issued insurance both through

traditional insurance policies, and through a particular structure known as a credit default swap.

A credit default swap is a derivative contract that offers credit protection relating to a particular

security or pools of specified securities.  Under the terms of a credit default swap, the buyer of

protection pays a periodic fee, like an insurance premium, to the seller of protection in exchange

for compensation in the event that the insured security experiences default.  Financially, a credit

default swap functions very similarly to an insurance policy, but receives different accounting

treatment.  A credit default swap is recorded as an asset on the insurer's balance sheet, valued

based on its "fair value," i.e., its "market" price, were the insurer to sell its interest in the swap on

the open market.  However, because the credit default swaps used by SCA did not have standard

market prices, fair value was estimated based on upon a number of factors including changes in

interest rates, credit spreads, changes in credit quality, expected recovery rates and other market

factors.  Shea explained in a conference call with analysts on August 3, 2007, "Fair value

measurement should be determined based on the assumptions that market participants would use

in pricing the transaction."  As Giordano summarized the principle in a July 24, 2007 call with

analysts, the fair value measurement is "representational of what we think we would be able to

sell these for in the marketplace."

90.     Under this sort of accounting, the fair value of the swap is functionally equivalent

to the discounted value of the expected future cash flows the swap will provide in the form of

payments from the buyer of insurance.  Thus, over time, if credit spreads — i.e., the difference in

price for a low-risk investment versus a high-risk investment — narrow, the value of the swap

increases, because the swap's terms were set under the older, wider spread.  By contrast, if credit

spreads widen — which occurs when, as here, the market judges that the risks associated with the swap have increased, i.e., the risks have increased that the security will default and the holder of the swap will have to pay claims — the value of the swap will correspondingly decrease. This decrease in the fair value of the swap represents the market's judgment that the premium payments on the swap are not sufficient to cover the risk of losses.

91.    Credit default swaps differ from insurance policies in that the insurer does not have to post collateral to ensure payment of any claims under the policy, and thus does not have to record an expense for the cost of such collateral. In this sense, the swaps are "cheaper" than providing traditional insurance. However, on the other side of the coin, the "fair value" of the swap must be reassessed and updated in each of the insurer's periodic financial statements. Any declines in the value of the swap are recorded as "unrealized losses," and, as losses, they cause lowered earnings in the period in which they are recorded. In other words, if the value of a swap decreases — based on the market's judgment that premium payments are insufficient to offset against the risk of loss — the insurer's reported earnings will also decrease. The process of updating the fair value of a credit default swap is known as "marking to market."

92.    As the contract nears its expiration, the expected future premium diminishes, as does the contract's value. Thus, when the term of insurance ends, the contract reaches a zero value. However, if the insurance company expects to pay claims under the contract, those expenses will offset expected premium much more quickly, causing the contract to lose all value — and become negatively valued — well before its expiration. As relevant here, SCA insured all of its ABS CDO business using credit default swaps.

93.    Under Generally Accepted Accounting Principles ("GAAP"), as part of its insurance business, SCA was required to maintain "reserves," which are an estimate of the

ultimate costs to SCA of eventual insurance claims it will be forced to pay. Reserves are set

aside to ensure that the insurer has sufficient resources to pay any future claims when they arise.

The size of the reserves are based on the riskiness of the insurer's portfolio — all other things

being equal, if the insurance company insures only low-risk securities, its reserves will be

relatively low; if, on the other hand, the insurance company provides financial guaranty insurance

for very high-risk securities, it will set aside larger reserves to account for the increased

likelihood that it will be forced to pay claims. Increases in the insurer's reserves must be funded

by an offsetting charge against the insurer's earnings. Accordingly, any increase in reserves will

invariably result in a corresponding decrease in corporate earnings. Thus, in determining the

profitability of the insurer, accurate assessments of the riskiness of the loan portfolio are essential

and must be performed regularly. Investors in insurance companies are very attentive to the size

of the reserves, because they are an indicator of the stability and riskiness of the insurer's

portfolio, and of the insurer's ability to absorb losses without having to take additional future

charges against earnings.

94. During the Class Period, SCA maintained two types of reserves: "case basis"

reserves, and "unallocated" reserves. "Case basis" reserves were established when a particular

security insured by SCA performed poorly, either leading the insured party to give notice of a

claim, or, in the absence of a claim, leading SCA to believe that an eventual loss was "probable."

The size of the reserve was equal to SCA's estimate of the amount of the loss. "Unallocated

reserves," by contrast, were not based on the particular performance of any single policy, but

instead were established based on an actuarial analysis of SCA's entire insurance portfolio and

SCA's expected liabilities overall. SCA also established a system for specially monitoring any

security in its portfolio that appeared to be performing poorly. According to SCA's 2006 10-K, SCA's policy for special monitoring divided problem securities into four categories:

> (i) Special Monitoring List—investment grade credits where a covenant or trigger may be breached or is close to being breached and warrants closer monitoring; (ii) Yellow Flag List—credits that we determine to be non-investment grade but a loss or claim is unlikely; (iii) Red Flag List—credits where we do not expect an ultimate loss but a claim is possible but not probable; and (iv) Loss List—credits where we have either paid a loss or expect to suffer a loss and have recorded a case reserve. … Credits that are not closely monitored credits are considered fundamentally sound, normal risk.

### e. SCA Aggressively Enters Market for ABS CDOs

95. As explained above, well before the beginning of the Class Period, the risks associated with mortgage-backed collateral, particularly CDOs, were well known. Indeed, SCA was well aware of the problems in the industry; in 2006, for example, it refused to directly insure any subprime RMBS (although it continued to indirectly insure subprime RMBS, to the extent that subprime RMBS collateralized its CDOs). During an analyst conference call on August 3, 2007, Cassie Lau ("Lau"), head of SCA's Consumer ABS Group, stated that SCA had not insured subprime RMBS in 2006 because "[t]here were warning signs in the subprime market starting in 2005 . . .  It was obvious that home price appreciation and readily available credit were allowing borrowers, who would have otherwise defaulted, to prepay out of the pool."

96. Despite SCA's awareness of these problems, toward the end of 2006, SCA decided to aggressively enter the market for insuring tranches of ABS CDOs, particularly those backed by a significant amount of RMBS. In so doing, SCA rapidly and massively altered its risk profile by entering into approximately 19 new ABS CDO contracts that were backed by more than 50% RMBS within, roughly, a year and a half period — most of which contained

significant amounts of subprime RMBS.  Though SCA insured only tranches that were "AAA"
rated at the time of the deal, for the reasons described above, these ratings were not reflective of
the overall risks of the transactions.  As a result, SCA both overvalued its credit default swaps,
and underreserved for the risk of loss.

97.    SCA's push to sign new ABS CDO business — and, in particular, CDOs
ultimately backed by residential mortgage collateral — began in late 2006, when it negotiated a
deal with Merrill to sign several new contracts to insure tranches of ultimately eight different
ABS CDOs.  Merrill was anxious to go through with these deals because, as an underwriter, it
was in the business of packaging thousands of mortgage loans as RMBS to sell to investors.
With each sale, Merrill retained a tranche of RMBS on its own books; by 2006, as it saw the
dangers in the housing market, it was desperate to reduce its own exposure.  It planned to
package its RMBS holdings, as well as other securities backed by consumer loans, as a series of
CDOs.  Most of the tranches of these CDOs were sold to investors, but it retained the top
tranches on its own books, and sought insurance from SCA on the tranches it retained.  More
than half of the collateral in each of these CDOs consisted of RMBS, a significant portion of
which was subprime; the CDOs also contained other CDOs, which themselves contained RMBS
with significant subprime exposure.  After reaching an initial agreement in late 2006, the eight
CDOs were created, and the contracts between SCA and Merrill were executed, in late 2006 and
throughout 2007.

98.    These deals cumulatively exposed SCA to potential liabilities in excess of $3.74
billion.  Additionally, and unbeknownst to investors, for at least the seven deals executed in
2007, SCA did not insist on insuring the most senior tranche of each CDO, but instead agreed to
insure the second most senior tranche — meaning that SCA would not have the first claim to

payment in the event that the collateral began to falter.  Indeed, toward the end of the Class

Period, on December 12, 2008, Fitch would announce that SCA had fallen below capital

requirements to maintain its triple-A rating, in large part due to the fact that "SCA effectively

insured a non-senior layered tranche."

99.     In addition to agreeing to the Merrill deals, SCA agreed to insure several other

ABS CDOs with similar characteristics — namely, CDOs with collateral that was more than half

RMBS, that included other CDOs, and that included a significant amount of subprime RMBS.

Though SCA had entered 2006 with just six ABS CDO transactions on its books with these

characteristics, by the end of the year, it had signed an additional six deals — insuring amounts

well in excess of $6.5 billion — including one of the eight Merrill deals.  Many of these were

signed in the second half of the year.  Indeed, in February 2007, Giordano told investors that they

had hired another new CDO transactor in the fourth quarter — and two others earlier in the year

— in anticipation of further growth in 2007.  In 2007, SCA would ultimately sign a total of 13

deals to insure ABS CDOs that used RMBS for more than half the collateral, including the

remaining seven Merrill CDOs.  In the first half of 2007 alone, SCA would sign ten deals

(including six of the Merrill deals), bringing SCA's total exposure to these kinds of securities to

$14.7 billion.  ABS CDOs backed by more than 50% RMBS quickly overtook CDOs backed by

corporate loans as SCA's greatest CDO exposure — whereas at the end of the first quarter of

2007, SCA's greatest CDO exposure was to corporate loans, averaging 42.4% of its entire CDO

portfolio, by the end of the second quarter of 2007, ABS CDOs backed by more than 50% RMBS

was the SCA's greatest category of CDO exposure, representing 37.6% of  total CDO exposure

in 22 transactions (exposure to corporate loans represented 34.4% of the total in 62 transactions).

The underlying loans on these transactions consisted almost entirely of loans of 2006 and 2007 vintage, i.e., loans issued in those years.[2]

100.     These ABS CDOs typically were backed by about 150 different RMBS tranches, and 35 tranches of other CDOs.  By the end of the Class Period, the RMBS portion of these ABS CDOs across the portfolio was 31% subprime, but for any single deal the subprime portion of any RMBS could reach as high as 76%.

101.     Despite its rush to insure ABS CDOs, SCA actually had a very poor understanding of them.  To begin, SCA's computer systems functioned poorly, making it impossible for SCA to track deal performance.  According to a former employee of XLCA who worked as a Managing Director in the Credit Department from before SCA's IPO and throughout the Class Period, and who sat on the Credit Committee (the "Managing Director"), SCA had

---

[2]The allegations concerning which deals were signed, when, and the amounts insured are based on analysis of SCA's disclosures at the end of the first, second, and third quarters of 2007; the allegations in the complaint filed in *Merrill Lynch International v. XL Capital Assurance*; and the charts disseminated by SCA on September 5, 2007 and March 17, 2008 listing outstanding ABS CDO contracts individually.  These allegations are based on Plaintiffs' best estimates in light of the fact that SCA's disclosures on this point do not appear to be entirely consistent.  For example, one contract listed as being of 2007 vintage in the September 5, 2007 chart is identified as being of 2006 vintage in the March 17, 2008 chart.  The complaint filed in *Merrill Lynch International v. XL Capital Assurance* indicates that one contract was executed in April 2007, but given an effective date of March 29, 2007 — for the purposes of this Complaint, Plaintiffs assume that Defendants properly accounted for this contract in the second quarter of 2007, rather than in the first quarter.  In the March 17, 2008 chart, the Company discloses a total of 28 outstanding ABS CDO contracts, 25 of which are backed by more than 50% RMBS collateral.  It is unclear how this data is reconcilable with the Company's disclosure of 19 ABS CDO contracts at the end of the first quarter (disclosed on May 17, 2007), the Company's claim to have signed eight new ABS CDO contracts in the second quarter (disclosed on July 24, 2007), and the Company's claim to have 22 ABS CDO contracts with more than 50% RMBS collateral outstanding at the end of the second quarter (disclosed August 3, 2007), unless the Company also had additional exposures to ABS CDO contracts that contained less than 50% RMBS and that were never disclosed.  Finally, it is unclear why one contract listed as $893 million in the September 5, 2007 chart is listed as $1,119.1 million on the March 17, 2008 chart.

trouble monitoring the performance of its CDOs because the monitoring systems did not report in

real time and were "evolving," making it difficult for SCA to evaluate performance information

between quarters.  SCA operated on an in-house computer system called "EMPRES."  It was

tailored to SCA's portfolio and was intended to track exposures and the details of deals under

consideration.  However, the data on each deal had to be entered manually, and the system was

often changed, making the data unreliable and making it difficult for employees to keep up with

the system.  As the Managing Director explained, when he tried to investigate ABS CDO

exposure in the summer of 2007, the systems would not allow him to see SCA's total exposures.

102.    The Vice President also remembers that the EMPRES system functioned poorly.

The Vice President confirmed that the data was unreliable, giving a specific example: data was

changed daily, but the system did not track the changes that were made, making it impossible to

tell what had been edited or follow the trail of data.  The Vice President said that when he began

to work at SCA, the problems in the system were already common knowledge, so much so that

SCA began meeting with IT companies in early summer 2007 to commission a system upgrade.

The Vice President recalls:

> That was actually a known fact from the very, very beginning
> when I got there …and I'm not even talking as far as capital or
> losses.  I'm talking premiums… It was very very well known that
> you couldn't do projections because of the basics, the premium
> stuff in the system was wrong, there were wrong cash flows
> inserted into the EMPRES system that were never updated.   It was
> just one thing after another.

The Vice President stressed that everybody in the company, including the entire SCA Board and

its senior management, knew that the system could not report accurate numbers.  The Vice

President says that Mark Katz, the Chief Information Officer, often complained about the

system.

103.    The Vice President says that despite the known problems in the EMPRES system, it was not a pressing concern until "the shit hit the fan in July."  The attitude at SCA was, "if people can get all their reporting that they-quote-need, it's fine, and all they needed to see was, look we're making millions and millions of dollars every year."  The Vice President says that the ratings agencies were continually annoyed with SCA, because "it took 6, 8 sometimes 9 and 10 weeks for the data to get sent from SCA to one of the rating agencies, because they didn't have it."

104.    The Vice President was commissioned to write a memo in the summer of 2007 to educate the Board about the issues the Capital Group was facing regarding the rating agencies. The memo explained how the ratings agencies conducted their modeling, performed their stress tests, and gathered information from SCA, and also delved into the data problems that SCA was having with the EMPRES system.  The Vice President recalls that the memo was completed in July 2007 and distributed to the Board a week prior to their meeting.  The memo went through several drafts.  Originally, it was "open and honest about how bad EMPRES and the data at SCA was," but the memo was "toned down" by either LeBlanc or Heberton.   Even in its revised form, however, after describing in great detail the formulae and procedures used by the ratings agencies to determine capital adequacy, the memo stated, in relevant part:

> The main gathering of data is completed using a manual process via excel spreadsheets and is obtained from three basic sources: the Master Exposure Report (MER), EMPRES, and 'other' data repositories.  This 'other' category includes data from third parties and is received in various forms: DDF, excel spreadsheets, text files, etc. *Due to the different formats and layouts of this third party data, each file must be analyzed and reprocessed in order to make the data useful for our needs.  In addition, many necessary data elements are not available from the current EMPRES system; therefore, this missing data must be obtained through various spreadsheet and sources and, again, combined in a useful manner.* Currently, much of the missing data is obtained from various

outside sources (Bloomberg, Intex, etc.) by the surveillance department.

*** 

Once this raw data file is created, it goes through a "processing" phase which is manually completed by the capital management group using multiple excel spreadsheets.  This data processing includes the following: completing sector mappings from deal names and internal sectors to each of the agencies sector categories, the merging of CUSIP data (another of the "other" data sources) to obtain more accurate and complete deal ratings, and the aggregation of deals into credit level summaries.  The capital management group also manually completes look ups of default rates and discount factors based on deal ratings and remaining life, calculates severities based on agency sector categories, and incorporates agencies maturity logic to address the remaining life of each deal.  In addition, adjustments are made to address the layered loss deals in the portfolio, individual stop losses on deals, as well as the excess of loss benefit for the entire portfolio.  *Again, each step of this data process is completed manually in excel spreadsheets by the capital modeling group.  In many instances, these mappings and calculations are completed three times, once for each of the agencies, leaving the process open to many instances for human error in data preparation.*

*As the newer generation of models becomes more sophisticated, the data required can create more volatile results as well as results which are subject to error. While these simulation models encompass the portfolio as a whole, the results are driven by the details of the data on a deal level basis, stressing the importance of the accuracy and timeliness of data.* For example, the timing of reporting the termination of a deal not only affects the outstanding PAR, but also has an impact on the diversification or concentration of sectors in the portfolio, thus potentially changing the capital requirements on the entire portfolio, not just the deal itself. Depending on the size and the rating of any potentially terminated deals not reported as such, the capital variation may be significant.

*** 

Furthermore, all three agencies have additional information requests to supplement the data feeds, which vary regularly.  The majority of the data used to satisfy these requests is obtained directly from the EMPRES system as well as the Master Exposure Reports (MER) of both XLCA and XLFA; however, this is not the only type of additional information that is being requested. Detailed financial statements, premiums and earnings, leverage ratios, and investment portfolio summaries are among the other ad

hoc requests from the agencies. *While the EMPRES system and the MER have proven time and again to be extremely useful, the capital management group is currently working with various teams within SCA to improve (i) availability of data; (ii) accuracy of data; and (iii) timeliness of data in order to meet both internal and external rating agency requirements.  While material improvements have been made in this regard, significant improvements and challenges still remain.*

***

As mentioned in the previous section, *data has been and will continue to become an even more crucial part of the agency models*. The availability of needed data fields, the timeliness of the availability of data, as well as one central repository with which to access all of the necessary data would not only eliminate a considerable amount of processing time, but, even more importantly, *would reduce the potential for human error* during all of the manual processing that is currently completed.  *Data integrity is crucial in obtaining accurate capital results, both internally as well as at the hands of the agencies themselves.*

(emphasis added).

105.    The Vice President said that the memo was written to explain why the rating agencies were always upset with SCA's data at the end of each quarter.  "'You sent us this last week, now you're sending us this, this week and it's totally different,' — but it's because what's in the back of that memo, which is how the whole system, EMPRES system works and doesn't capture things and there's nobody really there to deal with data and it was actually something that our group ended up having to do."

106.    Eventually, the Vice President recalls, an IT expert was brought in to deal with these issues in October 2007.  The IT expert reported directly to Hubbard.  The Vice President stated that the IT expert was forced to review 4200 policies by hand to collect the relevant information, a process that continued throughout the end of 2007 and into 2008.

107.    The lack of information was particularly problematic when it came to CDOs.  As the Vice President explained, "with the CDOs the issue is that they take all of these hundreds of RMBS deals and they take the cash flows and they put them into a CDO so they're just not transparent at all."  Indeed, after the ratings agencies began asking for more information about what the CDOs contained in the summer of 2007, the Vice President explains that the Surveillance Group was "scrambling" to gather information on the underlying collateral — and that they continued to struggle as late as October and November 2007.  The Vice President stated that the ratings agencies specifically sought information on subprime exposure in August 2007, and SCA could not provide it.  The Vice President said that there was no information anywhere in the system about whether the collateral underlying the CDOs was subprime; the system would only show the basic CDO information, such as the size, the premium, the capital charge, and the cash flows that were expected on the CDOs.

108.    The Vice President was startled to discover just how little SCA knew about the CDOs it insured: "[E]ven if the surveillance team didn't know what was exactly in them, you would think that the people who wrote the business to begin with, who did the underwriting, all of the analysis to price it to take that risk would know what was in there."  But they did not.  The Managing Director confirmed that at the time the deal was first reached, SCA would look at each of maybe 200 RMBS underlying the CDO, but "we didn't look at each of the 5000 loans within that security, we just looked at the characteristics of that security."

109.    According to the Vice President, when the Merrill deals were finalized, there was no analysis of the amount of risk SCA had assumed in the Capital Modeling Group — instead, the members just assumed that because the tranches that SCA had agreed to insure had been highly rated by the ratings agencies, the deals were necessarily low-risk.

110.    The Vice President also stated that as late as October 2007, in attempting to get sufficient data to run models for the Capital Modeling Group, the Surveillance Group told the Vice President that SCA had no exposure to subprime risk.  The Managing Director had a similar experience:  according to the Managing Director's account, in the summer of 2007, "I had asked the CDO group for some specific information on risk and the deals that were done, and they just didn't want to give it to me to tell you the truth."  The Managing Director reports complaining to several people about the lack of information in that period.

111.    SCA's lack of information about its own portfolio was evident in its own confusing and contradictory public disclosures.  For example, as set forth in Footnote 2, on multiple occasions, disclosures about SCA's ABS CDO portfolio varied inconsistently, and inexplicably, across quarters.

112.    What SCA did know about the collateral underlying the CDOs was cause for significant concern.  The Managing Director examined the underlying collateral as it existed when a deal was proposed and noted that there was a concentration of interest-only strips and option-ARMs.  As the Managing Director put it, "We would never do them on a standalone basis but did them in CDOs."

113.    The Managing Director also explains that SCA was willing to sign deals to insure CDOs even when the mortgages underlying the RMBS were serviced by bankrupt companies or companies that had been "flagged" as having poor ratings from ratings agencies.  This was a problem, the Managing Director explained, because "when a company starts to go bad they tend to reach to do almost anything just to keep things going forward . . . that's one of my big fears that a company that's going bankrupt they start skimping on the due diligence on the underlying loans they start taking on risks that they normally wouldn't take on."  The Managing Director

- 45 -

stated that SCA would accept a deal if approximately 5% of the underlying loans were serviced

by a company that was entirely bankrupt — a figure that does not account for service by a

struggling company. The Managing Director recalls that in one Credit Committee meeting, the

deal under consideration had 10-12% of the underlying collateral served by companies that were

no longer in business. The Managing Director says, "I pointed it out in Credit Committee and

they said yeah, so what's your point." The deal was signed.

114.    The Managing Director complained about this beginning in early 2007 to other

members of the Credit Committee, including Ifti Hyder, the CDO credit officer, David Beard, a

Managing Director who joined SCA in May 2007 and reported to Heberton, Adam Bergonzi,

who was a Public Finance manager and now the Chief Credit Officer, and John Williams in

Public Finance. The Managing Director explained that at Credit Committee meetings:

> there were quite a number of times we pointed out that the
> collateral in the transactions wasn't very good, it was originated by
> companies that were bankrupt, … or had very high LTV [loan to
> value] ratios. You would say these things, okay fine, and then they
> would turn to the Quant Group or turn to Ifti on the CDO side,
> how's this structured, do the numbers work when you run it
> through your models, they would all say yes and I signed off on the
> deals. I will readily admit that I signed off on the deals, but I
> would just shrug my shoulders at that point because I didn't have
> anything else to add. . . .

115.    Unsurprisingly, given the problems with data, SCA had very poor mechanisms for

analyzing and monitoring the CDOs it insured. For example, as explained above, the

Quantitative Analysis Group ran internal models to "stress test" the CDOs, i.e., to determine

whether SCA would experience losses under a variety of unfavorable market conditions. These

models were supposed to be distinct from the ratings agency models used by the Capital

Modeling Group, and thus act as an independent check on the ratings agencies (who, by then,

were not trusted when it came to the mortgage market). Indeed, as described below, SCA would often boast that its internal models were more conservative than ratings agency models. However, the Managing Director explained that SCA's internal models did not serve as an appropriate check because they depended on the same simulations and historical comparisons that the ratings agencies themselves used, including rating agency information regarding the likelihood of a downgrade. As the Managing Director described it, "Garbage in, garbage out."

116.    Because, as described above, SCA had very poor information about the collateral underlying its CDOs, the most visible measure of CDO performance available to it was the overcollateralization trigger. During the August 2007 conference call, SCA emphasized the overcollateralization triggers as a measure of CDO performance and one of the main protections against losses. However, for the reasons described above, these triggers did not serve as an adequate mechanism for evaluating CDO performance, even though, in SCA's case, it claimed that its deals insured tranches of CDOs with over-collateralization triggers that would "trip" after one or two assets in the pool defaulted.

117.    The Vice President also explained that SCA did not even use all of the information it had available when monitoring its CDO deals. As explained above, SCA insured RMBS directly, and also indirectly in the sense that RMBS served as collateral for the ABS CDOs. The Vice President stated that the RMBS deals were "transparent," because it was easy to see how the underlying loans were performing; however, nobody at SCA was looking at how the performance of the RMBS deals would eventually affect the CDOs. As the Vice President put it, "They would look at the RMBS deals, and they could clearly see how they were performing, but I don't think there was clear insight into how the performance of those RMBS deals, in turn, would play a role in the CDO's."

118.    As explained further below, SCA's failure to consider RMBS experience when evaluating CDOs was made startlingly clear in August 2007, when SCA disclosed that, based on current experience, it was forecasting a loss rate of 10.4% in its subprime RMBS of loans issued in 2006 and 2007.[3]  However, when it came to CDOs, SCA was using a 10% loss rate in subprime as a *stress test* — i.e., as a test meant to model an extreme, unfavorable hypothetical scenario.  In other words, the "stress test" being employed by SCA — the test meant to determine how the CDO would perform if market conditions took a turn for the *worse* — was in fact slightly *more* favorable than the actual market conditions currently being reported in SCA's RMBS portfolio.  This was particularly surprising given that the 10.4% loss rate was virtually certain to increase: loans of 2007 vintage had only barely begun to season and option-ARM rates had yet to reset; moreover, falling home prices meant that negative amortization would cause minimum payments to increase.  Thus, delinquencies and defaults were certain to rise.  However, when asked why SCA did not test for losses beyond 10% in subprime — a reasonable question, given that the RMBS portfolio was already experiencing a 10.4% loss rate for 2007 subprime mortgages — Sohail Rasul ("Rasul"), the head of SCA's CDO Production Group, openly stated "Frankly, to try to do more than that would require us to drill down and model every single security inside every single CDO, which runs into tens of thousands of securities. And that's not something that is really practical at that time."  SCA went on to assure investors that SCA's CDOs could withstand subprime losses in excess of 10%, but admitted it could not quantify tolerance levels.  Only a month later, SCA would admit that it was projecting actual median loss rates of 10% for 2007 vintage subprime RMBS and 12.5% for 2006 vintage subprime RMBS in

[3] By the end of the Class Period, Moody's and Fitch's were projecting actual losses of 21%. This is almost exactly the figure that the Center for Responsible Lending was projecting in October 2006.

the collateral underlying its CDOs.  Thus, it had no test to determine the extent to which losses would be incurred on its ABS CDOs if economic conditions worsened.

119.    The performance of the RMBS portfolio should have served as a particularly dire warning sign to SCA because SCA took care to weed out bad loans when it first signed its deals to insure RMBS — a protective measure that was not possible when SCA insured a CDO.

120.    SCA also had no process for evaluating whether, by cumulatively signing all of the ABS CDO deals with similar characteristics — and thus drastically increasing SCA's exposure to the home mortgage markets — SCA had, as a whole, taken on more risk than it could handle.  The Vice President explained that though SCA tested each deal individually, neither Capital Modeling nor Quantitative Analysis ever tested this new crop of deals as a whole — a mistake because, as the Vice President put it:

> It's one thing to do one of those deals, even maybe two of those deals with Merrill that were in the first loss piece of the triple A tranche, but when you look and you realize that we did seven of them, that should really kind of jump out and smack people in the face a little bit.

121.    The Vice President explained that the function of risk management should have been to notice that even if the deals looked good individually, "they're all the same deals and you start to realize the correlation piece.  If something happens to one it's most likely going to happen to all of them."  The Vice President stated that Risk Management should have known about the problems and limited SCA's exposure, but in 2007 SCA was interested in growing the business and risk management was left out of the deals in order to move the deals forward.  He reiterated that "no real work [was] ever done that said, if this area went down . . . if one area were to go down and just get crushed, would it put the company out of business or how much capital or how much in losses would it have."

122.    The Managing Director had a similar experience.  The Managing Director stated that throughout 2007, on several occasions, he raised the issue to many SCA employees, including several at his level, that SCA was taking on much higher levels of risk than it could afford, and that SCA had no policies as to how much risk SCA was willing to take on as a whole. He sought guidelines as to how much risk SCA would take on cumulatively or even how much it was willing to assume on each deal.   "What was frustrating, not only for me, but I'm sure a lot of other people, was that we just didn't exactly know what level of risk we were supposed to be taking on throughout most of 2007 and it was obvious that we were taking on more and more risk, and I raised that on several occasions."  The Managing Director recalls specifically raising the issue in a meeting in which David Blakeslee, former Director of Quantitative Analysis, was present.  The Vice President also recalls that there were many discussions at SCA among the employees about how the company was taking on more and more risk, especially the Merrill deals.

123.    The Vice President provided a specific example of how little SCA understood this issue.  The memo regarding the ratings agencies and the EMPRES system was eventually distributed to the Production and Financial Groups at a meeting in September 2007.  In attendance at the meeting were LeBlanc and Lau.  One senior member of the Production Group, Linda Kobrin, praised the memo, stating that until she read it, she had no clear idea how the ratings agencies worked.  The Vice President reports that most of the other members of the Production Group were unaware that the agencies considered the entire book of business, and not just individual deals.

124.    Another former employee, who worked as an assistant to Heberton from before the start of the Class Period through October 2007 ("the Assistant"), had a similar experience.

The Assistant was asked in early 2007 by Paul Buttress of the Quantitative Analysis Group to prepare a report regarding SCA's insurance of a type of security known as a Collateralized Loan Obligation ("CLO"). CLOs are much like RMBS, except that the underlying collateral consists of corporate loans, rather than residential mortgage loans. The completed report concluded that SCA was dangerously overexposed to certain risks because it insured many similar deals. As the Assistant put it, the report stated that "We should be looking at these differently because we are stockpiling a lot of the same risk." The report was sent to all SCA senior executives.

125.    Finally, both the Managing Director and the Vice President recalled that there were significant flaws in SCA's process for modeling the performance of the securities it insured and for conducting stress tests. Both stated that SCA did not consider the degree to which a failure among some of the securities backing a CDO increased the likelihood that other securities would fail. The Managing Director explained that for the modeling to work, it was essential to know this information, but SCA simply did not have the data. The Vice President stated that SCA would test for losses among subprime mortgage securities, but would not even test for the possibility that if the subprime mortgages failed, there was an increased likelihood of losses in securities backed by prime mortgages.

126.    This was a particularly significant failure on the part of SCA, because when the collateral underlying a particular security carries "correlation risk" — i.e., the risk that one failure will be associated with many failures — the security itself becomes much riskier overall. This is because the existence of a correlation means that it becomes far more likely that any losses experienced will be large losses — losses large enough to affect even the seniormost tranche. Or, as an article in *BIS Quarterly* explained in March 2008, "Correlation stresses can trigger significant downgrades for mezzanine and senior tranches, *even in the absence of downgrades in*

*the underlying pool.*"  For similar reasons, if several assets in the pool are downgraded at the same time, this indicates that the pool has a high level of correlation risk, which can have a drastic impact on the rating of the overall CDO.  That SCA did not consider the effect of correlation made its focus on overcollateralization triggers that much more risky — the triggers would only alert SCA of failures of particular securities within the pool, but would not alert SCA of the risk that if one failed, many would fail.

127.    In this regard, the Managing Director criticized SCA for employing unreasonable assumptions in its models.  SCA's models stated that the CDO tranches it insured would maintain a AAA rating from the ratings agencies even if all the underlying collateral was downgraded by several "mininotches."[4]  This, the Managing Director said, was unrealistic — no ratings agency would continue to leave a triple-A rating in place after all the collateral had been downgraded.

128.    According to the Managing Director, in June and July, 2007, SCA was "nervous" about market conditions and made an attempt to research the performance of the collateral underlying its CDOs.  The Managing Director attempted to reanalyze SCA's exposure at this time, but the CDO Group refused to provide him with the information he needed to evaluate the riskiness of SCA's ABS CDO portfolio.  The Managing Director told the Credit Department on several occasions that he was unable to obtain information from the CDO Group, and raised the issue in a Credit Committee meeting in the summer of 2007.  Both the Credit Group and the Quantitative Analysis Group attended this meeting.  The Managing Director also specifically complained to Heberton about the lack of information.

---

[4] Ratings agencies give letter grades indicating financial strength; those grades are refined further with a "+" or a "-" sign.  A mininotch refers to ratings that move in increments equivalent to the "+" or "-" sign.  Thus, a downgrade from AA to AA- represents a mininotch.

129.    The Vice President also noted SCA's lack of sufficient response to housing data in the summer of 2007.  As he explained, at that time, trouble in the housing markets was reported in every media outlet, but SCA did not acknowledge in July 2007 that there was any deterioration.  "At that point in time there was no real acceptance or no real acknowledgement that there was any deterioration at all and that it would be affecting them, because they were triple A, because they were fully supported by all these tranches underneath, the housing market would have to get so bad, and *there wasn't really significant work done on it except that it's not going to happen*" (emphasis added).  The Vice President explained out the error of this kind of thinking:  "If delinquencies are going up, are doubling, of course you should actually at that point assume, well if delinquencies are doubling then we should assume that delinquencies in our deals are doubling."  Indeed, even as the news worsened in July, the Vice President points out that SCA continued to sign contracts to insure risky mortgage-backed CDOs.

130.    In fact, SCA's concerns over market conditions and their effect on its financial statements reached the point where they attempted to have the accounting rules changed.  On June 18, 2007, SCA wrote to the Financial Accounting Standards Board to lobby to eliminate mark-to-market accounting for its credit default swaps.  The letter stated in relevant part, "We believe that a more appropriate accounting treatment would be to account for such instruments in a manner similar to the accounting for financial guaranty insurance contracts, as such contracts in substance are substantially the same as such insurance contracts."

131.    Between May 25 and June 29, 2007, SCA signed four additional Merrill deals to insure ABS CDOs with more than 50% RMBS collateral, representing additional exposure of nearly $2 billion.  One of these deals, insuring $625 million, contained 48.5% subprime RMBS collateral, with an additional 30% of its collateral consisting of other CDOs, which themselves

were substantially backed by subprime RMBS. Another deal, insuring $525 million, was backed by 40.4% subprime RMBS collateral, with an additional 30% of its collateral consisting of CDOs. Additionally, three other contracts to insure ABS CDOs with greater than 50% RMBS collateral were signed in this quarter, representing approximately $3 to 4 billion in additional ABS CDO exposure.

132.    Indeed, SCA's problems assessing its own portfolio reached such crisis proportions that it delayed conducting, or at least disclosing the results of, its annual actuarial review by several months — thus significantly delaying acknowledgment of massive losses on its ABS CDOs. In a July 2007 conference call with analysts, SCA stated that it would be conducting its annual actuarial review of its reserves in the third quarter of 2007, and that after the quarter was complete, it would disclose the updated information. After the third quarter, however, SCA mysteriously had not conducted the review — and with no explanations, simply told analysts that it would conduct a review in the fourth quarter. When it finally did conduct the review, it was forced to add nearly $1 billion to its reserves to deal with probable losses in its portfolio of ABS CDOs backed by more than 50% RMBS collateral, admitting that it had considered "a much broader array of pricing information not previously considered."

133.    SCA has since admitted that the problems in its own ABS CDO exposure were obvious by at least August 29, 2007. After the Class Period, SCA attempted to terminate its contracts with Merrill, alleging that Merrill had materially breached its agreement with XLCA by promising certain voting rights associated with its CDO tranches both to XLCA, and to another financial guaranty insurer, MBIA. When Merrill filed suit against XLCA for terminating the insurance agreements, XLCA argued that the voting rights Merrill had allegedly promised to both XLCA and MBIA were critical because they allowed XLCA to protect itself if the underlying

collateral became impaired or if there was an event of default. *See, e.g.*, Declaration of Trude Akersveen dated May 13, 2008, ¶ 9; Declaration of Mark Walsh dated May 14, 2008, ¶ 10, filed in *Merrill Lynch International v. XL Capital Assurance*, No. 08 CV 2893.

134.    In support of its argument that the voting rights were critical, XLCA submitted a declaration from Scott Gordon as an expert in CDOs and the financial guaranty industry. Gordon's declaration states in relevant part:

> [T]he confirmations between [Merrill] and MBIA are dated August 29, 2007, a point in time where, in my opinion, the potential for conflict between XLCA and MBIA could not be ignored. This is because at this time the ABS CDO market had virtually shut down due to the fears of a pending crisis in the sub prime market and the consequences this would bring to ABS CDOs. In fact, the ratings agencies had already begun downgrading the types of securities that make up ABS CDO collateral and that would ultimately result in many ABS CDOs in the market triggering Events of Default… It would have been reasonable for ML to anticipate that an Event of Default for the CDOs at issue here could result in ML receiving different voting instructions from MBIA and XLCA.

Declaration of Scott Gordon dated May 15, 2008, ¶¶ 17-18, filed in *Merrill Lynch International v. XL Capital Assurance*, No. 08 CV 2893.   In other words, XLCA's own argument in the Merrill litigation was that by August 29, 2007, it was clear that there was a significant possibility that the ABS CDOs insured by XLCA would default, thus making control of the voting rights extremely significant.[5]

135.    Despite this fact, as discussed in more detail below, even as late as the fourth quarter of 2007, SCA continued to insure ABS CDOs with significant mortgage exposure, and

---

[5] The Court granted Merrill Lynch's motion for summary judgment on June 10, 2008, holding that Merrill Lynch had not breached its agreements with XLCA and that the contracts would remain in force.  The parties announced a settlement on July 28, 2008.

continued to assure the market that its ABS CDOs were performing well and needed no special monitoring.

136.    Until SCA's risky underwriting caught up with it, SCA's rapid growth impressed the market and resulted in a soaring stock price.  After SCA reported its results for the fourth quarter of 2006 on February 5, 2007, Deutsche Bank increased its target price for SCA's stock, based in part on SCA's "strong new business production" in the recent quarter.  Fox-Pitt Kelton headlined a report "Huge production, solid earnings," highlighting SCA's increase in CDO business, and William Blair & Co. praised SCA's "Impressive new business growth, well above expectations" and reiterated its "Outperform" rating.

137.    From the date of its initial public offering to the start of the Class Period, SCA's stock price rose from $20.38 per share to $29.18 per share.[6]

### i.  Market Deteriorates Further; The Truth Is Slowly Revealed

138.    Beginning in late 2006, mortgage lenders began to reveal the effects of their liberal lending in an overheated housing market.  For example, in the third quarter 2006, Countrywide increased its loan loss provision because of an "overall increase in delinquencies," American Home reported that the delinquency rate of its portfolio had grown 236%, and Sovereign Bancorp reported income down 48% from 2005.

139.    In March 2007, HSBC wrote off $11 billion to cover losses stemming from US mortgage loans.  In April 2007, GMAC LLC's Residential Capital cut 700 jobs due to losses associated with subprime mortgages.  By this time, since the beginning of 2006, more than 50 subprime lenders had already ceased operations, entered bankruptcy, or sought buyers.

---

[6] All stock prices are adjusted for dividends.

140.    In May 2007, GE's mortgage unit cut lending, ceased no-money down mortgages, and fired 460 employees (20% of staff) due to increased subprime mortgage defaults. According to Friedman Billings, 10.12% of subprime home loans in securities were delinquent by 90 days or more, up from 5.37% in May 2005

141.    Once first quarter earnings began to be released, the situation looked even worse. Countrywide's earnings were down 37% from 2006 largely due to credit charges related to nonprime lending. Indymac reported that its earnings were down 34% from 2006, mostly attributable to increased delinquencies, non-performing loans, and early default payments. Sovereign Bancorp reported its income down 66%.

142.    In April 2007, New Century Financial, the second biggest subprime mortgage lender in the United States filed for bankruptcy, and NovaStar Financial cut off credit lines to mortgage bankers.

143.    In June 2007, Bear Stearns invested $3.2 billion in an attempt to bail out its subsidiary Long-Term Capital Management that was collapsing because of bad investments in subprime mortgages, Germany's IKB Deutsche Industriebank cut earnings forecast by $382 million because of investment losses in US MBS, and Indymac announced its earnings were down 335% as delinquencies and foreclosures "significantly worsen."

144.    On July 10 and 11, Moody's announced it would be downgrading 431 RMBS, and S&P announced downgrades of 612 RMBS. Both agencies also announced they were reviewing, with an eye to downgrading, hundreds of CDOs that had held the downgraded RMBS as part of their collateral. On July 10th, *Marketwatch* reported:

> S&P also said it's changing the way it evaluates those securities,
> partly because of unprecedented levels of misrepresentation and
> fraud, combined with potentially shoddy initial loan data. The new
> approach will be applied to new deals and could affect the ratings

of other residential mortgage-backed securities, such as those issued this year, the agency noted.

"This will impact everyone along the food chain," said Andy Chow, portfolio manager at SCM Advisors LLC, a $14 billion San Francisco-based investment firm specializing in fixed-income and structured-finance markets.

The announcements were a dramatic sign that subprime mortgage woes aren't going away and could prolong a downturn in the housing market…

Credit ratings on 612 classes of residential mortgage-backed securities backed by U.S. subprime collateral have been put on CreditWatch with negative implications, S&P said. Beginning in the next few days, the agency said most of these classes will be downgraded….

The agency said it's also reviewing ratings of Collateralized Debt Obligations (CDOs) that invested in the RMBS that could be downgraded…

Moody's said it downgraded 399 residential mortgage-backed securities because of higher-than-expected delinquencies on the underlying home loans. The rating agency also said it put 32 other RMBS under review for possible downgrades for the same reason.

The RMBS were sold in 2006 and are backed mainly by first lien adjustable- and fixed-rate subprime mortgage loans, Moody's added.

The moves affect $5.2 billion of securities. That represents 6.8% of the securities rated by Moody's last year that were backed by subprime first-lien home loans, the agency noted.

Total aggregate losses on all subprime RMBS transactions since the final quarter of 2005 have reached 29 basis points, versus seven basis points in 2000. … S&P used 2000 as a comparison because, until now, that was the worse year for subprime losses in the past decade.

Alleged misrepresentations on credit reports were up significantly in 2006 and overall mortgage fraud has exceeded previous highs, S&P also reported.

145.    A second *Marketwatch* story that day reported:

More than 350 collateralized debt obligations are exposed to possible downgrades of subprime residential mortgage-backed securities, rating agency Standard & Poor's said on Tuesday.

Roughly 13.5% of all U.S. cash-flow and hybrid collateralized debt obligations (CDOs), or 218 deals, are exposed to the downgrades, S&P said.

146.    On July 25, 2007, Countrywide announced that its profits were down 33% because of losses on certain types of prime mortgage loans and it slashed its 2007 earnings forecast because of expectations of increasingly weakening housing and mortgage markets.

## VI.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### a.  SCA's 2006 Form 10-K

147.    The Class Period begins on March 15, 2007.  On that date, SCA filed its 2006 10-K, signed by Giordano and Shea, and containing Certifications signed by both Giordano and Shea as required by the Sarbanes-Oxley Act of 2002, 15 U.S.C.A. §§ 7201 *et seq*.  SCA reported net income for the year of $117.4 million, up from $80.4 million in 2005.  SCA reported adjusted gross premiums — a non-GAAP measure of new business signed during the period — of $206.8 million in Structured Finance (a category that includes CDOs), up from $104.1 million in the prior year.

148.     SCA also reported that it maintained case basis reserves of $85.3 million, and unallocated reserves of $93.2 million, for total reserves of $178.5 million, or 0.15% of its total insured portfolio.  As of December 2005, SCA had kept total reserves of 0.18% of its insured portfolio.   Though SCA did not disclose the details of its CDO portfolio, at this time, SCA had signed deals to insure a total of 12 ABS CDOs with more than 50% RMBS collateral.  Six of these deals, or more than $6.5 billion net par insured, had been signed in 2006 alone.  However,

no ABS CDO had been placed on special monitoring, and no case basis reserves had been established for any ABS CDO.

149.    In its 10-K, SCA described its policy for establishing unallocated reserves, indicating that it not only relied on several years' old data, but that it started with smaller loss assumptions in recent years that it did not adjust in 2006 because, previously, SCA's portfolio had been skewed toward lower risk public-finance securities:

> Our unallocated loss reserves represent our estimated ultimate liability from claims expected to be incurred in the future under our in-force insured and reinsured policies less outstanding case basis reserves and cumulative paid claims to date on such policies. Our unallocated reserves are estimated by management based upon an actuarial reserving analysis. The actuarial methodology applied by us is in accordance with Actuarial Standards of Practice No. 36, Determination of Reasonable Provision. The methodology applied is based on the selection of an initial expected loss ratio, as well as an expected loss emergence pattern….

> *The selection of our initial expected loss ratio is based on an analysis, which we update annually, of the historic earned premium and ultimate losses of the financial guaranty industry. ... The mean ten-year observed historic industry loss ratio resulting from our initial analysis in 2001 (which was conducted when we first adopted our unallocated reserve methodology) encompassing years 1991 through 2000 was 13%. Later analyses performed in 2005 (encompassing years 1995 through 2004) and 2006 (encompassing years 1996 through 2005) indicated that the average industry loss ratio was 16%.*

> Management further reviewed the individual loss years and, where possible, the events underlying the average composite industry loss ratios in 2005 and 2006. Management noted that 1998 and 2002 were particularly adverse for the financial guaranty industry due to credit events following the stock market decline in 1997 and the Enron collapse in 2001 as well as that certain individual losses were in bond sectors in which we do not actively participate. Accordingly, in the judgment of management the increase in the industry loss ratio compared to the 2001 analysis was not indicative of an overall deterioration in our expected loss activity.

***

When we adopted our current unallocated reserve methodology in 2001 we selected an initial expected loss ratio of 25%. ….

\*\*\*

*During 2004 we adjusted our initial expected loss ratio to 20% from 25%, which was utilized since the adoption of our unallocated reserve methodology in recognition of the cumulative experience of our business to that point in time, as well as the increasing percentage of our in-force business from public finance insurance.* This change resulted in approximately a $15.0 million decrease in unallocated loss reserves, which decrease was substantially offset by a change in the estimated expected loss emergence pattern of our in-force business due to the availability of more detailed information as a result of the implementation in 2004 of a new automated information system. Management also considered its industry studies described above as supportive of management's change in the initial expected loss ratio in 2004, for the reasons described above. *Our updated analyses in 2005 and 2006 indicated that no change was necessary in our expected loss ratio of 20% from that in 2004.*

(emphasis added).

150.    The 10-K also stated that in its underwriting procedures, it relied both on ratings issued by the ratings agencies, as well as SCA's own "underwriting procedures that enable us to conduct our own, independent assessment of risk for each obligation that we guarantee." SCA stated that "Exposure limits and underwriting criteria are established, as appropriate, for sectors and asset classes." The 10-K stated that in 2006, "we were able to increase our production of new business written across all business lines, other than asset-backed obligations, while still maintaining price and underwriting discipline."

151.    The statements in the 2006 10-K were false and/or misleading because:

(a)    SCA had failed to create adequate loss reserves in light of the drastic alteration of the risk profile of its portfolio, as described more fully in ¶¶ 93, 298 — 332. Not only did SCA rely on old, historical data that was facially

inapplicable to the new kinds of mortgages and securities that it had insured in 2006 — many of which had not yet seasoned — but SCA actually made its loss reserves *smaller* than in prior years, as a percentage of its total in-force business, despite the current conditions in the housing market and its new, rapid exposure to ABS CDOs.  Indeed, as Rasul would concede during a conference call in August 2007, ABS CDOs had very little default history to use to evaluate the likelihood of claims;

(b)    For the reasons described above at ¶¶ 101 *et seq.*, SCA had not exercised discipline in its production of new business;

(c)    SCA's internal models were not distinct from those used by the ratings agencies, and in fact depended on ratings agency simulations, historical comparisons, and judgments concerning the likelihood of a downgrade; and

(d)    SCA did not have defined exposure limits with respect to ABS CDOs.

152.    Notably, the 2006 10-K did not contain the usual certification that management maintained a set of internal controls over financial reporting.  This was because the SEC had recently adopted a set of tighter standards for such certification, and had allowed companies a grace period in which to comply.

153.    The day that SCA filed its 10-K, its stock price closed at $29.18, up from $28.98 the day before.

154.    On March 26, 2007, SCA issued a press release announcing its plan to issue the Preferred Shares via Private Placement Memorandum (the "PPM").   In connection with this Private Placement, SCA and the Preferred Share Underwriter Defendants prepared and caused to be disseminated the PPM.  Defendant Lehman served as the Sole Structuring Advisor and was a

Joint Bookrunner, along with Defendants ML and Wachovia.  The Private Placement was completed on April 5, 2007.

155.    The PPM incorporated by reference SCA's 2006 10-K, and thus was false and/or misleading for the reasons stated at ¶ 151.

### b. April 23, 2007 Form 8-K and April 24, 2007 Analyst Call

156.    On April 11, 2007, SCA executed another deal with Merrill (with a contract effective date of March 29, 2007) to insure an ABS CDO tranche backed by more than 50% RMBS collateral, at a net par insured of $435.7 million.

157.    On April 23, 2007, SCA issued a press release, filed with the SEC on Form 8-K, announcing its results for the first quarter of 2007.  SCA reported net income for the quarter of $37.3 million, or $0.58 per share, as compared to net income of $0.36 in the prior year period. SCA also announced that "adjusted gross premiums" for structured finance rose 45% from the same period a year earlier, due largely to CDOs and "Consumer ABS," a category that includes directly-insured RMBS.  Defendant Giordano was quoted as saying, "We are well positioned to take advantage of credit market volatility when it arises, as it did with respect to U.S. sub-prime mortgages this quarter, while maintaining underwriting and pricing discipline."  Though SCA reported $6.9 million in losses on the fair value of its credit default swaps, it reported no increases either to its case basis reserves or to its unallocated reserves from the prior quarter.  It did not flag any ABS CDO contracts for special monitoring.

158.    During a conference call with analysts the next day, Shea repeated SCA's reported net income, and Giordano boasted that the CDO group had "record" new business production, including a contract to sign two "high-grade CDOs of ABS transactions."  Giordano

numbered these among their "high-quality transactions this quarter" that were "consistent with our disciplined approach to underwriting and pricing."  Though SCA did not say so, the two new ABS CDO contracts included at least one of the seven Merrill contracts scheduled for execution in 2007, and were both backed by more than 50% RMBS collateral, cumulatively representing additional exposure to SCA of $890 million.

159.    In response to questions by analysts, Shea admitted that the mark-to-market losses of $6.9 million earlier reported in the press release were attributable, in large part, to SCA's contracts to insure mortgage-backed CDOs, but hastened to assure analysts that the losses were "not reflective of the inherent risk within the portfolio. Considering the attachment points we have on it, this is more reflective of the market's perception in terms of the overall credit environment."  Shea emphasized, "[W]e don't think it's credit-driven. It's more just — there's volatility out there. *But we don't believe the underlying credit profile of our transactions is driving that mark in any way*." (emphasis added).

### c.  May 14, 2007 Form 10-Q

160.    Following the call, Deutsche Bank issued a report proclaiming that SCA was "continuing to meet or exceed expectations," reiterated its "Buy" rating, and increased its price target to $33.  The report noted that SCA's new business production in the structured finance area had increased by 45% from the prior year period, driven in part by ABS CDOs.

161.    On May 14, 2007, SCA issued its Report on Form 10-Q for the first quarter of 2007, which repeated the financial information contained in the April 23, 2007 press release, and stated that loss reserves stood at $176 million, or 0.14% of net par outstanding.  Giordano and Shea signed both the 10-Q and a Certification as required by the Sarbanes-Oxley Act of 2002, 15 U.S.C.A. §§ 7201 *et seq.*

162.    The statements described in ¶¶ 160 — 161 were false and/or misleading because:

(a)    SCA had failed to create adequate loss reserves in light of the drastic alteration of its portfolio, as described more fully in ¶¶ 93, 298 – 332 and at ¶ 147 – 155;

(b)    SCA understated its mark-to-market losses by failing to monitor the collateral underlying ABS CDOs backed by more than 50% RMBS, and failing to consider current market conditions, including the observed performance of the RMBS SCA had insured directly, as described more fully above at ¶¶ 93, 101 *et seq.*, and below at ¶¶ 196-97, 298 – 332;

(c)    Though SCA disclosed that it had signed two ABS CDO contracts, it did not disclose that at least one of the tranches it had insured was not the most senior, and thus would not have the first claim on payments in the event of defaults of the underlying collateral. As Fitch would later report, "SCA effectively insured a non-senior layered tranche;"

(d)    For the reasons stated above at ¶¶ 101 *et seq.*, SCA had not been disciplined in its underwriting; and

(e)    The mark-to-market losses were, in fact, reflective of the deterioration in the portfolio, as described more fully at ¶¶ 93, 298 – 332.

163.    On April 23, 2007, the day of the April earnings announcement, SCA stock closed at $29.66, up from $29.16 on the previous trading day.  After the conference call with analysts, on April 24, 2007, SCA stock closed at $30.38.  In the three week period from April 24 to May 15, 2007, SCA's stock rose to $32.81 per share.

**d.    May 16, 2007 Secondary Public Offering Registration Statement and May 17, 2007 Conference**

164.    On May 16, 2007, SCA filed a registration statement and prospectus (together, "Registration Statement") for its secondary public offering in which XL Capital would reduce its interest from 63% to 47.5% of SCA's outstanding shares.

165.    The next day, SCA held a conference for analysts and investors.  At that conference, Hubbard emphasized that the "core" of SCA's business and an "important aspect[] of our overall strategy" was to "maintain credit and pricing discipline."  Shea emphasized SCA's internal systems for monitoring its insurance portfolio and its ability to meet any claims under its policies, stating that, "We closely work with the rating agencies and their models. In addition, we have developed our own sophisticated models, which we use to analyze and manage our capital adequacy, risk and returns."

166.    Rasul presented SCA's approach to insuring CDOs.  He stated that a "key component" of SCA's "underwriting approach" was to focus on "senior tranches" of CDOs.  He later pointed out that:

> Over 95% of the book is rated AAA. And a substantial part of that AAA segment is actually is super senior.  In other words, where this — the tranche that we're insuring has credit enhancement that's actually significantly in excess of that required to achieve a straight AAA rating.

He also directed the audience to SCA's website, where a PowerPoint presentation of SCA's CDO exposure as of March 31 had been posted.

167.    Finally, Rasul repeated Shea's assurances that SCA did not "simply rely on rating agency ratings.  We create and run our own analytical models for our CDOs, which use a combination of worst-case portfolio composition and simulated macroeconomic conditions,

including some very extreme stresses on both interest rates and default curves." He concluded, "we have a strong, experienced team of underwriters in the CDO group, operating within a conservative framework."

168.    The PowerPoint presentation posted on SCA's website disclosed that it had insured a total of $10.1 billion in ABS CDOs. The chart stated that of SCA's "high-grade" ABS CDOs, only 16.6% of the collateral consisted of subprime RMBS. The chart also stated that SCA maintained "explicit limitations" on subprime exposure within its ABS CDOs, with an average limit of around 32%.

169.    However, as would later be revealed, several deals had far in excess of 32% subprime exposure. Defining subprime to mean borrowers with FICO scores under 640, which SCA would later say was its stated policy, one ABS CDO had 71.9% subprime exposure, another was 43.9% subprime, and another was 36.3% subprime. Later in the Class Period, additional ABS CDOs would be insured containing 50%, 60%, and even 76% subprime exposure.

170.    Additionally, defining subprime to mean FICO scores below 640, total CDO subprime exposure was actually closer to approximately 28%, rather than the 16.6% listed in the chart. As SCA would not reveal until March 17, 2008, the 16.6% exposure was based on a FICO score of 625, rather than 640, thus materially understating SCA's exposure to subprime collateral within its CDOs.

171.    Additionally, the statements made in connection with the May conference were false and/or misleading because:

(a)    For the reasons stated above at ¶¶ 101 *et seq.*, SCA's approach to underwriting was neither disciplined nor conservative;

(b)    SCA's internal models were not distinct from those used by the ratings agencies, and in fact depended on ratings agency simulations, historical comparisons, and judgments concerning the likelihood of a downgrade; and

(c)    For the Merrill deals, SCA did not insure the seniormost tranche of the CDO, but instead insured the second most senior tranche.

172.    The day after the conference, SCA's stock closed at $33.37, up from $32.90

173.    In June, 2007, SCA's registration statement became effective and SCA conducted its secondary public offering, selling $10,627,422 shares at $31 per share.  The registration statement stated that the last reported sale of SCA's common stock on NYSE was $31.76, and incorporated by reference the 2006 10-K and the first quarter 10-Q.  It also repeated the statements regarding SCA's net income from both the 2006 10-K and the first quarter 10-Q, and the statements regarding SCA's unrealized losses from the first quarter 10-Q.  The registration statement emphasized SCA's "disciplined approach to underwriting that emphasizes risk-adjusted profitability over market share," and stated that "Maintaining our triple-A financial strength ratings is paramount to our overall strategy. We plan to achieve this through disciplined risk selection, prudent operating and financial leverage and conservative investment guidelines." These statements were false and/or misleading for the reasons stated at ¶¶ 151 and 162.   The registration statement was signed by, among other things, Giordano and Shea, and listed Goldman Sachs, J.P. Morgan, and ML as underwriters.

### e.    July 23, 2007 Form 8-K and July 24, 2007 Conference Call

174.    On July 23, 2007, SCA issued a press release, filed with the SEC on Form 8-K, reporting its financial results for the second quarter.  SCA announced net income of $25.9 million, or $0.40 per share, a decline from the prior year period, in part due to $22.2 million in

mark-to-market losses.[7]  SCA recorded an 81% increase in new structured finance business as

compared to the prior year period due, in large part, to new contracts to insure CDOs, as well as

to insure Consumer ABS, a category that includes directly-insured RMBS.  SCA recorded no

increases to case basis reserves, and no increases to unallocated reserves beyond what it would

say in its 10-Q were increases for in-force business.  No ABS CDOs had been flagged for special

monitoring.  The press release quoted Giordano as saying that "Our insured portfolio continues to

perform well despite market concerns over subprime mortgages."

175.    The next day, SCA hosted a conference call with analysts to discuss its second

quarter results.   Giordano stated that SCA had now insured $14.7 billion worth of ABS CDOs

containing more than 50% RMBS, and that these CDOs were backed by roughly 21% other

CDOs.  Giordano stated that SCA had signed eight "high-grade CDOs of ABS transactions and

all were Super-Senior attachment points."  Shea repeated SCA's net income as disclosed in the

press release.  Giordano assured investors that though none of the securities insured by SCA had

been downgraded or placed on negative watch by the ratings agencies, "[w]e continue to monitor

this very closely."  Giordano also stated that "Prudent risk selection and superior execution

remain paramount in how we intend to approach today's environment."

176.    Turning to the $22.2 million decrease in value of SCA's credit default swaps,

which Shea attributed mainly to the ABS CDOs, Shea emphasized that the loss was no cause for

concern:

>   Again, this unrealized loss is a function of market changes and fair
>   value and not the result of claims, incurred losses or any
>   deterioration of the underlying CDO credit quality.

---

[7] SCA would reveal in August that the ABS CDOs had only been marked down by $13.3
million.

- 69 -

Continuing a trend we saw in the first quarter of this year, credit-spread indices we used to value these instruments began to widen significantly late in the second quarter, reflecting volatility and a lower fair value of these instruments, were they to be sold.

As we hold them to maturity, however, the negative mark-to-market will accrete back to zero over time.

177.    Giordano repeated these claims in response to analyst questions:

[W]e think this [the mark-to-market loss] has more to do with accounting rather than being truly reflective of what's going on with credit quality. . . .

[T]he important note here is that we hold these to maturity, and that any losses and/or gains, we would show in our income statement from the movements of these indices — would eventually accrete or discount to zero.

178.    Another analyst probed more deeply on the issue of mark-to-market losses, which were recorded as "unrealized losses" on SCA's balance sheet, resulting in the following exchange:

Q:  Just to put it in plain English — the CDO portfolio — the mark-to-market — it's a fluctuation.  But when, if ever, would that unrealized loss turn into a loss? In other words, if you had to sell those in the marketplace, what would compel the sale?

GIORDANO: It's hard to envision a situation like that because we really view these as being the equivalent of our bond-insurance contracts. And it's just difficult to see how those would be transferable.   It may be more possible, rather than selling the actual position, if, were we to become — and this is all theoretical, of course . . . but were we to become concerned about something, you might try to purchase offsetting protection against the exposure. But physically transferring it, I think — it's difficult to envision the circumstances in which we could do that.

SHEA:  This is really a creation of the accounting principles. And we work within it, but we look at the derivatives as — basically, it's an extension of our insurance program and we just have to comply with the rules around the derivative treatment.  And I think a lot of companies like ourselves are facing the same issues.

- 70 -

179.    When an analyst asked for an estimate as to whether the fair value of the credit

default swap had changed since the end of the quarter on June 30 to the date of the call on July

24, Giordano answered, "[W]e don't. We do this exercise on a monthly basis. So we'll be coming

up on that at the end of July."

180.    Shea also explained that in the third quarter, SCA would conduct its "annual

actuarial analysis," at which time it would do a thorough review of its portfolio and expected

losses, and it would update its reserves accordingly.  Shea emphasized the planned review three

separate times in the course of the call:

> Looking ahead to the third quarter, we will be conducting our
> annual actuarial analysis of our loss reserves. Barring any
> unexpected changes as a result of this study, our allocated loss
> ratio for 2007 could be in the range of 8% to 10%.
>
> ***
>
> I think, in the third quarter, what we'll be able to do is to come
> back with a much more firmer idea in terms of where our loss-
> emergence patterns are and what the overall loss — expense ratio
> will be for the balance of the year.
>
> ***
>
> And what we're looking at is, what is the net expense ratio we'll be
> having for the quarter? We feel that, probably, for the rest of the
> year, it will be between, maybe, 8% to 10%, and for the full year.
> But in the third quarter, we'll be going through our annual study
> and we'll be able to come back and give you a little bit more
> definition around that.[8]

181.    In response to an analyst's question about the methods SCA used for determining

expected losses, Giordano emphasized that SCA reached its own estimates, distinct from those

reached by ratings agencies.  As he put it, "But I think the important thing is we look at both, we

---

[8] As of July 12, 2008, a recording of the conference call was available on SCA's website.  It has
since been removed, although recordings of other conference calls during the period remain.

come up with our own. And, generally speaking, we are more — we have been more conservative in estimating that than we found the rating agencies."

182.    One analyst asked for information about how overcollateralization triggers worked to mitigate risk. Giordano claimed that these triggers not only served as a "robust" protection against losses in the CDO portfolio, but also they worked particularly well to protect against losses in the 21% of the collateral that itself consisted of additional CDOs:

> [I]f credit quality deteriorates on the underlying collateral in the CDOs — particularly, let's say, securities issued by other CDOs — then that begins to erode the over-collateralization test, and — to the extent that over-collateral triggers are breached, that really would initiate a de-leveraging of our Super-Senior level of the capital structure, where excess spreads would then be captured and applied towards our securities, and they would go into a sequential pay-down mode.
>
> So the structures are quite robust in the event that there is some deterioration out of the CDO-squared component of the portfolio.

183.    It was also during this call that SCA explained its approach to insuring RMBS directly, rather than indirectly through a CDO. Although in 2006 SCA had refused to insure subprime RMBS because it was aware of the problems in the mortgage industry, Giordano stated that SCA was now willing to insure RMBS with 2006 vintage collateral (i.e., RMBS backed by loans issued in 2006) because it could take such protective measures as to "exclud[e] early payment defaults and other non-performing loans from the pools with 2006 that we are insuring." SCA did not disclose, however, that on the CDO side, almost all of the RMBS, including subprime RMBS, backing the 22 ABS CDO transactions with more than 50% RMBS collateral, were 2006 to 2007 vintage — and because of the CDO structure, SCA could neither exclude individual nonperforming loans in the pools, nor could it even analyze loans on an individual basis.

184.    During the course of the call, Giordano unwittingly hinted at SCA's lack of insight into the collateral underlying its CDOs.  When an analyst asked him how familiar SCA was with the collateral underlying each CDO, Giordano responded, "As part of our CDO-underwriting process, we do have visibility into the underlying collateral, both in RMBS form and in terms of any securities issues by other CDOs that the managers whom we're backing wish to put into their portfolios.  So we do have some visibility into that. We do review that."  But just a few minutes later, when another analyst asked for information about the ratings of the 21% of the collateral underlying the CDOs that consisted of other CDOs, Giordano had no answer.  He responded, "I wouldn't — it would be difficult for me to quantify it, but I think it would be a fairly small part, because we are looking for CDO managers who, generally, like us, are pretty cautious in approaching that collateral.  We do rely on that CDO-squared bucket on the underlying ratings to a great extent, where, in most of it — over three-quarters — would be AA or AAA.  But managers employ a variety of strategies in terms of the underlying collateral that they invest in there. So it is a — it's difficult for us to quantify that."  In fact, as SCA would reveal after researching the issue a couple of weeks later, 58% of the CDOs backing the ABS CDOs were mezzanine rated, i.e., represented middle tranches in the hierarchy of loss absorption.

185.    The statements in ¶¶ 174 – 184 were false and misleading because:

(a)    SCA had failed to create adequate loss reserves in light of the drastic alteration of its portfolio, as described more fully in ¶¶ 93, 298 – 332.  Indeed, SCA had failed to update its loss expectations, and thereby alter its unallocated reserves, despite the fact that major credit rating firms announced that they raised their loss expectations.  For instance, on March 26, 2007, S&P raised its loss expectations on 2006 subprime mortgage bond issues to 7.75% from a previous assumption of 6.5%. On July 10, 2007 Moody's Investor Services increased its original

loss expectations "by a stress factor of 20%." In fact, according to Warren Kornfield, Moody's

Investors Service Team Managing Director, "[f]rom 2003 to 2006, Moody's cumulative loss

expectations for subprime mortgage securitizations steadily increased, by approximately 30%, in

response to the increasing risk characteristics of subprime mortgage loans and changes in …

market outlook." In August of 2007, Glenn Costello, a Managing Director of residential

mortgage-backed securities at Fitch, stated during a conference call that the stricter rating criteria

will increase default expectations by 20%, while default expectations for subprime mortgages

will increase by as much as 22%;

> (b)    SCA understated its mark-to-market losses by failing to monitor the

collateral underlying ABS CDOs backed by more than 50% RMBS, and failing to consider

current market conditions, including the observed performance of the RMBS SCA had insured

directly;

> (c)    Though SCA stated that it was monitoring the collateral underlying its

CDOs and assessing the value of its credit default swaps on a monthly basis, in fact, this was not

the case. Indeed, the Vice President stated that SCA management did nothing in response to

Countrywide's July disclosures of loss profits due to increasing defaults of sub-prime loans.

> (d)    SCA did not disclose that for six of the ABS CDO deals it had signed in

2007 — i.e., six of the seven Merrill deals — it had insured not the most senior tranche, but the

secondmost senior tranche;

> (e)    For the reasons stated above at ¶¶ 101 *et seq.*, SCA did not exercise

prudent risk selection;

> (f)    The mark-to-market losses were, in fact, reflective of the deteriorating

quality of the portfolio, as described more fully at ¶¶ 93, 298 – 332. These losses would not

necessarily accrete to zero, and, in fact, unrealized losses could — and did — become realized losses in the event that SCA was forced to pay claims in excess of premium. At minimum, SCA's lack of insight into its portfolio made it impossible for SCA to determine one way or the other whether credit quality had deteriorated;

(g)    SCA did not, in fact, release the results of its actuarial analysis after the third quarter. Instead, as explained below at ¶ 242, without any explanation, after the third quarter, SCA simply stated that its annual actuarial analysis would be conducted in the fourth quarter. SCA would not acknowledge that it had previously claimed the analysis would take place in the third quarter. After the analysis was finally completed, SCA's loss ratio turned out to be 334% for 2007 as a result of nearly $1.2 billion worth of losses on its ABS CDOs both in the form of increases to reserves and mark-to-market losses in the fourth quarter of 2007;

(h)    SCA's internal models were not distinct from those used by the ratings agencies, and in fact depended on ratings agency simulations, historical comparisons, and judgments concerning the likelihood of a downgrade; and

(i)    As explained above at ¶¶ 52 – 54, the overcollateralization triggers did not serve as "robust" protections for the CDOs embedded within the collateral backing SCA's ABS CDO exposure.

186.    After the call, Fox-Pitt Kelton issued a report stating that though the market had reacted negatively to SCA's earnings announcement, apparently fearing that SCA was vulnerable to the housing downturn, it had confidence in SCA because it believed financial guarantors like SCA had constructed their portfolios to avoid correlation risk — i.e., the risk that it would be overexposed to a single type of risk. The report stated that it viewed SCA as a buying opportunity.

187.    Deutsche Bank also issued a report on July 24 reiterating its "Buy" rating on SCA stock, increasing its predicted earnings-per-share, and highlighting SCA's strong new business production in the area of structured finance.

188.    Reacting to the losses reported by SCA as well as the uncertainty as to the effect of the housing market on SCA's business, SCA's stock price fell from $28.73 on July 23, 2007 to $24.37 on July 24, 2007.

189.    According to both the Vice President and the Managing Director, the extent of analyst interest in SCA's mortgage exposure during the July 24, 2007 conference call took SCA by surprise and led SCA to host a second call, on August 3, 2007, to specifically discuss the mortgage collateral underlying its CDO and RMBS policies.  The Managing Director reports that it was only after the July call that SCA made a serious effort to research the underlying collateral — only to discover that, as explained above, SCA was hobbled by "evolving" computer systems that could not capture data between quarters.  The Vice President confirms that even though his group was responsible for testing the CDOs under various economic scenarios, SCA had relied so heavily on the agency ratings for deals like the ones with Merrill that no such models were seriously run until after the July conference call, in preparation for the August follow-up.  Even then, the Vice President stated that the CDOs were so complex that his group found them difficult to model; as explained above, SCA ran simulations involving subprime losses with no consideration as to whether subprime losses were likely to be correlated with prime losses.

### f.    August 3, 2007 Conference Call and PowerPoint Presentation

190.    On the August 3, 2007 call, SCA addressed its mortgage exposure both in its directly insured RMBS, and in its CDOs.  In the course of the call, SCA for the first time revealed many more details of its ABS CDO portfolio.  SCA disclosed that it had currently 22

deals on its books for ABS CDOs with greater than 50% RMBS collateral, and that of the $22.2 million in mark-to-market losses recorded in the second quarter, only $13.3 million was due to those ABS CDO deals.[9]  SCA also, for the first time, revealed that of the CDOs that served as collateral for its ABS CDOs, 58% were mezzanine level.  Finally, Rasul disclosed that the RMBS collateral underlying the CDOs was of the same vintage as the CDO itself — meaning that the CDO deals signed in 2006 and 2007 were collateralized with loans issued in those years.

191.    SCA attempted to assuage concerns by distributing a PowerPoint presentation, simultaneously posted on the SCA's website and filed with the SEC on Form 8-K, detailing SCA's ABS CDO exposure.  Among other things, the pie chart showed that out of the $14.7 billion exposure to ABS CDOs with more than 50% RMBS collateral, 96.8% was rated "AAA," with "BBB" and "below investment grade" exposures as $10 million and $4 million, respectively — described on the chart as "0.0%" of the portfolio.  The PowerPoint presentation also revealed that in addition to its ABS CDOs, SCA had directly insured $8.6 billion of RMBS, of which $2.1 billion was subprime.

192.    Nonetheless, Heberton stressed SCA's diligence and prudence in underwriting:  "I want to emphasize that everyone involved in the underwriting process at XLCA is committed to maintaining strong credit discipline. We consider that the key to our success. We expect our transactors to act as our first line of defense by selecting only the best deals to pursue."  He also praised the quality of SCA's stress testing and modeling, promising that before SCA agreed to insure any security, "[W]e subject the deal to a variety of severe stresses to make sure it can withstand multiples of expected loss rates without us paying claims."  Rasul, too, speaking

_____

[9] In fact, in the 10-Q that would be filed a week later, the Company would disclose that ABS CDOs were associated with a $13.8 million mark-to-market loss.

specifically of SCA's process for underwriting CDOs, stated that SCA conducts a "detailed scrutiny of every asset in the portfolio. We talk through the portfolio with the manager, getting their views on each asset, querying the ones that we feel are risky or which don't seem to fit the manager's strategy. We will also test the portfolio through stress modeling…."

193.    Rasul also stressed that SCA controlled for risks inherent in subprime mortgages with "strict limitations" on the amount of subprime collateral in its CDOs.  The PowerPoint presentation also stated that SCA maintained "limits on subprime exposure" within its CDOs. Subprime was defined on the call and on the presentation as including borrowers with FICO scores below 640.  SCA also emphasized that its underwriting was not dependent on agency ratings.  Heberton explicitly stated that "Our underwriting of deals is independent of the rating agencies. We develop our own views based on rigorous analysis of the data and in-depth due diligence with the managers and originators."  The presentation distributed to analysts also stated, "Underwriting is independent of rating agencies."

194.    SCA once again assured analysts that it was carefully monitoring the performance of the collateral in its CDOs.  Giordano stated that "Our AAA ratings have not been affected by recent developments in the market as well. . . .  [O]ur RMBS and CDO portfolios are structured to withstand considerable stress and are performing very well amid the current turmoil in the credit market."  He went on to state that "Losses are possible and do occur from time to time, but we actively monitor the performance of the credits we insure to give ourselves the opportunity to intervene early in the event of deterioration and substantially mitigate, and ideally eliminate, the risk of loss."

195.    Hoffman told the analysts that recent actions by the ratings agencies affected only "52 out of 3,305 unique securities in our ABS CDO collateral pool, with no concentration within

any one particular transaction.  None of our ABS CDOs are on our watch list."  He also stated

that Surveillance "track[s] the entire portfolio consisting of over 100 transactions on at least a

monthly basis."  The presentation distributed to analysts stated "CDOs tracked at least monthly

based on information received from trustee and manager" and repeated Hoffman's assertion that

no ABS CDOs were on the watch list.  Hubbard also stated, "[W]e are in regular contact with the

CDO managers, and so we do have visibility into the collateral that they're buying into their ABS

CDOs."

196.    Praising the quality of SCA's stress tests, Rasul told analysts that "The

downgrade analysis shows that we could downgrade every single asset three to four notches and

not affect the rating of our risk position. . . ."  Hubbard, as well, emphasized that the ABS CDOs

survived stress testing because, "as we had stated earlier, the average credit rating on our ABS

CDO portfolio is super-senior."  However, in discussing the CDO stress tests, Rasul unwittingly

revealed some of the disconnect between SCA's stress tests for its CDOs relative to its actual

experience on its directly-insured RMBS.  The presentation distributed to analysts stated that

among its directly-insured subprime RMBS, SCA was expecting losses of 10.4% for loans issued

in 2006 and 2007 — despite the fact that SCA had weeded poorly performing loans out of the

RMBS before signing the deals to insure them.  Nonetheless, Rasul boasted of one of the stress

tests SCA performed for its CDOs: "Subprime mortgage losses could reach 10% across the entire

subprime universe and the rating of our super senior position would not be remotely at risk."   In

other words, despite the fact that SCA knew that the *base case* was 10.4% losses on subprime

RMBS, SCA used 10% as a *stress test* for its CDOs.

197.    Moreover, despite SCA's claims of careful monitoring, underwriting, and stress testing, some of the deficiencies in its understanding of its portfolio were revealed when an analyst expressed dissatisfaction with the 10% stress test:

> Q: And I'm curious, you picked 10% as sort of the stress level on the subprime RMBS, but do you have a sense of what happens if it's 15% or 20%? …
>
> Rasul: [W]hen we run a 10% loss scenario, our CDO positions still retain several multiples of the required AAA enhancement. So I think we can safely say it would take something significantly in excess of 10% for us to see significant impact on our super-AAA CDO position. *Frankly, to try to do more than that would require us to drill down and model every single security inside every single CDO, which runs into tens of thousands of securities. And that's not something that is really practical at that time.* As Ed said, to reiterate, we feel comfortable that we can sustain substantially in excess of that 10% number. (emphasis added).

198.    Hubbard also admitted that SCA simply did not know what level of subprime losses its ABS CDOs could withstand beyond the current, existing loss levels:

> So as we had indicated earlier, we know that we can withstand at least a 10% accumulative pool loss in all *subprime* RMBS deals across our entire portfolio, both direct and to our ABS CDO portfolio, and we know that we can withstand an even higher level of losses. *It's just hard for us to put out a specific number around that point*.  (emphasis added).

199.    SCA's lack of information about its tolerance levels for losses among the RMBS backing its CDOs stood in sharp contrast to its disclosures about tolerance levels for its directly insured RMBS: during this call, SCA was able to quantify that for its directly-insured subprime RMBS, it could tolerate losses of up to 26.2% for 2006 and 2007 vintages.

200.    In fact, only a month later, SCA would publicly state that it expected median losses of 10% on the subprime RMBS of 2007 vintage underlying its CDOs, and 12.5% on the subprime RMBS of 2006 vintage.  Because the collateral underlying its CDOs was entirely 2006

and 2007 vintage, these figures demonstrated the inadequacy of SCA's 10% stress test.  In fact, as far back as October 2006, the Center for Responsible Lending forecast that nearly 20% of vintage 2005 and 2006 subprime mortgages would end in foreclosure.

201.    When an analyst asked how SCA could be so comfortable with its ABS CDO exposure, Rasul answered, "We are in the process right now of going through all of our managers and talking to them about how these deals are performing, and we're very encouraged by what we've been hearing" — thus tacitly admitting that this process had not been conducted earlier.

202.    Rasul also assured analysts that "We then compare [the] break-even default rate [calculated on a CDO] to the worst default rate we can find in history for any investment of similar credit ratings, which just happens to be in the Moody's corporate bond default database.  Our CDOs can survive many multiples of the worst corporate bond default rate ever experienced."  Later, he reiterated, "Our CDOs could withstand an average of two times to four times the worst Moody's corporate bond default in history."  What Rasul did not reveal — and would not reveal until he spoke at another conference a month later — was that by his calculations, the "worst" historical bond default rate was 2.81%, or less than a third of SCA's expected losses on subprime RMBS from 2006 and 2007.

203.    SCA also made clear the degree to which it emphasized the use of overcollateralization triggers as a mechanism for monitoring its CDO performance and protecting against losses.  In the process of this discussion, and in addition to the statements quoted above, SCA repeatedly emphasized that SCA was exposed only to "senior" liabilities.  Rasul stated that he would explain how "triggers will cause a CDO to de-lever and pay out the senior classes of liabilities."  He told analysts that "the ability to track interest proceeds means that senior CDO liabilities can generally sustain losses that are larger than the absolute dollar amount of

subordination" and directed analysts to the PowerPoint presentation, which listed the existence of

the triggers as one of the main mechanisms for monitoring CDO performance and stated that

"Because of over collateralization ("OC") triggers, CDO structures will trap cash and pay it to

the senior notes if there is material deterioration."  Rasul also explained that "In high-grade ABS

CDOs, the trigger levels are very sensitive, so even one or two assets defaulting typically will trip

the triggers. Therefore, the senior liabilities are being paid down not from asset sales but just

from cash that is being diverted in the cash flow waterfall." Hoffman also stated that the

Surveillance Group "closely monitor[s] the OC ratios because the OC tests are one of the key

sources of structural enhancement for SCA at the super senior tranche," explaining that "if a test

is breached, cash that normally would flow to the equity holders is instead used to pay down the

senior notes, thereby de-levering the deal and building SCA's credit enhancement."

204.    Rasul presented an example of a CDO structure from 2002 which, he said,

demonstrated the power of the triggers.  He explained the presentation as "an excellent example

of the power of over-collateralization triggers, of being senior in the liability structure, of the

structure giving the deal time to work through the problem and of manager cooperation in

protecting senior note holders."  The PowerPoint presentation described the 2002 illustration as

showing that "The senior class was downgraded from AAA/Aaa to A/Aa2 and subsequently

upgraded to Aaa/Aa positive."

205.    As it had done during prior analyst calls, SCA also sought to minimize the

significance of mark-to-market losses.  The chart distributed to analysts repeated this sentiment

in three places, stating "Unrealized loss will accrete to zero as deal approaches maturity."

Giordano told analysts:

> Although we are required to reflect in our income statement
> unrealized — and I stress unrealized — gains or losses on

protection we write in credit derivative form, this is solely due to
spread widening, not credit deterioration, and merely reflects the
protection previously sold at an adequate price could be sold for
even more today…. Over time, as David will demonstrate later in
the presentation, negative markets on credit derivatives should
revert to zero and, as a result, do not affect how we view the
performance of our business.

206.    Similarly, Shea stated:

[I]t's important to emphasize that the second quarter $22.2 million
unrealized mark to market loss we reported does not reflect an
impairment of any kind, an incurred loss, any claim or any credit
deterioration.

SCA has the ability and intent to hold these CDS positions to
maturity, and these unrealized losses will accrete to zero as the
contracts approach maturity. There is no structural or market-based
reason for SCA to crystallize this unrealized loss.

…Financial reporting reflects the more significant impact with
reductions to net income and corresponding reduction to
shareholders' equity, but a temporary one. … From the perspective
of valuation, the impact to shareholders' equity, that book value
can sometimes be significant, but also temporary.

207.    Shea said "As we mentioned on our earnings call last week, the sector that

experienced the most significant widening was the CDO of ABS portfolio, for which the

reference credit spread widened 7 basis points at the super senior level."

208.    In addition to the reasons given above, the statements made during the August

conference call were false and/or misleading because:

(a)      SCA was not disciplined in its underwriting, and was not adequately

monitoring the collateral backing its ABS CDOs, for the reasons stated above at ¶¶ 98 – 137.

Among other things, SCA's focus on overcollateralization triggers and the absolute number of

downgraded securities in its ABS CDO collateral failed to detect or consider correlation risk

inherent in the portfolio, and SCA's "stress tests" of its ABS CDO collateral were facially

inconsistent with SCA's actual experience on its directly insured RMBS;

(b)      Despite SCA's claim that it had strict limitations on the amount of

subprime collateral that could be used to back its CDOs, SCA would later reveal that subprime

collateral made up more than half the collateral on several of its CDOs, and exceeded 40% of the

collateral on others.  Moreover, though SCA stated that it defined subprime to mean FICO scores

below 640, in fact, when it had previously disclosed subprime exposure in May, it had only

disclosed exposure associated with FICO scores of 625 or below, thus understating its true

subprime exposure by approximately $1.4 billion;

(c)      SCA's internal models were not distinct from those used by the ratings

agencies, and in fact depended on ratings agency simulations, historical comparisons, and

judgments concerning the likelihood of a downgrade;

(d)      For the Merrill deals, SCA did not insure the seniormost tranche of the

CDO, but instead insured the second most senior tranche; and

(e)      The mark-to-market would not necessarily accrete to zero, and, in fact,

unrealized losses could — and did — become realized losses in the event that SCA was forced to

pay claims in excess of premium.  At minimum, SCA's lack of insight into its portfolio made it

impossible for SCA to determine one way or the other whether credit quality had deteriorated.

209.    Despite SCA's efforts to alleviate the market's fears, however, investors were still

concerned about SCA's exposure to mortgage backed securities.  SCA's stock price fell from a

closing price of $22.52 on August 2, 2007 to $19.36 on August 6, 2007.

210.    On August 10, 2007, SCA executed its final deal with Merrill to insure an

additional $375 million ABS CDO tranche.  Additionally, during this quarter, SCA insured its

24th ABS CDO tranche backed by more than 50% RMBS collateral, in excess of $810 million net par.  On this transaction, the underlying collateral was 64% subprime.   These two transactions brought SCA's total exposure to ABS CDOs backed by more than 50% RMBS to $16.1 billion.

### g.  August 10, 2007 Form 10-Q

211.    Also on August 10, SCA filed its 10-Q for the second quarter of 2007.  The 10-Q repeated the earnings information from the July press release, and stated that loss reserves stood at $174.5 million, or 0.12% of the insured portfolio.  Giordano and Shea signed both the 10-Q and a Certification as required by the Sarbanes-Oxley Act of 2002, 15 U.S.C.A. §§ 7201 *et seq*. The 10-Q also revealed that during the August call, the mark-to-market losses recorded on the ABS CDOs totaled $13.8 million, not $13.3 million.   The statements in the 10-Q were false and/or misleading for the reasons given at ¶ 185.

212.    The 10-Q also stated that SCA's total exposure to subprime mortgages, both through direct insurance of RMBS and through CDOs backed by RMBS, was $4.8 billion. However, with respect to CDOs, this figure only included borrowers with FICO scores below 625, rather than — as SCA had stated just a week earlier — including borrowers with FICO scores between 625 and 640.  By not counting borrowers with FICO scored between 625 and 640 in the totals, SCA understated its subprime exposure by approximately $1.5 billion.  The true amount of SCA's subprime exposure in its CDOs would not be revealed until March 17, 2008.

### h.  September 5, 2007 Conference and PowerPoint Presentation

213.    On September 5, 2007, SCA gave a presentation at the Keefe, Bruyette & Woods, Inc. Insurance Conference.  In connection with the conference, SCA distributed and posted on its

website a PowerPoint presentation that included a chart listing all 22 of its ABS CDOs with more than 50% RMBS exposure as of the end of the second quarter. The chart listed the total amount insured for each CDO, the percent backed by RMBS, and the percent backed by subprime RMBS. The PowerPoint presentation defined subprime to mean borrowers with FICO scores below 640, and Hubbard also stated in the course of the presentation that SCA defined subprime to mean borrowers with FICO scores below 640.

214.    However, just as with the second quarter 10-Q, unbeknownst to investors, the subprime exposure listed on the chart of CDOs only included borrowers with FICO scores below 625. By eliminating borrowers whose FICO scores fell between 625 and 640 from its disclosures of subprime exposure, SCA was able to significantly understate the subprime exposure in its CDOs.

215.    For example, on one CDO, the chart stated that out of a total $370.6 million insured, subprime exposure was 27.6%. In fact, using a FICO score of 640 as the subprime cutoff, subprime exposure was 30.8%. On another CDO, SCA stated that of $798.9 million insured, subprime exposure was only 24.6%. The true figure, as SCA would later reveal in March 2008, was 39% - a difference of approximately $115 million. On a third CDO, SCA listed its subprime exposure as 26.5% of $505.3 million — the true figure, SCA would later reveal, was 40.4%, for a difference of approximately $70 million. All told, by using a FICO score of 625 instead of 640, SCA understated the subprime exposure in its CDOs by approximately $1.5 billion.

216.    By understating its subprime exposure in this manner, SCA was also able to maintain the illusion that it instituted strict controls on subprime exposure. During the course of the conference, Rasul stated, "As a matter of underwriting policy, we place restrictions on the

amount and quality of subprime RMBS that we are prepared to accept in our CDOs.  None of our

CDOs after 2005 had more than one-third of their exposure in subprime RMBS, and most are

considerably less."  He later reiterated, "As far as the subprime mortgages and mezz ABS CDOs

are concerned, we can show those by imposing strict limitations on the amount that can be in any

CDO portfolio."  The chart of CDO deals appeared to back up these assertions — according to

the data SCA provided, only two CDO deals, both of older vintage, had more than one-

thirdsubprime collateral.  In fact, as SCA would reveal in March 2008, ten deals — nearly half of

the deals listed on the chart — exceeded the one-third level (and SCA would sign two additional

deals that were more than half subprime in the second half of 2007).  Of the ten deals with more

than one-third subprime RMBS collateral, six had been signed in 2006 and 2007.

217.    In addition to understating SCA's subprime exposure, Defendants also

misrepresented other aspects of SCA's business.  Both Giordano and Rasul boasted about SCA's

underwriting and monitoring procedures.  Giordano told conference attendees that "Credit

underwriting and risk mitigation really lay at the core of our culture, and we actively monitor the

credits we insure through our surveillance group."  Rasul described SCA's exhaustive stress

testing, stating that, "[W]e will run an impact analysis on a selection of the RMBS portfolio to

assess the likelihood of high defaults, and we use the same kind of high stresses that [inaudible]

that line we use for our mainstream RMBS business."  The PowerPoint presentation stated, "If all

securities downgraded to BBB+, then portfolio would need to withstand 11.5% cumulative

default to maintain AAA rating — Our portfolio could withstand downgrade from AA+ to BBB+

(6 notches) and still have AAA ratings on the senior tranche."

218.    Additionally, the PowerPoint presentation listed the following tactics that SCA

purportedly employed to "out-perform" the subprime market: "Higher quality originators and

servicers, Loan seasoning, Better performing loan types (e.g., full doc, low LTV loans), Stronger

deal structures."

219.    As he had done in prior calls, Giordano minimized the significance of SCA's

mark-to-market losses, stating:

> Traditionally, we've marked our exposures to market rather than to
> model. Gains or losses from these marks are unrealized and merely
> reflect the change in credit spreads each quarter. It does not
> represent credit deterioration. In the event that we have credit
> deterioration as an insurance company, we will post a specific case
> reserve in respect of that.   And as we demonstrated in our call last
> month, these marks, because we hold them to maturity, will accrete
> back to zero over time as these transactions amortize…. So
> directionally we would expect to see an additional unrealized
> negative mark for the third quarter, although we're not really yet in
> a position to estimate or try to quantify that. However, this mark
> too should revert to zero over time as the underlying exposures
> amortize.

220.    As in the August call, Defendants emphasized overcollateralization triggers and in

particular how they protected "senior" note holders.  Rasul began by saying, "Now I want to talk

now about another topic that's receiving much attention, and that is protection offered by CDO

structures in the event of portfolio deterioration, specifically how these triggers will cause a CDO

to delever and pay out the senior classes of liability."  He explained that due to triggers, "As the

bonds deteriorate and get downgraded, this will cause over collateralization triggers in the CDOs

to be tripped and the CDOs start to trap cash, . . . and use that cash to pay down the senior-most

liabilities in sequence."  He offered the same example of a 2002 deal structure that had been used

in August, stating that "The point of this example is that it shows the power of having OC

triggers, of being senior in the liability structure and of the structure being given time to work

through the problems."  When describing an example from August 2006, he described it as a case

in which SCA "insured $1.06 billion of the super-senior class."   The PowerPoint presentation

also described overcollateralization triggers as "trap[ping] all principal payments and excess

interest from the collateral and pay it to the senior notes if there is material deterioration."

221.    SCA also drew attention to its "senior" position.  Giordano explained the mark-to-

market losses as being the result of "credit spreads on even AAA super-senior tranches of ABS

CDOs [that] widened significantly late in the quarter."  Rasul told analysts that "Every one of our

ABS CDOs is a super-senior risk attachment, on average at 2.6 times the level of subordination

required to achieve an AAA rating," a claim repeated in the PowerPoint presentation, and

Hubbard described how SCA established base case losses by determining "the default rate that

causes the first dollar of loss to the super-senior risk attachment."

222.    At this conference, Rasul also clarified what he had meant when he said in August

that SCA's CDOs could withstand multiples of the "worst corporate bond default rate ever

experienced" by comparing a sample CDO to "the worst Moody's corporate bond default rate for

a similarly rated cohort and that default rate happened to be 2.81%."  SCA also stated that it was

now projecting median losses of 12.5% on the 2006 vintage subprime RMBS underlying its

CDOs, and 10% on the 2007 vintage, thus tacitly invalidating its 10% stress test only a month

after the August call.

223.    The statements made during the Keefe, Bruyette & Woods conference were false

and/or misleading because:

(a)    As explained above, SCA had materially understated its subprime

exposure and misrepresented its policies for controlling for subprime risk in the CDOs it insured;

(b)    For the reasons stated at ¶¶ 101 *et seq.* and ¶¶ 50, 190 – 208, SCA was not

properly monitoring its CDO exposure or conducting appropriate stress tests.  Additionally, it

was not performing the same stress tests on its RMBS exposure within CDOs that it performed

on its directly-insured RMBS.  Whereas during the August call, SCA was able to state its precise

outer limit of tolerance of losses on subprime loans for its directly-insured RMBS, it was unable

to do so for the subprime RMBS contained within its CDOs, other than to say it could tolerate

losses in excess of 10%;

        (c)     As explained above in ¶¶ 101 *et seq.*, SCA did not mitigate risks by

selecting high quality originators, low LTV loan types, or seasoned loans;

        (d)     The mark-to-market losses were, in fact, reflective of the deteriorating

quality of the portfolio, as described more fully at ¶¶ 93, 298 – 332.  These losses would not

necessarily accrete to zero, and, in fact, unrealized losses could — and did — become realized

losses in the event that SCA was forced to pay claims in excess of premium; and

        (e)     For the Merrill deals, SCA did not insure the seniormost tranche of the

CDO, but instead insured the second most senior tranche.

224.    Also on September 5, 2007, the SEC stated that it was conducting an investigation

into the role of the ratings agencies and their policies for reviewing mortgage-backed securities.

Testifying before a House subcommittee, SEC Market Regulation Director Erik R. Sirri said that

the Commission was examining potential conflicts of interest, as well as agency disclosures and

the meanings of various ratings.  That investigation would ultimately culminate in the July 2008

report.

225.    Reflecting the market's continuing uncertainty as to SCA's stability in light of the

mortgage downturn, SCA's stock price fell from $20.89 on September 4, 2007 to $19.77 on

September 6, 2007.

226.    On October 3, 2007, Fitch completed its review of 2006 subprime RMBS and

downgraded 1,003 classes of bonds, with a par balance of $18.4 billion.

227.     On October 4, 2007, Moody's reported that subprime mortgage bonds backed by 2007 vintage loans were going delinquent at the fastest rate ever.  According to Moody's, 6.3% of the loans in bonds issued in the first half of 2007 were seriously delinquent four months after their securitization.  By comparison, in 2006, the rate was 4.2% after four months.  Moody's released a chart of the performance of subprime mortgages issued in 2007 as compared to prior years.

228.     The chart illustrated that for subprime mortgages issued in the first half of 2007, losses had already reached 6.3%, and were on a trajectory for losses far worse than any prior year — including 2000, when losses peaked at almost the 10% level 18 months after issuance.  The chart also illustrated that 2007 loans were performing worse than 2006 loans, and that 2006 loans hit the 10% loss level nine months after issuance — or nine months earlier than the next worst performing year.  In other words, in the third quarter of 2007, sufficient data was available to show that subprime loans from 2006 were on a trajectory to greatly exceed the 10% level, and that 2007 loans were likely to perform even more poorly.

229.     On October 5, 2007, Merrill issued a press release stating that it expected to report write-downs of $4.5 billion, net of hedges, of its CDOs and subprime mortgage holdings.  The press release stated that "[t]hese valuation adjustments reflect in part significant dislocations in the highest-rated tranches of these securities which were affected by an unprecedented move in credit spreads and a lack of market liquidity in these securities, which intensified during the third quarter."

### i.    October 16, 2007 Form 8-K

230.     On October 16, 2007, SCA issued a press release announcing that it also would record mark-to-market losses in the third quarter — of $145 million.  The release quoted Shea as

saying, "It is important for investors to recognize that this unrealized mark-to-market adjustment is not an actual loss, claim, or impairment of SCA's insured portfolio. Our credit derivative contracts are functionally equivalent to the financial guarantee insurance policies we write, are held to maturity, and are not subject to margin or collateral calls."  Giordano observed, "All product lines contributed to strong year-over-year production growth, reflecting the opportunities we saw to write new business at higher prices on generally stronger credit terms.  We believe our franchise is well positioned to take advantage of the improved environment for providing financial guarantee protection going forward."  SCA also stated that it would report $140 million of new business, as measured in adjusted gross premiums, and that it had not established any additional case basis reserves.  The press release was filed with the SEC on Form 8-K.

231.    SCA's stock price closed at $20.81 on October 16, down from $21.39 the previous day.

232.    On October 17, 2007, Deutsche Bank issued a report on SCA noting that despite the mark-to-market losses, which were "smaller than we expected," SCA had not added to case basis reserves.  The report stated that "We are not concerned with the aforementioned loss as it is purely accounting driven and does not signify an underlying economic problem, in our view."  The report highlighted SCA's "strong" new business growth and stated, "We maintain our Buy rating given the company's faster growth rate, attractive valuation, . . . and that subprime mortgage fears should pass without significant losses."

233.    That same day, S&P downgraded 1,713 classes of RMBS backed by subprime, mid-prime, and second-lien loans issued in the first half of 2007.  S&P stated:

> Transactions issued in 2007 have not experienced an adequate
> payment history to reliably apply our traditional surveillance
> assumptions; however, the same risks that are apparent in
> transactions issued in 2006 are present in transactions issued in

2007. Therefore, we reviewed ratings for the first half of 2007 based on our current default, loss, and cash flow assumptions for assigning new ratings.

… Also for transactions backed by first-lien subprime loans and first-lien Alt-A loans issued from January through April 2007, we further adjusted our ratings based on the extent of seriously delinquent loans in each transaction. Seriously delinquent loans include loans that are either: delinquent by more than 90 days, in foreclosure or for which the real estate is in possession of the servicer. Transactions issued during May and June 2007 did not have sufficient payment history for this adjustment to be relevant.

The report also stated that S&P was reevaluating CDOs that were backed by the downgraded RMBS.

234.    On October 19, 2007, S&P additionally lowered ratings on 1,413 RMBS classes backed by subprime mortgages issued from the fourth quarter of 2005 through the fourth quarter of 2006.  S&P explained its actions:

The September 2007 data shows increasing levels of overall delinquencies and serious delinquencies. Seriously delinquent loans include loans that are either: delinquent by more than 90 days, in foreclosure, or for which the real estate is possessed by the servicer. *For all U.S. RMBS backed by first-lien subprime mortgage loans issued during this period, overall delinquencies averaged 21.43%, and serious delinquencies averaged 14.17%. This is in contrast with the downgraded transactions, for which overall delinquencies averaged 15.73% and serious delinquencies averaged 23.33%.*

We expect that the downgraded securities will be particularly vulnerable to increased losses because, on average, 60%-70% of the loans backing them are subject to some type of payment adjustment in the near future.

*** 

As part of this review, we assumed losses for defaulted loans that closed during the second half of 2005 at a level of 40%, and for those that closed during 2006 at a level of 45%. *During our July 2007 review we assumed losses for defaulted loans that closed in*

*2006 of 40%. We have now increased this assumption based on the most recent data and projected declines in home value*s.

(emphasis added).

235.    On October 24, 2007, Merrill issued another press release announcing that although it had originally intended to write down $4.5 billion worth of CDO and subprime mortgage assets, it had now revised that figure upward and had written down $7.9 billion. Merrill's Chair and CEO, Stan O'Neal, explained the change: "In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated.  We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions."

**j.    October 25, 2007 Form 8-K and October 26, 2007 Conference Call**

236.    The next day, SCA issued a press release, filed with the SEC on Form 8-K, announcing its results for the third quarter of 2007.  SCA had actually reduced its planned write-down from $145 million to $143 million, resulting in a net loss of $89.9 million for the quarter, and it reported adjusted gross premiums of $141.1 million, a 55% improvement over the prior year period.   SCA stated that adjusted gross premium for structured finance had improved 32%, in large part due to Consumer ABS, a category that included directly-insured RMBS.  However, although SCA would disclose in a conference call with analysts that it had placed three directly-insured RMBS contracts on its list for special monitoring, SCA's only increases to its unallocated reserves were due to growth in the portfolio, and not due to any reassessment of the risks inherent in its ABS CDO exposure or even its directly-insured RMBS.  There were no additions to case

basis reserves for ABS CDOs with more than 50% RMBS collateral, or even additions to case basis reserves for directly-insured RMBS.  The press release quoted Giordano as saying, "New business production in the third quarter was one of the strongest in our history, fueled by generally higher pricing and stronger credit terms.  Our triple-A ratings remain strong despite the stress in the residential mortgage market and we are well positioned to take advantage of the improved environment for new business."

237.     Fox-Pitt Kelton responded to the press release with an October 25, 2007 report raising its earnings estimate, though the report noted that SCA's stock decline "seems to imply that the market believes there is a high correlation of loss potential across a variety of types of collateral."

238.     Meanwhile, in late 2007, home prices had fallen by more than 6% from mid-2006 and existing-home sales had fallen by a third.

239.     On October 25, 2007, the day of the earnings announcement, SCA's stock closed at $13.21, down from $14.41 the previous day.

240.     On October 26, 2007, SCA hosted a conference call for analysts to discuss its third quarter results.  After Giordano repeated the net income and mark-to-market losses contained in the press release, SCA stated that it now insured a total of $16.1 billion worth of ABS CDOs, or 24 deals, in which the underlying collateral was more than 50% RMBS.[10] Nowhere did SCA reveal that it had insured eight separate deals involving the CDOs of Merrill — which had announced nearly $10 billion in write-downs two days earlier.

_____

[10] Hubbard stated that the $16.1 billion figure was "high grade."  This was not true; it included roughly $300 million of older mezzanine CDOs.  The correct figures would be listed in SCA's 10-Q.

241.    Hubbard then disclosed that of the 3,700 securities underlying these CDOs, 16.9%
had been downgraded by at least one ratings agency, with an additional 4.6% placed on negative
watch.  The average downgrade amount was 2.8 notches.  Additionally, two of the 24 ABS
CDOs had tripped overcollateralization triggers, and Hubbard stated that "Based on the recent
downgrades, we anticipate that another three ABS CDOs will be out of compliance with one or
more hard coverage tests going forward and will, therefore, trip their triggers, which will serve to
divert cash flow to the senior-most class of securities."  Shea also reported that because "trading
of certain CDO obligations was virtually nonexistent," there were few or no market indices on
which to rely in establishing the fair value of the insurance contracts.

242.    Nonetheless, SCA reported that it had not placed a single one of the 24 ABS
CDOs on watch for special monitoring, nor had it established case basis reserves for any of them,
nor had it updated its loss projections in such a manner as to increase its unallocated reserves.
Still, Shea boasted that SCA's "net unallocated reserves at the end of the third quarter stand at
approximately $85.7 million and, as a percentage of total par insured, is among the highest in the
industry."  Notably, even though during the July 2007 conference call Shea had stated three times
that SCA would reassess its actuarial work, and its reserves, in the third quarter of 2007, Shea
now stated — with no explanation — "*Looking ahead to the fourth quarter, we will be
conducting our annual actuarial analysis of our loss reserves.* We continue to expect our
effective unallocated loss ratio for 2007 to be in the range of 10% to 12%."[11] (emphasis added).
Shea's failure even to explain why they were delaying the analysis by three months — and thus
would not release the results of the analysis until March 2008, or five months after the results

_____

[11] The loss ratio is another mechanism for describing reserves.  It is calculated by dividing net
losses and loss adjustment expenses by the net premiums earned.

were originally promised — demonstrates that SCA was aware that the analysis would result in

tremendous losses or, at minimum, that SCA was aware it simply did not have sufficient insight

into its ABS CDO portfolio to conduct the analysis in the first place.  In fact, when SCA did

finally conduct its analysis in the fourth quarter, it would be forced to create case basis reserves

for ABS CDOs of nearly $1 billion.

243.    Because the markets for CDOs and RMBS were virtually frozen, Shea stated that

SCA established fair value of its credit default swaps — and thus its mark-to-market losses for

the quarter — based on an "internal pricing model" that included "management judgment" and

"data inputs" such as credit spreads, "our judgment in regards to market perception of risk," the

life span of SCA's contracts, historic rates of return, and "estimated returns required by a market

participant in the current market."  The purpose of the model was to calculate fair value based on

the present value of expected future cash flows due to SCA under the contract and an

"appropriate" rate of return in the current market.  Through this process, SCA had settled on the

$143 million loss figure, 77% of which was attributable to the 24 ABS CDOs and to certain other

credit default swaps.  Shea also continued to claim that mark-to-market losses were unimportant:

"This unrealized loss is not the result of claims, impairment or incurred losses, but merely

reflects a fair value adjustment of these instruments primarily due to the higher premiums that

could be received today to bear these risks. Since we hold these positions until maturity, these

losses will accrete back to zero."

244.    Despite the tripped overcollateralization triggers, the frozen markets, and the

massive write-downs announced by Merrill, SCA continued to insist that its portfolio was strong.

Hubbard stated that "based on what we see now, we do not foresee significant adverse credit loss

development in our RMBS or CDO product lines…" with exceptions for certain direct RMBS

exposures.  Hubbard assured analysts that all of SCA's high grade ABS CDO exposure "has a super AAA credit rating. The super senior attachment level represents a weighted average multiple of 2.7 times the level of subordination required by the rating agencies to receive a AAA rating."   He stated that because tranches of CDOs are "insulated" from delinquencies and charge-offs in the underlying collateral due to the fact that "[w]e have focused on super senior AAA attachments with highly rated diversified collateral and capable CDO managers … we do not see significant credit deterioration in our insured portfolio."  Finally, Hubbard claimed that, "while recognizing that it is still early days, we do not expect to suffer any losses. Given the recent rating agency actions in the RMBS and CDO sectors, our ABS CDOs are performing well within the tolerance's structure into these deals."   Shea, as well, insisted that "Our AAA capital position is strong, our insured portfolio is healthy and the pricing environment for financial guarantee insurers has improved considerably."

245.    Defendants repeated assurances offered during earlier conferences regarding the degree of credit enhancement inherent in their ABS CDOs.  Hubbard insisted that "[I]t is important to emphasize that our super senior attachment levels provide us with an important buffer from a downgrade of our guaranteed exposure.  On average, 100% of the collateral or every single one of the underlying securities in one of our ABS CDOs would have to be downgraded by three notches in order for our exposure simply to be downgraded to AA.  ABS CDOs typically have deal level triggers, which can cause excess cash flow to be diverted from paying the equity and mezzanine holders and instead used to amortize its senior notes on a sequential basis."  In addition, Shea stated, "But please keep in mind that the CDO tranche we wrapped can withstand between a three- to four-notch downgrade of 100% of the underlying collateral without being subject to a downgrade itself."  And Rasul insisted, "At this stage, we are

still comfortably within the AAA range, as Ed mentioned in his earlier remarks, because of the

substantial cushion that we have underneath our position, if we take several notches of

downgrades across the entire portfolio in one of these CDOs, for it even to be considered not

AAA. *So we are a long way away at this point from restricting any of these to be in danger of

being downgraded to non-investment grade.*" (emphasis added).

246.    Finally, Hubbard claimed they were monitoring the situation closely.  Hubbard

stated, "[W]e have pretty good visibility into the performance of the collateral that is underneath

the deal. So we have guaranteed, as a for instance, when you take a look at the RMBS that we

have guaranteed, we receive monthly trustee reports that give us the high level of detail on how

the collateral is performing. . . .  And we received similar information for the CDOs that we have

guaranteed."  Rasul, as well, told analysts that, with respect to the CDO collateral underlying the

ABS CDOs, "we obviously have visibility into the inner CDOs, as Ed said, and we are looking at

the performance of those inner CDO buckets. The ratings of each of the positions within those

are coming under stress, as you would imagine in this market. Where we take comfort is that we

have at the outer CDO levels, sufficient subordination to be able to absorb a significant amount

of deterioration within those inner CDO buckets. And that still remains the case today."

247.    In response to an analyst's question about whether SCA's internal ratings differed

from those of the agencies, Hubbard stated, "At this point, there might be a handful of CDOs

where there is a difference between our internal rating and the third-party ratings. But as I said

before, because of the super senior attachments on our ABS CDOs … as a general matter, our

ratings track pretty closely the current rating agency ratings."

248.    The statements in ¶¶ 236 – 247 were also false and/or misleading because:

(a)     SCA had failed to create adequate loss reserves, as described more fully in ¶¶ 93, 298 – 332 and at ¶ 151.  Indeed, SCA had failed to update its loss expectations, and thereby alter its unallocated reserves, despite the fact that by this time it had publicly announced changes to their own loss expectations;

(b)     SCA understated its mark-to-market losses and the strength of its portfolio by failing to monitor the collateral underlying ABS CDOs backed by more than 50% RMBS, failing to conduct appropriate stress tests, and failing to consider current market conditions, as described more fully above at ¶¶ 101 *et seq.*, and below at ¶¶ 93, 298 – 332;

(c)     The mark-to-market losses did, in fact, reflect deterioration and would not accrete back to zero, as described more fully in ¶¶ 93, 298 – 332;

(d)     SCA did not have visibility into its CDO portfolio and had failed to monitor the collateral; and

(e)     For the Merrill deals, SCA did not insure the seniormost tranche of the CDO, but instead insured the second most senior tranche.

249.    Additionally, during the course of the October 26, 2007 call, Hubbard stated that subprime second-lien RMBS exposure within the ABS CDOs constituted only 0.4%, on average, of the underlying collateral.  This statement was misleading because the 0.4% figure was calculated by defining subprime to mean borrowers with FICO scores below 625; previously, as stated above, SCA had told investors that it defined subprime to include borrowers with FICO scores below 640.

250.    After the call, Deutsche Bank issued a report reiterating its "Buy" rating and restating that its view that the mark-to-market loss was "purely accounting driven" and did not "signify an underlying economic problem."

251.    William Blair also issued a report after the call reiterating its "Outperform" rating. The report stated that SCA had only one discernable area of "mild" credit pressure attributable to its directly insured RMBS portfolio, and opined that although SCA had been "too aggressive" in insuring CDOs in the first half of 2007, SCA, as well as other financial guarantors, had "the best visibility and analytics" to test its insured portfolio and it was not projecting losses. The analyst added that the mark-to-market loss was "only an accounting adjustment, it has no economic impact on the company's business. . . . it is not necessarily a predictor of future losses. . . ." The report concluded that though the mortgage market was in turmoil, "current valuation [of SCA] implies a draconian outcome that we believe is more than discounted in the stock."

252.    Following the call, SCA's stock price rose from $13.21 on October 25, 2007 to $14.09 on October 30, 2007.

253.    Not everyone agreed that the third quarter earnings announcement was all good news. On October 29, 2007, an article in *The Bond Buyer* quoted analyst Andrew Wessel as saying he was "concerned about mark-to-market losses and whether those are going to become somewhat realized down the road." The article also reported that Wessel was worried about the fact that neither SCA nor two of its financial guarantor competitors had increased reserves on CDOs. "The equity market is finding that hard to swallow and so is the debt market," he said.

### k.  Further Deterioration in the Market for Mortgage-Backed Securities

254.    More information about SCA's true financial condition was revealed when, on November 5, 2007, Fitch issued a press release stating that it was reviewing the capital adequacy of financial guarantors in light of its recent ratings actions on CDOs with subprime exposure. Fitch stated that there was a "moderate" probability that SCA would experience pressure on its capital cushion, and it would review the situation over the next four to six weeks.

255.    Three days later, Moody's commented that it was re-estimating the capital

adequacy of financial guarantors to reflect deterioration in RMBS performance, and would

update its stress tests to account for higher subprime loss assumptions on guarantors' RMBS and

CDO exposure.  Moody's reported that there was a "moderate possibility" that XLCA would no

longer have sufficient capital to meet the requirements for its Aaa ratings.

256.    On November 12, 2007, Fitch announced downgrades of 352 CDO tranches.  The

next day, SCA issued a press release announcing that among the downgraded securities were two

ABS CDO tranches that SCA had insured.  The Fitch actions resulted in the formerly-AAA rated

tranches to be downgraded to BBB and CCC, respectively,[12] and together represented $792

million par insured.  The tranches had been insured by SCA in the first and second quarters of

2007, and both were Merrill deals.  SCA also announced that Fitch was reviewing the ratings of

an additional ABS CDO tranche, at a net par exposure of $573 million, that had been insured by

SCA in 2006.

257.    The day after the press release, SCA's stock price closed at $6.64, down from

$7.65 the previous day.

**l.    November 14, 2007 Form 10-Q**

258.    On November 14, 2007, SCA filed its 10-Q for the third quarter of 2007.  The

report repeated the earnings information from the 8-K, and reported total reserves at $181

million, or 0.12% of par insured.  For the first time, SCA detailed the reserves associated with its

structured finance business — the area that included CDOs and RMBS.  For this entire segment,

with exposures of $49 billion, SCA's reserves were only $17 million.  The report also disclosed

---

[12] Fitch's "CCC" rating is non-investment grade.

that of the total $143 million in mark-to-market losses, $85 million was associated with the ABS

CDOs backed by more than 50% RMBS, and stated that SCA's exposure to subprime RMBS

within these ABS CDOs was $3 billion, or 19% of the $16.1 billion worth of these ABS CDOs

that it had insured. However, SCA did not disclose that this figure was calculated by defining

subprime borrowers to mean those with FICO scores below 625, rather than using the 640 cut-off

that SCA had previously stated it used. In fact, SCA's true exposure to subprime RMBS within

these ABS CDOs was approximately $4.75 billion, or nearly 30% of the $16.1 billion of ABS

CDOs. Thus, SCA had understated its exposure to subprime RMBS by approximately $1.64

billion.

259.    The 10-Q also noted certain "subsequent events," i.e., developments that had

occurred after the end of the third quarter but before the filing of the 10-Q. The 10-Q noted the

recent Fitch downgrades of two of its ABS CDO tranches and the fact that a third was under

review, and also disclosed that as of November 12, 2007, Moody's had placed six of SCA's ABS

CDO tranches on "watch for downgrade," with a net par exposure of $2.7 billion. Still, the 10-Q

reiterated that no ABS CDOs had been placed on SCA's watch list as of September 30, 2007.

260.    The above statements were false and/or misleading for the reasons stated in ¶ 248.

261.    The third quarter 10-Q was also false for an additional reason. In discussing its

method for calculating fair value of the credit default swaps, the 10-Q stated:

> In periods prior to September 30, 2007, management principally
> considered price indices published by non-affiliated financial
> institutions in forming our best estimate of the fair value of our
> credit default swap contracts. The fair value of the guarantee was
> determined by multiplying the percentage change in the applicable
> credit price index or indices applicable to the assets referenced in
> the credit default swap by the present value of the remaining
> expected future premiums to be received under the contract.

262.    This was important to investors, because an alternative mechanism for fair valuation — one that involves "estimates" based on discussions with counterparties and management judgment — is significantly more subjective than reliance on market indices, and thus is inherently less reliable.  Indeed, during the September 5, 2007 call, Giordano acknowledged this fact in an exchange with an analyst:

> Q:  I know it's just for GAAP accounting, but how are you making the decision to mark to market or mark to model? I know obviously a lot of the markets are closed? Who's making the decisions?   The rating agencies, their accountants? Are you doing it product by product? How are you making those decisions?
>
> Giordano:  Well, I think historically we've just had a bias to try to mark our portfolio to market and I would say up until recently there hasn't been a significant challenge in being able to do that.
>
> I think other companies in our space and in the broader financial services sector have a mark-to-model approach. What we're working through right now is what's the most accurate way to mark our portfolio, given that you have severe dislocation caused by illiquidity in the marketplace?
>
> So I think our bias is to continue to mark to market.

263.    In fact, however, despite SCA's statement in its 10-Q that it relied on market indices, the fair value calculations in the third quarter 10-Q were not based on market indices, but were instead based on management judgment.  As SCA would reveal on March 17, 2008, when it filed its 2007 10-K:

> In periods prior to July 1, 2007, we principally considered price indices published by nonaffiliated financial institutions in forming our best estimate of the fair value of our CDS contracts.

264.    Later periods, including the third quarter, had calculated fair value in the following manner:

> Of our net liability relating to credit derivatives at December 31, 2007, 47.1%, 2.3%, 48.8% and 1.8%, respectively, reflects estimates based primarily on price discovery resulting from discussions and negotiations to commute certain of our CDS contracts, market indices, management's judgment in regard to the rate of return required by a market participant to transfer the risk, as discussed above, and other factors.

In other words, according to the 2007 10-K, the swaps in the third quarter had not been valued according to market indices, as the 10-Q had stated, but instead were literally 95.9% based on management judgment.

265.    Giordano and Shea signed both the 10-Q and a Certification as required by the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 et seq.

### m. November 18, 2007 S-4/A

266.    On November 18, 2007, SCA filed a Form S-4/A with the SEC in connection with the Exchange Offer, thereby registering the Preferred Shares with the SEC.  The Exchange Offer incorporated by reference SCA's 2006 10-K, the first quarter 10-Q, the second quarter 10-Q, and the third quarter 10-Q, and was thus false and/or misleading for the reasons described above.

267.    On November 21, 2007, Fitch downgraded the third ABS CDO tranche insured by SCA, representing $573 million of exposure, from AAA to BBB-.  SCA's stock price closed at $4.28, as compared to $4.74 the previous day.

268.    On November 26, 2007, Brian O'Hara, the President and CEO of XL Capital, resigned his position from the SCA Board of Directors.  In response, shares of SCA rose from $4.44 on November 26 to $7.06 on November 30, 2007.  An article in *Marketwatch* on November 28 reported that SCA's stock had "surged" over the past two days because O'Hara's departure suggested that XL Capital might be willing to infuse fresh capital into SCA.

269. On November 29, 2007, SCA management spoke at a conference sponsored by Fox-Pitt Kelton and discussed actions it was considering taking to shore up its capital base, including potential reductions in new business and/or increased conservatism in signing new deals, obtaining new reinsurance, raising debt, and raising equity.

270. More information about SCA's financial instability came to light when, between December 12 and December 19, all three ratings agencies announced unfavorable actions on SCA and its subsidiaries:

- On December 12, 2007, Fitch announced that after reviewing SCA's exposure to RMBS and CDOs backed by RMBS, it had concluded that SCA fell $2 billion short of capital adequacy requirements for an AAA rating. The downgrade was based on Fitch's conclusion that a number of SCA's insured CDOs "would now be rated in either the 'BBB' category, or non-investment grade." Fitch also stated that for several of the problematic transactions — which would eventually be disclosed as the Merrill transactions — "SCA effectively insured a non-senior layered tranche… of the original 'AAA' capital structure." Fitch stated that these non-senior tranches were "responsible for a high proportion of SCA's inreased simulated losses." Fitch stated that it would affirm SCA's current ratings if SCA was able to raise sufficient capital within 4-6 weeks.

- On December 14, 2007, Moody's announced that XLCA had been placed on review for possible downgrade as a result of higher expected losses due to RMBS and CDO exposure. Moody's analysis showed that while XLCA was adequately capitalized for "base case" losses, it fell below capital adequacy requirement under stress scenarios due to the ABS CDOs' sensitivity to cumulative losses in

the RMBS collateral.  Moody's stated it would affirm current ratings if SCA raised sufficient capital.

- On December 19, 2007, S&P announced that it was considering downgrading SCA due to the results of updated stress tests on SCA's RMBS and CDO exposure.  S&P's stress test predicted $884.1 million of after-tax losses, as compared to SCA's capital cushion of $645 million.

271.    In response to the Fitch announcements, SCA issued a press release on December 13, 2007, filed with the SEC on Form 8-K, stating that it had a plan to raise additional capital, including using new and existing reinsurance, restructuring its existing obligations with counterparties, and raising new debt or equity capital from external sources.

272.    Between December 12, 2007 and December 20, 2007, SCA's stock price fell from $5.45 to $4.00 per share.

273.    On December 28, 2007, Alan Senter, a Director of XL Capital and SCA, announced his resignation from SCA's Board.  Michael Esposito, Chair of XL Capital and SCA, resigned from his position as Chair of XL Capital.

274.    Despite the ratings agency actions, the mark-to-market losses, the departure of executives, and the general turmoil in the market, SCA was not dissuaded from signing an additional deal in the fourth quarter of 2007 to insure an ABS CDO tranche of approximately $800 million that was more than 50% RMBS.  With this deal, SCA's total exposure to ABS CDOs with more than 50% RMBS collateral reached $16.8 billion.  Contrary to SCA's stated policy of limiting subprime exposure to one-third of any deal, this tranche was backed by 76.1% subprime RMBS.

275.     On January 23, 2008, SCA issued a press release, filed with the SEC on Form 8-K, stating that it no longer planned to raise new capital due to "uncertainty and instability" in the industry.  The next day, Fitch downgraded XLCA from AAA to A, and SCA from AA to BBB, with ratings to remain on ratings watch negative.  Fitch stated that the new ratings reflected "significant uncertainty with respect to the company's franchise, business model and strategic direction; uncertain capital markets and the impact of SCA's recent decisions on future financial flexibility; the company's future capital strategy; ultimate loss levels in its insured portfolio; and the challenges in the financial guaranty market overall."

276.     SCA's stock price fell from $3.79 on January 23, 2008 to $2.63 on January 24, 2008.

277.     On February 7, 2008, Moody's cut XLCA's ratings six notches, from Aaa to A3, concluding that SCA would require in excess of $6 billion to meet capital adequacy requirements for AAA ratings, as compared to its current resources of $3.6 billion.  On February 25, 2008, S&P cut the ratings of XLCA from AAA to A-.  The Moody's action was due in part to a stress test that assumed a 21% cumulative loss rate on first-lien subprime RMBS, exactly as the Center for Responsible Lending had predicted in October 2006.

278.     SCA's stock price fell from $2.77 on February 6, 2008 to $2 on February 8, 2008.

### n.  The Full Truth is Revealed

279.     The truth about SCA's financial condition was finally revealed in a series of disclosures regarding its fourth quarter and full year results.  On February 29, 2008, SCA filed a notice with the SEC that it would delay filing its annual report on Form 10-K for 2007.  The notice stated that SCA was expecting to report approximately $1.5 billion in losses on the fair

value of its credit default swaps, and that SCA's auditors were considering whether to include a going concern warning in their audit opinion.

280.    On March 4, 2008, Moody's announced that it was placing SCA and XLCA on review for possible ratings downgrades due to SCA's filing indicating that it might be including a going concern warning in its 2007 10-K.

281.    Between February 28, 2008 and March 6, 2008, SCA's stock price dived from $1.64 to $0.60 per share.

282.    On March 13, 2008, SCA issued a press release, filed with the SEC on Form 8-K, announcing its results for the fourth quarter of 2007.  SCA announced losses for the quarter of $1.2 billion, which Giordano attributed to "[t]he extraordinary and rapid deterioration in U.S. residential mortgage-related credits" during the quarter.  SCA had established case basis reserves for 13 ABS CDOs with more than 50% RMBS collateral that it had insured — or more than half of the 25 such ABS CDOs in its portfolio — recording an expense of $838.6 million, or $651.5 million net of reinsurance.  SCA had additionally established case basis reserves of $216.7 million for its directly-insured RMBS, which, after reinsurance, resulted in another $37 million in expenses.  These new reserves would bring SCA's loss reserves to 0.76% of its net par insured, as compared to 0.12% just three months earlier.  Additionally, SCA had recorded mark-to-market losses in the fair value of its credit default swaps of $518.8 million.

283.    The press release also announced that SCA had terminated seven of its ABS CDO contracts with an unnamed counterparty (later revealed as Merrill) due to the counterparty's alleged repudiation of its obligations under the contract.  These seven deals alone represented $204.9 million of SCA's mark-to-market losses and $427.4 million of its net case loss reserves for the quarter.  As explained above, Merrill eventually filed suit against XLCA challenging the

termination, winning summary judgment on June 10, 2008.  As previously explained, SCA eventually announced a settlement with Merrill.

284.    Finally, the release announced that SCA was no longer writing new business, and would not pay dividends on either its common shares or its Preferred Shares.  SCA stated that its auditors would not include a going concern warning in the 10-K.

285.    On March 14, 2008, SCA hosted a conference call to discuss its fourth quarter results.  During the call, Giordano conceded that when accounting for its ABS CDO exposure during the quarter, SCA "look[ed] at a much broader array of pricing information not previously considered. This new information included deterioration and rating downgrades of the ABS CDOs, an extensive ground up internal risk assessment of the ABS CDO portfolio, total evaluations of certain CDS [credit default swap] policies, price discovery associated with our discussion with counterparties regarding potential commutation or restructuring of certain CDO contracts."  In other words, Giordano admitted that despite the turmoil in the markets earlier in the year, despite SCA's extensive assurances regarding the care with which it monitored its portfolio and evaluated its exposure, despite the fact that other companies had reevaluated their risk and acknowledged massive losses several months earlier, it was not until the fourth quarter — several months *after* it had originally told investors it would conduct a full review — that SCA reassessed its exposure to ABS CDOs and evaluated its credit default swaps.

286.    Notably, SCA consistently referred to all of the losses associated with ABS CDOs — roughly $1.16 billion — as "mark-to-market" losses, even though $651 million of those losses were "realized" in the form of additions to case basis reserves.  In other words, SCA tacitly conceded that "mark-to-market" losses, far from being a meaningless accounting maneuver, do,

in fact, represent actual deteriorations in the value of a portfolio that will not necessarily accrete to zero.

287.    During the call, Hubbard also informed investors that eight of the 13 ABS CDOs for which case basis reserves had been established were from 2007.  In other words, out of 13 ABS CDO deals signed in 2007 — including at least one signed as late as August 10 -- SCA was now predicting losses on nearly 75% of them.  Moreover, although Hubbard did not identify the vintages of the remaining five CDOs, a Fitch report issued March 26, 2008 would disclose that almost all of the losses were caused by 2006 and 2007 collateral, suggesting that the remaining five ABS CDOs were all of 2006 vintage.

288.    Three days later, on March 17, 2008, the final day of the Class Period, SCA filed its 10-K for 2007 and posted a PowerPoint presentation on its website detailing its CDO exposure as of December 31, 2007.  Among other things, the presentation contained a list of all outstanding CDOs, similar to the list contained in the Keefe, Bruyette presentation from September 5, 2007.  However, in this presentation, a small footnote at the bottom of the page disclosed that "Subprime RMBS includes securities with a FICO score of 640 or below. . . .  In previous disclosures, a FICO threshold of 625 had been used by SCA to categorize securities as subprime." [13]

289.    The difference in calculations was massive.  As explained above at ¶¶ 258, by using a FICO score of 625 in earlier disclosures and falsely telling investors that SCA used a 640 threshold, SCA was able to understate its subprime exposure by approximately $1.64 billion, or 10% of its exposure to the 25 ABS CDOs backed by more than 50% RMBS.  Indeed, the

---

[13] The PowerPoint presentation that disclosed that the Company had previously used only the 625 FICO score was available on SCA's website as late as May 14, 2008.  It has since been removed from the website.

PowerPoint presentation included a pie chart detailing the difference: calculated using a FICO score of 625 as a the threshold for subprime, SCA's subprime exposure at the end of the year was 17.2% of these ABS CDOs; calculated using a 640 threshold, SCA's current subprime exposure was 31.2%.

290.     The PowerPoint presentation also showed the current ratings of the 25 ABS CDOs.  Whereas on August 3, 2007, the portfolio was 96.8% AAA rated, with only $10 million of "BBB" exposure and $4 million of "below investment grade" exposure, the portfolio was now 26.3% AAA rated, with 5.1% BBB rated and 15.4% below investment grade.

291.     On the day of these disclosures, SCA's stock price closed at $0.72, down from $0.79 the previous day.


VII.   **POST-CLASS PERIOD EVENTS**

292.     On March 26, 2008, Fitch issued a report downgrading XLCA to the "junk" rating of BB, attributing the revised rating to, among other things, the Merrill contracts, writing that "A majority of these non-senior transactions have experienced noticeable credit deterioration and Fitch expects they will ultimately suffer high loss given defaults, and make up a disproportionate share of SCA's future expected SF [structured finance] CDO losses."  Fitch explained that the rating reflected "the material erosion in SCA's franchise value and competitive business position following downgrades to well below 'AAA' by each of the three major rating agencies,"  and projected about 21% expected losses in subprime RMBS for 2006 and 26% for 2007.

293.     On April 3, 2008, SCA was notified by the NYSE that it was in danger of being delisted because its average trading price had fallen below $1.

294.     As of June 30, 2008, XLCA carried ratings of B2 (Negative Outlook) by Moody's, BBB- (CreditWatch with negative implications) by S&P, and BB (Outlook Negative) by Fitch.

295.     Following the Class Period, both Shea and Heberton announced their departures from SCA.

296.     On July 28, 2008, SCA announced a set of agreements whereby XL Capital would relinquish all ownership and control over SCA, extinguish all contracts between the two companies, and pay SCA $1.775 billion.  The $1.775 billion would then be used by SCA to restructure or terminate its outstanding credit default swaps with 14 out of 27 counterparties, thus eliminating those contracts.  One of the 14 counterparties included in the deal was Merrill, who agreed to accept $500 million in exchange for allowing SCA to terminate the eight ABS CDO contracts.  The remaining 13 counterparties had not agreed to negotiate to eliminate the contracts.

297.     In the same announcement, SCA disclosed that XLCA was functionally insolvent, and that it expected to report further losses on its ABS CDOs backed by more than 50% RMBS in the second quarter of 2008, including expenses for increases to its case basis reserves.  Although the deal with XL Capital would restore XLCA to solvency, SCA stated that after the completion of its deal with XL Capital, it would "re-assess whether substantial doubt exists about SCA's ability to continue as a going concern."

## VIII.   DEFENDANTS' FALSE AND MISLEADING FINANCIAL STATEMENTS

298.     Throughout the Class Period, SCA represented that its financial statements were presented in conformity with GAAP which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting

practice at a particular time.  However, SCA used improper accounting practices in violation of GAAP, SEC reporting requirements, and its own publicly stated policies to falsely inflate SCA's reported operating profits, net income and earnings per share and to falsely deflate its reserves in the interim quarters and fiscal years during the Class Period.

299.    Defendants caused SCA's financial statements to violate GAAP in the following ways:

(a)    Defendants overstated the fair value of SCA's credit default swaps pertaining to ABS CDOs backed by more than 50% RMBS by failing to consider observable market data demonstrating that the swaps were experiencing a deteriorating financial condition; and

(b)    Defendants failed to make changes in its risk profile and various loss contingencies, causing it to understate both case basis and unallocated reserves.

300.    SCA's materially false and misleading financial statements resulted from a series of deliberate senior management decisions that concealed the truth regarding SCA's actual operating results.  The SCA Defendants caused SCA to violate GAAP and SEC rules by, among other things:

(a)    failing to consider that the value of mortgages and mortgage-related securities supporting insured obligations were experiencing deteriorating financial conditions, necessitating material provisions to increase unallocated reserves and case basis reserves;

(b)    failing to consider the adverse news and events that existed as early as December 2006, including significant defaults negatively impacting the U.S. residential sub-prime market;

- 114 -

(c)      failing to consider that changes in the value of mortgages and mortgage-related securities supporting insured obligations, including the value of their CDS contracts, were experiencing deteriorating financial conditions, necessitating material write-downs;

(d)      failing to consider observable market data in valuing its mortgages and mortgage-related securities supporting SCA's insured obligations; and

(e)      failing to design and implement an internal control system over SCA's financial reporting processes.

301.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1 (November 1978), one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

302.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing financial statements that conform with GAAP.  As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . .
> [M]anagement is responsible for adopting sound accounting

> policies and for establishing and maintaining internal control that
> will, among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management
> . . . . Thus, the fair presentation of financial statements in
> conformity with Generally Accepted Accounting Principles is an
> implicit and integral part of management's responsibility.

### a.  Defendants' Failure To Timely Record
### Material Provisions to Increase Unallocated Reserves

303.    SCA improperly failed to timely record material provisions to increase

unallocated reserves.  Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting*

*for Contingencies*, provides that an estimated loss from a loss contingency "shall be accrued by a

charge to income" if: (i) information available prior to issuance of the financial statements

indicated that it is probable that an asset had been impaired or a liability had been incurred at the

date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.

SFAS No. 5 ¶ 8 (Mar. 1975).  SFAS No. 5 also requires that financial statements disclose

contingencies when it is at least reasonably possible (*i.e.*, greater than a slight chance) that a loss

may have been incurred.  The disclosure shall indicate the nature of the contingency and shall

give an estimate of the possible loss or a range of loss, or state that such an estimate cannot be

made.

304.    In addition, FASB Interpretation No. 14, *Reasonable Estimation of the Amount of*

*a Loss*, Paragraph 3 states that if the reasonable estimate of a particular loss contingency is a

range, an amount shall be accrued for the loss.  When some amount within the range appears at

the time to be a better estimate than any other amount within the range, that amount shall be

accrued.  When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued.

305.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that, although disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."  17 C.F.R. § 210.10-01.

306.    SCA also violated GAAP by failing to record material provisions to increase unallocated reserves related to SCA's financial guarantee insurance business in its interim financial statements, as indicated by APB Opinion No. 28, paragraph 17, *Interim Financial Reporting*:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates.  To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

307.    In addition, Concepts Statement No. 5 *Recognition and Measurement in Financial Statements of Business Enterprises*, states that "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ."

308.    As explained at ¶ 149, according to SCA's 2006 10-K, in 2004, SCA altered the method by which it calculated its unallocated reserves by reducing its "initial expected loss ratio to 20% from 25%, which was utilized since the adoption of our unallocated reserve methodology

- 117 -

in recognition of the cumulative experience of our business to that point in time, as well as the increasing percentage of our in-force business from public finance insurance." In other words, SCA's reserving methodology was based on the fact that in 2004, SCA's portfolio was skewed toward low-risk public finance projects. According to SCA's disclosures, this method for calculating unallocated reserves remained unchanged throughout 2006 and 2007, despite the rapid growth in SCA's ABS CDO business as well as increases to SCA's portfolio of directly-insured RMBS:

(a) In the first quarter of 2007, SCA recorded $139 million in adjusted gross premiums, up 26% from a year ago. More importantly, U.S. structured finance, which included consumer ABS CDOs and RMBS, was up 45% from the prior year, while public finance was down 16%;

(b) In the second quarter of 2007, adjusted premium for the quarter was heavily weighted towards U.S. structured finance at $59 million, up 81%, while public finance was down 72%; and

(c) SCA's adjusted premiums in the third quarter of 2007 increased 55% to $141.1 million from $91.3 million in the third quarter of 2006. In the quarter, U.S. Structured Finance grew by 32% from the comparable period in 2006, due in large part to Consumer ABS, the category that includes directly-insured RMBS. Though SCA also recorded increases in public finance transactions, the adjusted gross premiums for public finance totaled $34.6 million, a figure dwarfed by the $52.4 million earned from structured finance.

309.    Indeed, even as SCA rapidly increased its exposure to residential mortgages, SCA's unallocated reserves, as a percentage of its insured portfolio, remained flat or even decreased over the course of the Class Period:

(a)    As of December 31, 2005, unallocated reserves stood at 0.10% of net par insured and 0.10% of the portion of SCA's portfolio that was deemed "fundamentally sound" and had not been flagged for special monitoring; total reserves stood at 18% of total net par insured; [14]

(b)    As of June 30, 2006, unallocated reserves stood at 0.09% of net par insured and 0.09% of the portion of SCA's portfolio that was deemed "fundamentally sound" and had not been flagged for special monitoring; total reserves stood at 0.16% of total net par insured;

(c)    As of September 30, 2006, unallocated reserves stood at 0.07% of net par insured and 0.07% of the "fundamentally sound" portfolio; total reserves stood at 0.13% of total net par insured;

(d)    As of December 30, 2007, unallocated reserves stood at 0.08% of net par insured and 0.08% of the "fundamentally sound" portfolio; total reserves stood at 0.15% of total net par insured;

(e)    As of March 31, 2007, unallocated reserves stood at 0.07% of net par insured and 0.07% of the "fundamentally sound" portfolio; total reserves stood at 0.14% of total net par insured; and

---

[14] Contracts flagged for special monitoring were sometimes associated with a case base reserve instead of, or in addition to, unallocated reserves.

(f)      As of June 30, 2007 and September 30, 2007, unallocated reserves stood

at 0.07% of net par insured and 0.07% of the "fundamentally sound" portfolio; total

reserves stood at 12% of total net par insured.

310.    By failing to increase their reserves based on their shift towards riskier products,

Defendants violated a general rule - lower quality or higher risk products or loans dictate higher

reserves.  For example, at the end of the third quarter of 2007, SCA's notional exposure under

credit default swaps aggregated to $49.2 billion and unallocated reserves relating to such

exposures was only $17.0 million.  Indeed, in establishing unallocated reserves, SCA failed to

consider whether changes in the business or industry caused other factors to become significant

to the assumptions, such as "[n]ew lines of business and classes of business within lines."

AICPA Audit and Accounting Guide, Property and Liability Insurance Companies ¶ 4.82 (Sept.

2006).

311.    Moreover, despite the changes in the mix of products SCA was insuring,

particularly the ABS CDOs, SCA put off the actuarial analysis of its loss reserves until the fourth

quarter of 2007.  By that time, it was too late, as SCA was forced to record material charges to

increase case reserves.  The materiality of SCA's failure to properly assess and record

unallocated reserves is exemplified by SCA recording gross case loss reserve provisions of

$838.6 million, $651.5 million net of reinsurance, related to thirteen of SCA's high grade multi-

sector CDO of ABS transactions at the end of fourth quarter of 2007, when in the third quarter

they had only recorded $17 million in reserves for all derivative products.[15]

---

[15] Had the analysis been performed earlier, the Company would have been able to detect the
problems with the ABS CDOs and established appropriate reserves.

312.    As a result, Defendants ignored the guidance in SFAS No. 60, paragraph 18, which requires that "[t]he liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience."

313.    Accordingly, Defendants failed to timely record adequate unallocated loss reserves related to SCA's financial guarantee insurance business, thus causing SCA to report materially overstated earnings and understated liabilities during the Class Period.

**b.  Defendants' Failure To Timely Record Material Provisions to Case Basis Reserves**

314.    As stated above, SFAS No. 5, *Accounting for Contingencies*, provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated. SFAS No. 5 ¶ 8 (Mar. 1975).

315.    Similarly, SCA's financial statements filed with the SEC on Form 10-K for the year ended December 31, 2006 represented that:

> Case basis reserves on financial guarantee insurance business written are established by us with respect to a specific policy or contract upon receipt of a claim notice or when management determines that (i) *a claim is probable* in the future based on specific credit events that have occurred and (ii) the amount of the ultimate loss that we will incur *can be reasonably estimated* (emphasis added).

316.    According to SFAS No. 5, paragraph 68, the condition of probable calling for an accrual of a liability "is not so past-oriented that accrual of a loss must await the occurrence of

the confirming future event, for example, final adjudication or settlement of a lawsuit." Indeed, "[t]he condition requires only that it be probable that the confirming future event will occur." *Id*. As discussed above, Defendants did not consider the endless array of adverse news affecting the underlying products that SCA was insuring but were aware of the probable losses to be incurred.

317.    Additionally, according to SFAS No. 60, paragraph 18 "[t]he liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience." As discussed above, in 2006, SCA rapidly expanded its exposure to ABS CDOs, thus modifying SCA's past experience. FASB's May 2007 *Discussion Paper – Preliminary Views On Insurance Contracts*, also discusses the need to update estimates based on new information, and new or recent experience.

> Although the Board favours estimates based on all available information, this does not mean that estimates would be identical to the most recent actual experience. On the contrary, the most recent experience would supply only one of the possible outcomes that an insurer would need to consider. For example, suppose that mortality experience last year was 20 per cent worse than previous experience and previous expectations. Several factors could have caused that change, including lasting changes in mortality, changes in the characteristics of the insured population (eg changes in underwriting or distribution, or selective lapses by policyholders in unusually good or bad health), random fluctuations and identifiable non-recurring causes. In the Board's approach, an insurer would investigate why experience changed and would develop new probability estimates for each possible outcome, in the light of the most recent experience, earlier experience and other information. Typically, the expected present value of the cash flows would increase, but not by as much as 20 per cent. If mortality continues to run significantly above previous estimates, the estimated probability assigned to high-mortality scenarios will gradually increase over time.

318.     In addition, as stated above, FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss*, Paragraph 3 states that if the reasonable estimate of a particular loss contingency is a range, an amount shall be accrued for the loss.  Regulation S-X requires that even interim period financial statements must disclose material contingencies.  17 C.F.R. § 210.10-01.

319.     SCA also violated GAAP by failing to take timely case basis reserves related to SCA's financial guarantee insurance business, in its interim financial statements, as indicated by APB Opinion No. 28, paragraph 17, and Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, quoted above.

320.     Defendants, however, failed to timely record adequate case basis reserves for probable losses related to SCA's financial guarantee insurance business, thus causing SCA to report materially overstated earnings and understated liabilities during the Class Period.

321.     Indeed, as late as the third quarter of 2007, Defendants had not set up any ABS CDO-related case reserves, had only established $17 million in unallocated reserves, and had not placed any ABS CDOs on SCA's watch list, despite the problems in the market described above, including, for example, the ratings agencies announcing new loss models, Merrill's own recognition of $7.9 billion in losses related to its mortgage-exposure.  SCA also failed to consider observable market data.  In fact, as discussed below, in March 2008, SCA admitted that it had failed to consider available information in evaluating its credit default swaps.

### c.   Defendants' Failure To Properly Value Credit Default Swaps

322.     GAAP, specifically SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, requires that Companies report derivatives, such as CDSs, on the balance

sheet as either assets or liabilities at fair value, with changes in the mark-to-market fair value of the derivative instrument reflected in earnings.

323.    Under SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities,* a Company must determine whether a decline in fair value below the amortized cost basis is other than temporary.  If the decline in fair value is judged to be other than temporary, the individual security shall be written down and the amount of the write-down shall be included in earnings.

324.    According to Statement of Auditing Standards ("SAS") No. 92:

> Determinations of whether losses are other than temporary often involve estimating the outcome of future events. Accordingly, judgment is required in determining whether factors exist that indicate that an impairment loss has been incurred at the end of the reporting period.  These judgments are based on subjective as well as objective factors, including knowledge and experience about past and current events and assumptions about future events. The following are examples of such factors.

> Fair value is significantly below cost and —

>    — The decline is attributable to adverse conditions specifically related to the security or to specific conditions in an industry or in a geographic area

325.    Additionally, the SEC's Staff Accounting Bulletin No. 59 ("SAB 59"), *Accounting for Noncurrent Marketable Equity Securities,* specifies that declines in the value of investments in marketable securities caused by general market conditions or by specific information pertaining to an industry or an individual company, "require further investigation by management."  In this regard, SAB 59 states, "[a]cting upon the premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment."  SCA, in its Fiscal 2006 10-K, disclosed that SCA "determine[s] the fair value of [its] issued in-force credit default swaps using a model [it] developed."  Additionally, SCA's

10-K states that SCA fair valued its in-force credit default swaps using "observable market data where available and is dependent upon a number of factors including changes in interest rates, credit spreads, changes in credit quality, expected recovery rates and other market factors."

326.    In this regard, SCA disclosed, in pertinent part, the following:

> Our process for identifying declines in the fair value of investments that are other-than-temporary involves consideration of several factors. These factors include (i) the time period during which there has been a significant decline in value, (ii) an analysis of the liquidity, business prospects and financial condition of the issuer, (iii) the significance of the decline, (iv) an analysis of the collateral structure and other credit support, as applicable, of the securities in question and (v) our intent and ability to hold the investment for a sufficient period of time for the value to recover. Where our analysis of the above factors results in the conclusion that declines in fair values are other-than-temporary, the cost of the security would be written down to fair value and such write down is reflected as a realized loss in the period that such determination is made.

327.    As discussed above, there was observable market data to support that the credit default swaps were experiencing deteriorating financial conditions, that was other-than-temporary, as exhibited by, among other things, the record high default levels. Accordingly, SCA violated GAAP by failing to consider the observable market data of significant adverse conditions and failing to write-down SCA's investments in its in-force credit default swaps. *See generally* SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities* (May 1993); SFAS No. 5, *Accounting for Contingencies* (Mar. 1975) (stating that upon the occurrence of a decline in the market value of a security, deemed to be anything other than temporary, then the security's carrying value should be written down to fair value and the amount of the write-down reflected in earnings).

328.    Defendants also failed to consider other observable data that indicated deterioration in the underlying assets insured by SCA.  SFAS No. 157 *Fair Value Measurements*,[16] describes observable inputs as "inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity.  Observable inputs include the data sources and market prices that are available and visible outside of the entity."

329.    As discussed above, deterioration related to CDOs and the U.S. subprime market existed as early as December 2006.  Market participants were taking material write-downs related to their mortgage and mortgage-related portfolios.  SFAS No. 157, states that "the reporting entity must not ignore information about market participant assumptions that is reasonably available without undue cost and effort."  However, SCA did not consider observable data sources, such as: interest rates and yield curves observable at commonly quoted intervals, volatilities, loss severities, credit risks, and default rates.  *See* SFAS No. 157, ¶ 28 c.  In this regard, Defendants admitted in SCA's March 2008 earnings call their failure to consider all available data sources prior to the fourth quarter of 2007.  Defendants stated that in the fourth quarter, they were "require[d]:"

> to look at a much broader array of pricing information not previously considered.  This new information included deterioration and ratings downgrades for the ABS CDOs; an extensive ground-up internal risk assessment of the ABS CDO portfolio; broker valuations of certain CDS policies; price discovery associated with our discussion with counterparties

---

[16] SCA did not adopt SFAS No. 157 until after the Class Period, "[h]owever, while certain clarifications have been made to the definition of fair value, the definition of fair value in FAS 157 is not conceptually different than the definition found in previous accounting literature in that it remains an exchange price notion with a focus on the assumptions marketplace participants would use in the pricing the asset or liability."  AICPA "Measurements Of Fair Value In Illiquid (Or Less Liquid) Markets" (Oct. 3, 2007).

regarding potential commutation or restructuring of certain CDO contracts.

330.    Prior to the fourth quarter of 2007, Defendants did not consider observable market data that showed that there was significant deterioration in the market. In addition to the various examples of deterioration given above, one example is the ABX index, which showed significant deterioration starting in the second half of 2007.

331.    The ABX index is a synthetic asset-backed credit derivative index that allows investors to gain broad exposure to the subprime market without holding the actual asset-backed securities. The index is a series of credit default swaps based on 20 bonds that consist of subprime mortgages. During the second half of 2007, the implied spread widened for the Triple-A, or highest-rated, tranches (implied spread from price decline) reflecting investor concern that subprime mortgage holders would suffer an increased level of financial loss. As stated in the AICPA's White Paper, "Measurements Of Fair Value In Illiquid (Or Less Liquid) Markets," "[t]he reporting entity may not ignore information about market participant assumptions that is reasonably available without undue cost and effort (FAS 157, par. 30)."

332.    Moreover, a Reuters article entitled "ANALYSIS-Housing, Car Markets May Spark Credit Crunch," dated December 15, 2006 reported that "[t]he lowest rated 'BBB-' index of subprime mortgages fell to 95.26 this week, while spreads widened to about 400 basis points, increasing the costs for investors to buy protection against default . . . . The index traded at 242 basis points in July." According to the same article, "[d]owngrades on subprime mortgage securities are expected to climb to a record 300 by the end of the year, twice as much as last year, and rise even more in 2007, Fitch Ratings said . . . ." Thus, there was ample evidence that the downgrades would continue and thus were not temporary, requiring additional write-downs.

- 127 -

## IX.     SCIENTER ALLEGATIONS

333.     As alleged above, during the Class Period, SCA and the Individual Defendants touted themselves as experts in their field of financial guaranty insurance, and represented that they had fully investigated and stress tested each security before agreeing to insure it. Defendants were aware of the deterioration in the housing market and increasingly risky loans that had been issued.  Defendants were also aware that they had insured at least $3.1 billion of "non-senior" ABS CDO tranches that would not have the first claim to payment.  Yet, by their own admission, Defendants still did not alter their loss assumptions or even place any ABS CDO contract on special monitoring until the end of the period.  Thus, Defendants made statements with full knowledge of their falsity, or with reckless disregard for their falsity.  By issuing false and misleading statements about their ABS CDO exposure, SCA and the Individual Defendants knowingly and/or recklessly deceived the investing public as to the true value of SCA.

334.     As explained above, Defendants aggressively entered the market to insure ABS CDOs in the latter half of 2006 and throughout 2007.  According to the Managing Director, XLCA management made the decision to get into ABS CDOs because SCA wanted to "stimulate revenues" and raise its income.   The Managing Director stated that after the Offering, SCA began taking on more and more risk.  His account is confirmed by the Vice President, who said that in 2007, and particularly with respect to certain deals with Merrill, "it wasn't so much a matter of looking at the risk, it was a matter of bring in premium and gaining market share."

335.     In fact, SCA had a particular reason to sign ABS CDO contracts in late 2006 and early 2007 — it wanted to be able present the impression of explosive growth in anticipation of its forthcoming secondary offering, which was to take place on or about June 6, 2007.  In the secondary offering, XL Capital, through its wholly-owned subsidiary, XL Insurance, would sell

an additional 9,680,022 million of its SCA shares, reducing its holdings from 63% of SCA's common stock to 47.5%.  Although the proceeds of the sale went to XL Capital and not SCA, SCA, given its close ties to XL Capital, was eager increase its stock price and thus the price of the shares sold in the offering.

336.    XL Capital, in fact, exercised substantial control over SCA both before and after the Secondary Public Offering.  In SCA's 2006 10-K, issued prior to the Secondary Public Offering, SCA stated:

> **XL Capital owns approximately 63% of our outstanding common shares and will retain the ability to exert significant influence over us.**
>
> XL Capital has a significant economic and voting interest in us and, therefore, is able to exercise significant influence over us. This is primarily a result of the following factors:
>
>  • XL Capital beneficially owns approximately 63% of our outstanding common shares;
>
>  • Three of the members of our Board of Directors are directors or officers of XL Capital; and
>
>  • Until XL Capital's ownership of our then-outstanding common shares is first reduced to 35% or less, XL Capital has the right, pursuant to the transition agreement, to nominate such number of nominees for director as would equal one nominee less than a majority of the total number of directors constituting our full board (currently four out of nine persons). Such nominees are allocated among the classes of our Board of Directors as follows: (i) two nominees to Class I, whose term will expire at our annual general meeting in 2007, (ii) one nominee to Class II, whose term will expire at our annual general meeting in 2008, and (iii) one nominee to Class III, whose term will expire at our annual general meeting in 2009.
>
> XL Capital may therefore exert significant influence over, among other things, election of our directors and determination of our business strategies, risk profile and underwriting limits.
>
> We cannot assure you that the resolution of any matter that may involve the interests of both us and XL Capital will be resolved in what investors would consider to be in our or their best interests. In addition, our Bye-laws contain provisions providing

- 129 -

indemnification, exculpation and other protections to our directors, officers and employees with respect to such matters.

337.    Even after the Secondary Public Offering, SCA stated in its 2007 10-K:

> **_XL Capital owns approximately 46% of our outstanding common shares and will retain the ability to exert significant influence over us._**
>
> XL Capital has a significant economic and voting interest in us and, therefore, is able to exercise significant influence over us. This is primarily a result of the following factors:
>
> • XL Capital beneficially owns approximately 46% of our outstanding common shares; and
>
> • Until XL Capital's ownership of our then-outstanding common shares is first reduced to 35% or less, XL Capital has the right, pursuant to the transition agreement, to nominate four of nine directors, or, if there are more than nine directors, such number of nominees for director as would equal one nominee less than a majority of the total number of directors constituting our full board.
>
> XL Capital may therefore exert significant influence over, among other things, election of our directors and determination of our business strategies, risk profile and underwriting limits.
>
> We cannot assure you that the resolution of any matter that may involve the interests of both us and XL Capital will be resolved in what investors would consider to be in our or their best interests. In addition, our bye-laws contain provisions providing indemnification, exculpation and other protections to our directors, officers and employees with respect to such matters.

338.    Additionally, after SCA's IPO in 2006, SCA and XL Capital had a number of service agreements which took effect at the SCA IPO. The agreements stated that for two years, XL Capital would provide "transitional services" including: "treasury, payroll and other financial services, human resources and employee benefit services, legal services, information systems and network services, tax and treasury services, investment management and procurement and sourcing support."

X.     **APPLICABILITY OF PRESUMPTION OF RELIANCE:
       FRAUD-ON-THE-MARKET DOCTRINE**

339.    The market for SCA securities was open, well-developed and informationally efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, SCA's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired SCA securities relying upon the integrity of the market price of SCA's securities and market information relating to SCA, and have been damaged thereby.

340.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SCA's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SCA, its business and operations, as alleged herein.

341.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about SCA's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of SCA and its business, prospects, and operations, thus causing SCA's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the

Class purchasing SCA's securities at artificially inflated prices, thus causing the damages complained of herein.

342.    At all relevant times, the market for SCA's securities was informationally efficient for the following reasons, among others:

(a)    SCA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, SCA filed periodic public reports with the SEC and the NYSE;

(c)    SCA regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

343.    SCA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

344.    As a result of the foregoing, the market for SCA's securities promptly digested current information regarding SCA from all publicly available sources and reflected such information in SCA's stock price. Under these circumstances, all purchasers of SCA's securities during the Class Period suffered similar injury through their purchase of SCA's securities at artificially inflated prices and a presumption of reliance applies.

XI.    **CLAIMS FOR RELIEF**

**FIRST CLAIM**
**Violation of Section 11 of the Securities Act Against**
**SCA, Shea, Giordano, and the Secondary Public Offering Underwriter Defendants**

345.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the Defendants to defraud Plaintiffs or members of the Class.  This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement.

346.    This claim is asserted by Plaintiffs against Defendants by, and on behalf of, persons who acquired shares of SCA's securities pursuant or traceable to the false Registration Statement issued in connection with the Secondary Public Offering.

347.    Shea and Girodano, as signatories of the Registration Statement, as directors and/or officers of SCA and controlling persons of the issuer, owed to the holders of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time it became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  As such, Defendants are liable to the Class.

348.    Certain Underwriter Defendants owed to the holders of the securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts

- 133 -

required to be stated in order to make the statements contained therein not misleading.  As such, certain Underwriter Defendants are liable to the Class.

349.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

350.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct herein alleged, each Defendant violated and/or controlled a person who violated section 11 of the Securities Act.

351.    As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, the market price of SCA's securities sold in the Secondary Public Offering was artificially inflated, and Plaintiffs and the Class suffered substantial damage in connection with their ownership of SCA's securities pursuant to the Registration Statement.

352.    SCA is the issuer of the securities sold via the Registration Statement. As issuer of the securities, SCA is strictly liable to Plaintiffs and the Class for the material misstatements and omissions therein.

353.    At the times they obtained their shares of SCA, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

354.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

355.    By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under section 11 as measured by the provisions of section 11(e), from the Defendants and each of them.

## SECOND CLAIM
### Violation of Section 11 of the Securities Act Against
### SCA, Shea, Giordano, and the Preferred Share Underwriter Defendants

356.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the Defendants to defraud Plaintiffs or members of the Class.  This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Exchange Offer.

357.    This claim is asserted by Plaintiffs against Defendants by, and on behalf of, persons who acquired shares of SCA's securities pursuant or traceable to the false Registration Statement issued in connection with the Exchange Offer.

358.    Shea and Girodano, as signatories of the Exchange Offer, as directors and/or officers of SCA and controlling persons of the issuer, owed to the holders of the securities obtained through the Exchange Offer the duty to make a reasonable and diligent investigation of the statements contained in the Exchange Offer at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  As such, Defendants are liable to Plaintiffs and the Class.

359.    Certain Underwriter Defendants owed to the holders of the securities obtained through the Exchange Offer the duty to make a reasonable and diligent investigation of the statements contained in the Exchange Offer at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  As such, certain Underwriter Defendants are liable to Plaintiffs and the Class.

360.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Exchange Offer were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

361.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Exchange Offer, which misrepresented or failed to disclose, inter alia, the facts set forth above.  By reason of the conduct herein alleged, each Defendant violated and/or controlled a person who violated section 11 of the Securities Act.

362.    As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, Plaintiffs and the Class suffered substantial damage in connection with their ownership of SCA's securities pursuant to the Exchange Offer.

363.    SCA is the issuer of the securities sold via the Exchange Offer. As issuer of the securities, SCA is strictly liable to Plaintiffs and the Class for the material misstatements and omissions therein.

364.    At the times they obtained their shares of SCA, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

365.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Exchange Offer which should have been made through the exercise of reasonable diligence.

366.    By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under section 11 as measured by the provisions of section 11(e), from the Defendants and each of them.

### THIRD CLAIM
### Violation of Section 12(a)(2) of the Securities Act Against
### SCA, Individual Defendants, and the Secondary Public Offering Underwriters

367.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except those allegations concerning scienter.

368.    This Count is brought pursuant to section 12(a)(2) of the Securities Act on behalf of the Class, against Defendants.

369.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Registration Statement.

370.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.   The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

371.    Defendants owed to the purchasers of SCA's securities, including Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the secondary public offering materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a

- 137 -

material fact required to be stated in order to make the statements contained therein not misleading.

372.     Plaintiffs and other members of the Class purchased or otherwise acquired SCA's securities pursuant to and/or traceable to the defective Registration Statement.  Plaintiffs and other members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

373.     Plaintiffs, individually and representatively, hereby offer to tender to Defendants the securities which Plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their SCA securities are entitled to rescissory damages.

374.     This action is brought within three years from the time that the securities upon which this Count is brought was sold to the public, and within one year from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based.

## FOURTH CLAIM
### Violation of Section 12(a)(2) of the Securities Act Against
### SCA, Individual Defendants, and the Preferred Share Underwriters

375.     Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.  For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

376.    By means of the defective PPM which operated as a prospectus for the Preferred Shares in connection with the Private Placement Offering, Defendants promoted the sale of Preferred Shares to Plaintiff NYHTC and other members of the Class.

377.    On or about April 5, 2007, Defendants completed the Private Placement of the Preferred Shares.  In connection with this Private Placement, SCA and certain Underwriter Defendants prepared and caused to be disseminated the PPM that, as set forth above, contained untrue statements of material fact, and concealed and failed to disclose material facts.

378.    Defendants owed Plaintiff NYHTC and the other members of the Class who purchased Preferred Shares pursuant to the PPM the duty to make a reasonable and diligent investigation of the statements contained in the PPM to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the PPM as set forth above.

379.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the PPM at the time Plaintiffs acquired the Preferred Shares in the Private Placement.

380.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Preferred Shares pursuant to the PPM sustained substantial damages in connection with their purchases of these securities.  Accordingly, Plaintiff NYHTC and the other members of the Class who hold Preferred Shares have the right to rescind and recover the consideration paid for these securities, and hereby tender their Preferred Shares to the

Defendants sued herein.  Class members who have sold their Preferred Shares seek damages to the extent permitted by law.

## FIFTH CLAIM
### Violation of Section 15 of The Securities Act Against the Individual Defendants, XL Insurance and XL Capital

381.    Plaintiffs repeat and reallege each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a section 15 claim, including without limitation, scienter.

382.    This count is asserted against Individual Defendants, XL Insurance and XL Capital and is based upon section 15 of the Securities Act.

383.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of SCA within the meaning of section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause SCA to engage in the acts described herein.

384.    XL Capital, by virtue of its "significant economic and voting interest" in SCA, as admitted by SCA in its 2006 10-K and its 2007 10-K, was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of SCA within the meaning of section 15 of the Securities Act.   Specifically, in addition to the control over SCA alleged herein:

(a)    Michael Esposito, XL Capital's chair from 1995 until December 2007, served as the chair of XLCA from March 2000 through February 2005, and has served as SCA's chair since June 2006;

(b)    Brian O'Hara, XL Capital's president and CEO from 1994 through April 2008, occupied a position on SCA's Board of Directors from the time of its IPO through November 2007;

(c)     Alan Senter, a member of XL Capital's Board of Directors, occupied a position as an SCA director from the time of its IPO until December 2007.  During this time, Senter served as a chair of the SCA Audit Committee;

(d)     Robert Lichten, a member of SCA's Board of Directors from the time of its IPO, previously served as a director of at least two XL Capital subsidiaries, Annuity & Life Re (Holdings), LTD, and XL America.  Lichten is a director of GovernanceMetrics International, a corporate governance rating agency;

(e)     Giordano served as executive VP, general counsel and secretary of XL Capital from January 1997 through October 2004;

(f)     Shea served as chief financial & administrative officer of Financial Products and Services Operations for XL Capital from 2003 through 2006; and

(g)     LeBlanc served as senior vice president—corporate development for XL Capital from 2002 through November 2006.

385.    XL Capital thus had the power and influence and exercised the same to cause SCA to engage in the acts described in this complaint

386.    By virtue of the conduct alleged, the Individual Defendants, XL Insurance and XL Capital are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered

### SIXTH CLAIM
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### Against SCA and the Individual Defendants

387.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

388. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, during the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase SCA's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

389. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of SCA's securities in an effort to maintain artificially high market prices for SCA's securities in violation of section 10(b) of the Exchange Act and rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

390. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of SCA as specified herein.

391. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SCA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about SCA and its business operations and future prospects

in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of SCA securities during the Class Period.

392.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at SCA during the Class Period and members of SCA's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of SCA was privy to and participated in the creation, development and reporting of SCA's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of SCA's management team, internal reports and other data and information about SCA's finances, operations, and sales at all relevant times; (iv) each of these Defendants was aware of SCA's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading; and (v) each of the Individual Defendants either signed the materially misleading statements or personally made materially misleading statements to the public.

393.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SCA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of SCA's business,

operations and earnings during the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain

such knowledge by deliberately refraining from taking those steps necessary to discover whether

those statements were false or misleading.

394.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of SCA's securities was

artificially inflated during the Class Period.  In ignorance of the fact that market prices of SCA's

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false

and misleading statements made by Defendants, or upon the integrity of the market in which the

securities trade, and/or on the absence of material adverse information that was known to or

recklessly disregarded by Defendants but not disclosed in public statements by Defendants

during the Class Period, Plaintiffs and the other members of the Class acquired SCA securities

during the Class Period at artificially high prices and were damaged thereby.

395.    At the time of said misrepresentations and omissions, Plaintiffs and other

members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs

and the other members of the Class and the marketplace known the truth regarding the problems

that SCA was experiencing, which were not disclosed by Defendants, Plaintiffs and other

members of the Class would not have purchased or otherwise acquired their SCA securities, or, if

they had acquired such securities during the Class Period, they would not have done so at the

artificially inflated prices which they paid.

396.    By virtue of the foregoing, Defendants have violated section 10(b) of the

Exchange Act, and SEC rule 10b-5.

397.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of SCA's securities during the Class Period.

**SEVENTH CLAIM**
**Violation of Section 20(a) of the Exchange Act Against**
**the Individual Defendants and XL Capital**

398.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

399.    The Individual Defendants acted as controlling persons of SCA within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their participation in and/or awareness of SCA's operations and/or intimate knowledge of the false financial statements filed by SCA with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of SCA, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants, because of their positions with SCA, controlled the contents of quarterly and annual reports, press releases and presentations to securities analysts.  Each Individual Defendant either signed documents alleged herein to have been misleading, or personally made public statements alleged to have been misleading.  Each Individual Defendant was provided with copies of the reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material nonpublic information available to them, each of these Defendants recklessly disregarded that the true

performance of SCA's business had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

400.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of SCA and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

401.    As set forth above, SCA and the Individual Defendants each violated section 10(b) and rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of SCA's securities during the Class Period.

402.    Additionally, Defendant XL Capital is a controlling person by virtue of its substantial ownership of SCA's stock and the presence of high-level XL Capital Directors on SCA's Board of Directors, as alleged at ¶¶ 333 – 338 and ¶¶ 387 – 397.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

August 6, 2008                             Respectfully submitted,
New York, New York

**BERNSTEIN LIEBHARD & LIFSHITZ,
LLP**

*Rebecca M. Katz*

Stanley D. Bernstein (*bernstein@bernlieb.com*)
Rebecca M. Katz (*katz@bernlieb.com*)
Christian Siebott (*siebott@bernlieb.com*)
Ann M. Lipton (*lipton@bernlieb.com*)
Sabina Sosunova (*sosunova@bernlieb.com*)
Hanna R. Neier (*neier@bernlieb.com*)
10 East 40th Street
New York, New York 10016
(212) 779-1414

**ADLER POLLOCK & SHEEHAN P.C.**
James R. Oswald (*joswald@apslaw.com*)
One Citizens Plaza, 8th floor
Providence, Rhode Island 02903
(401) 274-7200

*for Lead Plaintiff Employees' Retirement
System of the State of Rhode Island*

**SCHOENGOLD SPORN LAITMAN &
LOMETTI, P.C**
Christopher Lometti (chris@spornlaw.com)
Frank R. Schirripa (frank@spornlaw.com)
19 Fulton Street, Suite 406
New York, New York 10038
(212) 964.0046

*for Plaintiff New York Hotel Trades Council
and Hotel Association of New York City, Inc.
Pension Fund*

**CERTIFICATION IN CONNECTION WITH PROPOSED**
**SECURITIES CLASS ACTION COMPLAINT**

I, Harry Veras, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.   I am the Chief Financial Officer of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund (the "Fund").

2.   I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.   The Fund is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.   During the Class Period (as defined in the Complaint), the Fund purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.   The Fund did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.   During the three year period preceding the date of my signing this Certification, the Fund has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act except in *In re Avon Products, Inc. Sec. Litig.*, S.D.N.Y. Docket No. 05-CV-6803 and *In re Sea Containers Ltd. Sec. Litig.*, S.D.N.Y. Docket No. 06-cv-02565.

7.   The Fund will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to its representation of the Class.

Signed under the penalties of perjury, this 6th day of August 2008.

Harry Veras, on behalf of the New York
Hotel Trades Council and Hotel Association of
New York City, Inc. Pension Fund

*Schoengold Sporn Laitman & Lometti, P.C., 19 Fulton Street, New York, NY 10038 (866) 348-7700*

## SCHEDULE A

| DATE | BUY/SELL | NO. OF SHARES | PRINCIPAL AMOUNT |
|------|----------|---------------|------------------|
| 3/29/2007 | BUY | 500,000 | $500,000 |
| 11/28/2007 | BUY | 450,000 | $225,000 |