UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

IN RE SECURITY CAPITAL ASSURANCE,
LTD. SECURITIES LITIGATION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/10

07 Civ. 11086 (DAB)
MEMORANDUM & ORDER

----------------------------------X

DEBORAH A. BATTS, United States District Judge.

Lead Plaintiff Employees' Retirement System of the State of

Rhode Island ("ERSRI") and Plaintiff New York Hotel Trades

Council and Hotel Association of New York City, Inc. Pension

Fund ("NYHTC") bring this putative securities fraud class action

against Defendants XL Capital Ltd. ("XL Capital") and XL

Insurance (Bermuda) Ltd. ("XL Insurance") (collectively, the "XL

Defendants"), Security Capital Assurance, Ltd. ("SCA"), four of

SCA's officers, Paul S. Giordano ("Giordano"), David P. Shea

("Shea"), Edward B. Hubbard ("Hubbard"), and Richard Heberton

("Heberton") (collectively, the "Individual Defendants"), and

five of SCA's financial advisors and underwriters, Merrill

Lynch, Pierce, Fenner & Smith ("Merrill Lynch" or "Merrill"),

Goldman Sachs & Co. ("Goldman Sachs"), J.P. Morgan Securities

Inc. ("JP Morgan"), Lehman Brothers ("Lehman") and Wachovia

Securities ("Wachovia"), pursuant to Sections 10(b), 15 U.S.C.

Section 78j(b), and 20(a), 15 U.S.C. Section 78t(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the

"Securities Act"). Plaintiffs allege that Defendants misled Plaintiffs and similarly situated investors about SCA's exposure to securities backed by subprime residential mortgages, causing Plaintiffs and the putative class members significant losses when SCA's stock declined in value and ultimately collapsed.

Defendants move to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6).[1]  For the reasons set forth below, Defendants' Motions to Dismiss are GRANTED, and Plaintiffs are granted leave to replead their Complaint.

---

[1] Four Rule 12(b)(6) motions, submitted by four distinct groups of Defendants - SCA and the Individual Defendants; XL Capital and XL Insurance (the "XL Defendants"), Goldman Sachs, JP Morgan, and Merrill Lynch (the "Secondary Offering Underwriter Defendants"), and Merrill Lynch and Wachovia (the "Preferred Share Underwriter Defendants") - are before the Court, based on the claims asserted variously against Defendants in the seven counts of the Complaint. Count One of the Complaint alleges violation of Section 11 of the Securities Act against Defendants SCA, Shea, Giordano, and the Secondary Offering Underwriter Defendants. Count Two alleges violation of Section 11 against Defendants SCA, Shea, Giordano, and the Preferred Share Underwriter Defendants. Count Three alleges violation of Section 12(a)(2) of the Securities Act against SCA, the Individual Defendants, and the Secondary Public Offering Underwriter Defendants. Count Four alleges violation of Section 12(a)(2) against SCA, the Individual Defendants, and the Preferred Share Underwriter Defendants. Count Five alleges violation of Section 15 of the Securities Act against the Individual Defendants and the XL Defendants. Count Six alleges violation of Section 10(b) of the Exchange Act and Rule 10b-5 against SCA and the Individual Defendants. Count Seven alleges violation of Section 20(a) of the Exchange Act against the Individual Defendants and XL Capital.

BACKGROUND

The following facts alleged in the Consolidated Amended

Class Action Complaint in 07 Civ. 11086 (DAB) ("Complaint" or

"Compl.") are assumed to be true for purposes of the Motions to

Dismiss before the Court.

I.    Parties

Lead Plaintiff Employees' Retirement System of the State of

Rhode Island ("ERSRI" or "Lead Plaintiff") is an institutional

investor that purchased shares from Defendant Security Capital

Assurance ("SCA") between March 15, 2007 and March 17, 2008 (the

"Class Period").[2]   (Compl. ¶ 14.)   Plaintiff New York Hotel

Trades Council and Hotel Association of New York City, Inc.

Pension Fund ("NYHTC") is a Taft-Hartley pension fund located in

New York City that purchased Preferred Shares from SCA on or

about March 29, 2007, pursuant and traceable to a private

placement completed on April 5, 2007 (the "Private Placement").

(Id. ¶ 15.)   NYHTC later exchanged these Preferred Shares for

registered Preferred Shares pursuant to an Offer to Exchange

filed with the SEC on or about November 19, 2007 (the "Exchange

Offer").   (Id.)   Plaintiffs bring this action on behalf of a

---

[2] The Court appointed ERSRI as Lead Plaintiff in an Order dated
April 23, 2008.

Class consisting of all those who purchased or otherwise acquired the common stock of SCA during the Class Period and who were damaged thereby (the "Common Shares Class"), and all those who purchased or otherwise acquired Preferred Shares pursuant and/or traceable to: (1) the Private Placement or (2) the Exchange Offer, and who were damaged thereby (the "Preferred Shares Class") (collectively, the "Class"). (Id. ¶ 32.)

Defendant XL Capital Ltd. ("XL Capital") is a global provider of insurance and reinsurance coverage with offices in Bermuda, and Defendant XL Insurance Ltd. ("XL Insurance") is a wholly-owned subsidiary of XL Capital (collectively, "XL Defendants"). (Compl. ¶¶ 21-22.) Defendant SCA is a Bermuda-domiciled corporation that was formed by XL Capital in 2006 as a holding company for its financial guaranty insurance business, XL Capital Assurance, Inc. ("XLCA") and its reinsurance business, XL Financial Assurance Ltd. ("XLFA"). (Id. ¶¶ 16, 40.) SCA provides financial guaranty insurance and reinsurance through XLCA and XLFA, its wholly-owned subsidiaries. (Id. ¶ 16.) From shortly after the start of the Class Period through the end of the Class Period, SCA's senior executives resided in New York and conducted business out of XLCA's New York office. (Id. ¶ 84.) Plaintiffs allege that during this period, little distinction was made between the personnel of the two companies.

4

(Id.)  Throughout the Class Period, SCA securities were actively traded on the New York Stock Exchange ("NYSE") under the symbol "SCA".  (Id.)

Defendant Paul S. Giordano ("Giordano") was at all times relevant to this action the president, chief executive officer ("CEO"), a director, and chairman of SCA, and CEO of XLCA. (Compl. ¶ 17.)  Defendant David P. Shea ("Shea") was SCA's chief financial officer ("CFO"), principal accounting officer, and executive vice president.  (Id. ¶ 18.)  Defendant Edward B. Hubbard ("Hubbard") was executive vice president and chief operating officer ("COO") of SCA, a member of SCA's executive committee, and president and COO of XLCA.  (Id. ¶ 19.) Defendant Richard Heberton ("Heberton") was senior managing director and chief credit officer of XLCA.  (Id. ¶ 20.) Defendants Giordano, Shea, Hubbard, and Heberton are referred to collectively as the "Individual Defendants".

Defendants Merrill Lynch, Pierce Fenner & Smith Inc. ("Merrill Lynch" or "Merrill"), Goldman, Sachs & Co. ("Goldman Sachs") and J.P. Morgan Securities Inc. ("JP Morgan") were financial advisors to SCA and assisted with the preparation of SCA's Secondary Public Offering ("SPO") (collectively, "Secondary Offering Underwriter Defendants").  (Id. ¶ 23.) Defendants Lehman Brothers ("Lehman"), Wachovia Securities

5

("Wachovia"), and Merrill Lynch were financial advisors to SCA, and assisted in the offering of SCA's Preferred Shares (collectively, "Preferred Share Underwriter Defendants"). (Id. ¶ 24.)[3]

## II.   Residential Mortgage-Backed Securities (RMBS) and Collateralized Debt Obligations (CDOs)

Financial guaranty insurers such as SCA protect investors against the risk of default by the issuers of debt securities. (Id. ¶ 38.)  The financial guarantor issues a policy for a particular security, such as a bond or note, and promises to pay the security holders the principal or interest if the issuer of the security defaults on its obligation. (Id.)  Financial guaranty insurers depend on high ratings from the major credit rating agencies to survive. (Id. ¶ 39.)  These agencies allegedly examine the securities underlying a particular guarantor's insurance policy, and compare the risk of default among those securities to the insurer's available capital to arrive at a rating that represents the insurer's ability to meet its obligations in the event of claims on its policies. (Id.)

---

2. Claims against Lehman are subject to the automatic stay provision of 11 U.S.C. § 362(a), as indicated in the Notice of Automatic Stay of Claims against Lehman filed in this matter on October 1, 2008.

Plaintiff alleges that after its initial public offering in August 2006, SCA and its management made the decision to "aggressively enter the market" for insuring collateralized debt obligations (CDOs) backed by interest and principal payments due on residential mortgage-backed securities (RMBS). (Compl. ¶ 3.) A RMBS is created when an investment bank pools thousands of individual residential mortgages over which it has ownership and transfers ownership of the pool to a trust. (Id. ¶ 42.) The trust then issues debt securities, which are purchased by investors, and the mortgages in the RMBS pool serve as the collateral for the securities. (Id.) Typically, the trust issues several different classes, or "tranches", of a RMBS, representing different levels of investment risk. (Id. ¶ 43.) Investors purchasing from the least risky, "senior" tranches are paid the least amount of interest, while investors who purchase the riskiest class are paid the highest amount of interest to compensate them for their risk. (Id.) The senior tranche has the first priority on payments by individual borrowers. (Id. ¶ 44.) For the first few years, principal payments may go only to the senior tranche, while interest payments are divided among the remaining tranches. (Id.) Rating agencies evaluate the loans held by the RMBS, and the structure of the RMBS in light

7

of market conditions, and issue ratings for each RMBS tranche,
representing the degree of risk of nonpayment.  (Id. ¶ 47.)

Collateralized debt obligations ("CDOs") are created in the
same way that a RMBS is created, except that instead of pooling
loans as collateral for the securities issued by the trust, a
CDO pools asset-backed securities ("ABS") that themselves are
backed by loans, including RMBS and other securities backed by
consumer loans, such as auto loans, student loans, and credit
card loans.  (Compl. ¶ 48.)  Therefore, while a RMBS may be
backed by 5,000 loans, a ABS CDO may be backed by many times
that number, packaged in the form of various securities.  (Id.)
CDOs are considered opaque and difficult to evaluate precisely
because they contain so many different securities, each of which
has its own structure and collateral pool.  (Id. ¶ 49.)  Given
this structure, there is little visibility and control over the
individual loans that ultimately back the securities that make
up a CDO.  (Id. ¶ 50.)

Beginning in the mid 1990s, there was a dramatic increase
in mortgage lending, and in particular, subprime mortgage
lending, that is, lending to borrowers with weak or damaged
credit histories.  (Compl. ¶¶ 55-56.)  The growth of the
subprime mortgage market in turn spawned a host of new types of
home loans, including "adjustable-rate mortgages" ("ARM"), with

8

fluctuating interest rates, and interest-only mortgages ("IOM"), which permit borrowers to pay only interest for a fixed period of time, during which borrowers accrue no equity.  (Id. ¶¶ 57-60.)  Lenders also made it easier for borrowers to qualify for loans, reducing or completely eliminating the requirements of down payments, verification of employment, and income and asset data.  (Id. ¶ 61.)  These increasingly risky and new types of mortgages were then packaged by the investment banks that purchased them into securities like RMBS and CDOs.  (Id. ¶¶ 65-67.)  According to the SEC, between 2002 and 2006, the number of RMBS and CDOs packaged and sold to investors dramatically increased.  (Id.)

While the major credit rating agencies assign ratings to CDOs and RMBS, as they do to financial guaranty insurers like SCA, the agencies could not and did not thoroughly investigate all the underlying securities before awarding them high ratings, and by the beginning of the Class Period, the problems with the ratings agencies were well known.  (Id. ¶ 67-72.)  In September 2006, Congress passed the Credit Rating Agency Reform Act, granting the SEC oversight over the agencies.  (Id.)  Concern regarding the high ratings of RMBS and CDOs, considering their high risk and volatility, was widely noted by analysts and

market participants, and covered by the press at that time.
(Id. ¶¶ 73-76.)

Plaintiff alleges that as early as summer 2005, "numerous
forecasters saw the inevitability of the housing market crash",
including The New York Times, The Economist, Forbes magazine,
Alan Greenspan.  (Id. ¶ 78.)  Beginning in late 2006, mortgage
lenders began to reveal the effects of their liberal lending -
reporting serious increases in loan delinquencies.  (Compl. ¶
138.)  An October 2006 report by Moody's reported that the
downward spiral of the housing market was in "full swing" "with
nearly 20 metropolitan areas set to 'crash'" in the near future.
(Id. ¶ 79.)  According to a Reuters story dated March 30, 2007,
"[a] massive wave of defaults is set to hit the CDO
(collateralized debt obligation) market following the sub-prime
mortgage meltdown in the U.S., although this could take a year
to play out".  (Compl. ¶ 82; internal quotation marks omitted).
Between the beginning of 2006 and April 2007, more than 50
subprime lenders ceased operations, entered bankruptcy, or
sought buyers.  (Id. ¶ 139.)

## III. SCA's Investment in RMBS and CDOs

SCA was allegedly well aware of the problems in the
industry, and in 2006, refused to insure directly any subprime

10

RMBS.  (Compl. ¶ 95.)  SCA continued, however, to insure
indirectly subprime RMBS through CDOs, and toward the end of
2006, SCA decided to enter aggressively the market for insuring
ABS CDOs backed by RMBS.  (Id. ¶¶ 95-96.)  Over the course of
the next year and a half, SCA "rapidly and massively altered its
risk profile" by entering into approximately 19 new ABS CDO
contracts that were backed by more than 50% RMBS.  (Id. ¶ 96.)
The gravamen of Plaintiffs' Complaint is that by making false
and misleading statements about SCA's ABS CDO exposure
throughout the Class Period, Defendants knowingly and/or
recklessly deceived Plaintiffs and the investing public as to
the true value of SCA, resulting in losses to Plaintiffs when
the price of its stock declined when the truth was revealed.
(Compl. ¶ 334.)

SCA insured only tranches that were "AAA" at the time of
the deal, but Plaintiff alleges that these ratings were not
reflective of the overall risks of these transactions.  (Id. ¶
96.)  As a result, SCA allegedly both overvalued its credit
default swaps and underreserved for the risk of loss.  (Id.)  In
late 2006, SCA negotiated a deal with Merrill to sign several
new contracts to insure tranches of eight different ABS CDOs.
(Id. ¶ 97.)  As an underwriter, Merrill was in the business of
packaging thousands of mortgage loans as RMBS to sell to

11

investors, and with the dangers in the housing market, Plaintiff alleges that Merrill was desperate to reduce its exposure to RMBS.  (Id.)  As such, it packaged its RMBS holdings as CDOs, and sold most of the tranches to investors, retaining the top tranches on its own books.  (Id.)  Merrill sought insurance from SCA on the tranches it retained.  (Id.)  After reaching an initial agreement in late 2006, the eight CDOs were created, and the contracts between SCA and Merrill were executed in late 2006 through 2007.  (Id.)  Unbeknownst to investors, for at least the seven deals executed in 2007, SCA agreed to insure the second most senior tranche, meaning that SCA would not have the first claim to payment.  (Id. ¶ 98.)  In addition to its deals with Merrill, SCA agreed to insure several other ABS CDOs backed more than 50% by RMBS, including a significant amount of subprime RMBS.  (Id. ¶ 99.)

Despite its high acquisition of ABS CDOs, Plaintiff alleges that SCA had a poor understanding of them and little ability to evaluate their performance. (Compl. ¶ 101.)  SCA's computer systems functioned poorly, producing unreliable data and making it impossible for SCA to track deal performance.  (Id. ¶¶ 101-103.)  There was no information anywhere in SCA's system about whether the collateral underlying SCA's CDOs was subprime; only basic information about CDOs was available, including the size,

12

premium, capital charge, and expected cash flows.  (Id. ¶ 107.)
Plaintiff alleges that "[w]hat SCA did know about the collateral
underlying the CDOs was cause for significant concern."  (Id. ¶
112.)  According to a former Managing Director in the Credit
Department during the Class Period ("Managing Director"), for
example, SCA was willing to sign deals to insure CDOs even when
the mortgages underlying the RMBS were serviced by bankrupt
companies or companies that had been flagged as having poor
credit ratings.  (Id. ¶ 113.)

Given the problems with its data, SCA had very poor
mechanisms for analyzing and monitoring the CDOs it insured.
While SCA claimed that its internal "stress test" models were
distinct from those used by the rating agencies (who were not
trusted when it came to the mortgage market), SCA's models in
reality depended on the same simulations and historical
comparisons that the rating agencies themselves used.  (Id. ¶
115.)  SCA's lack of information was evident in its confusing
and contradictory public disclosures about SCA's ABS CDO
portfolio, which varied inconsistently across quarters.  (Id. ¶
111.)

While it was easy for SCA to see how the underlying loans
were performing on the RMBS that SCA insured directly, "nobody
at SCA was looking at how the performance of the RMBS deals

13

would eventually affect the CDOs."  (Id. ¶ 117.)  According to the former Managing Director in the Credit Department, in June and July 2007, SCA became "nervous" about market conditions and made an attempt to research the performance of the collateral underlying its CDOs.  (Id. ¶ 128.)  However, SCA's CDO Group refused to provide him with the necessary information.  (Id.) Despite wide media coverage of the trouble in the housing markets in the summer of 2007, SCA did not acknowledge in July 2007 that there was any deterioration in its portfolio. According to a former Vice President of SCA ("Vice President"), "there was no real acceptance or no real acknowledgement [by SCA] that there was any deterioration at all and that it would be affecting them, because they were triple A, because they were fully supported by all the tranches underneath, the housing market would have to get so bad, and there wasn't really significant work done on it except that it's not going to happen."  (Id. ¶ 129.)  Rather, SCA continued to sign contracts to insure risky mortgage-backed CDOs at that time.  (Id.)  As late as the fourth quarter of 2007, SCA continued to insure ABS CDOs with significant mortgage exposure, and continued to assure the market that its ABS CDOs were performing well and needed no special monitoring.  (Id. ¶ 135.)

14

Plaintiff alleges that SCA's rapid growth initially "impressed the market and resulted in a soaring stock price." (Id. ¶ 136.)  Specifically, from the date of its initial public offering to the start of the Class Period, SCA's stock price rose from $20.38 per share to $29.18 per share, adjusted for dividends.  (Id. ¶ 137.)

IV.   Fraudulent Misrepresentations Alleged of Defendants

     a.   SCA's 2006 Form 10-K

On March 15, 2007, the start of the Class Period, SCA filed its 2006 Form 10-K ("10-K"), signed by Giordano and Shea, and containing Certifications as required by the Sarbanes-Oxley Act of 2002.  (Compl. ¶ 147.)  In the 10-K, SCA reported that it maintained case basis reserves of $85.3 million, and unallocated reserves of $93.2 million, for total reserves of $178.5 million, or .15% of its total insured portfolio.  (Id. ¶ 148.)  SCA described its policy for establishing unallocated reserves, indicating that it relied on several years' old data, and had not adjusted its loss assumptions in 2006.  (Compl. ¶ 149.)  The 10-K stated that SCA relied both on ratings issued by the rating agencies, as well as SCA's "own underwriting procedures that enable us to conduct our own, independent assessment of risk for each obligation that we guarantee."  (Id. ¶ 150.)  SCA further

15

reported that "[e]xposure limits and underwriting criteria are established, as appropriate, for sectors and asset classes" and that in 2006, "we were able to increase our production of new business written across all business lines, other than asset-backed obligations, while still maintaining price and underwriting discipline." (Id.)  SCA did not disclose the details of its CDO portfolio in the 2006 10-K, but Plaintiffs allege that SCA had signed deals to insure a total of 12 ABS CDOs with more than 50% RMBS collateral at that time.  (Id. ¶ 148.)

Plaintiffs allege that the statements in the 2006 Form 10-K were false and/or misleading because (a) SCA had failed to create adequate loss reserves in light of the risk profile of its new, CDO-heavy portfolio; (b) SCA had not exercised discipline in its production of new business; (c) SCA's internal models were not distinct from those used by the ratings agencies; and (d) SCA did not have defined exposure limits with respect to ABS CDOs.  (Id. ¶ 151.)

On March 15, 2007, the day that SCA filed its 10-K and the start of the Class Period, SCA's stock price closed at $29.18, up from $28.98 the day before.  (Id. ¶ 153.)  On March 26, 2007, SCA issued a press release announcing its plan to issue the Preferred Shares via Private Placement Memorandum (the "PPM").

16

(Id. ¶ 154.)  Plaintiffs allege that the PPM incorporated by reference SCA's 2006 Form 10-K and was false or misleading for the same reasons.  (Id. ¶ 155.)

### b. April 23, 2007 Form 8-K and April 24, 2007 Analyst Call

On April 23, 2007, SCA issued a press release, filed with the SEC on Form 8-K, announcing its results for the first quarter of 2007.  (Compl. ¶ 157.)  SCA reported net income for the quarter of $37.3 million, or $.58 per share, up from $.36 per share in the prior year period.  (Id.)  SCA also announced that "adjusted gross premiums" for structured finance rose 45% from the same period a year earlier, due largely to CDOs and "Consumer ABS," a category that includes directly-insured RMBS. (Id.)  SCA reported $6.9 million in losses on the fair value of its credit default swaps, but neither reported any increases to its case basis reserves or its unallocated reserves from the prior quarter, nor flagged any ABS CDO contracts for special monitoring.  (Id.)

During a conference call with analysts the next day, Giordano allegedly "boasted that [SCA's] CDO group had 'record' new business production, including a contract to sign two 'high-grade CDOs of ABS transactions.'"  (Id. ¶ 158.)  The two new ABS CDO contracts included at least one of the seven Merrill

17

contracts scheduled for execution in 2007, both backed by more than 50% RMBS collateral, although SCA did not say so at that time.   (Id.)   In response to questions by analysts, Shea admitted that mark-to-market losses of $6.9 million reported in the press release were attributable, in large part, to SCA's contracts to insure mortgage-backed CDOs, but assured analysts that the losses were "not reflective of the inherent risk within the portfolio" but "more reflective of the market's perception in terms of the overall credit environment."   (Id.)   Shea emphasized "we don't believe the underlying credit profile of our transactions is driving that mark in any way."   (Id.)

On April 23, 2007, the day of the press release, SCA stock closed at $29.66, up from $29.16 on the previous trading day. (Id. ¶ 163.)   After the conference call with analysts, on April 24, 2007, SCA stock closed at $30.38.   (Id.)

### c.   May 14, 2007 Form 10-Q

On May 14, 2007, SCA issued its Report on Form 10-Q for the first quarter of 2007, signed by both Giordano and Shea, which repeated the financial information contained in the April 23, 2007 press release, and stated that the loss reserves stood at $176 million. (Compl. ¶ 161.)   Plaintiffs allege that the statements made in the Form 10-Q were false and/or misleading

18

because (a) SCA had failed to create adequate loss reserves in light of the alteration of its portfolio; (b) SCA understated its mark-to-market losses by failing to monitor the collateral underlying ABS CDOs backed by more than 50% RMBS, and failing to consider current market conditions; (c) SCA disclosed that it had signed two ABS CDO contracts but did not disclose that at least one of the tranches it had insured was not the most senior; (d) SCA had not been disciplined in its underwriting; and (e) the mark-to-market losses were, in fact, reflective of the deterioration in the portfolio.  (Id. ¶ 162.)

In the three week period from April 24 to May 15, 2007, SCA's stock rose to $32.81 per share.  (Id. ¶ 163.)

### d.  May 16, 2007 Secondary Public Offering Registration Statement and May 17, 2007 Conference

On May 16, 2007, SCA filed a registration statement and prospectus (together, "Registration Statement") for its secondary public offering, in which XL Capital would reduce its ownership in SCA from 63% to 47.5% of SCA's outstanding shares. (Compl. ¶ 164.)  The next day, May 17, 2007, SCA held a conference for analysts and investors.  (Id. ¶ 165.)  During the conference, Hubbard stated that the "core" of SCA's business was to "maintain credit and pricing discipline" and Shea

19

emphasized SCA's internal systems for monitoring its insurance portfolio, stating that, "we have developed our own sophisticated models, which we use to analyze and manage our capital adequacy, risk and returns."  (Id. ¶ 165.)

At the conference, Rasul presented SCA's approach to insuring CDOs, stating that a "key component" of that approach was to focus on "senior tranches" of CDOs.  (Id. ¶ 166.)  He pointed out that:

> Over 95% of the book is rated AAA. And a substantial part of that AAA segment is actually is [sic] super senior. In other words, where this — the tranche that we're insuring has credit enhancement that's actually significantly in excess of that required to achieve a straight AAA rating.

(Id.)  Rasul repeated Shea's assurances that SCA did not simply rely on agency ratings, but instead used "our own analytical models for our CDOs, which use a combination of worst-case portfolio composition and simulated macroeconomic conditions, including some very extreme stresses on both interest rates and default curves."  (Id. ¶ 167.)  He concluded that "we have a strong, experienced team of underwriters in the CDO group, operating within a conservative framework."  (Id.)  Rasul directed analysts and investors to SCA's website, where a PowerPoint presentation of SCA's CDO exposure as of March 31, 2007 disclosed that SCA had insured a total of $10.1 billion in

20

ABS CDOs.  (Id. ¶¶ 167-68.)  The chart stated that of SCA's "high-grade" ABS CDOs, only 16.6% of the collateral consisted of subprime RMBS.  (Id. ¶ 168.)  The chart also stated that SCA maintained "explicit limitations" on subprime exposure within its ABS CDOs, with an average limit of around 32%.  (Id.)

Plaintiffs allege that these statements were false and/or misleading because: (a) SCA's approach to underwriting was not disciplined or conservative; (b) SCA's internal models were not distinct from those used by the ratings agencies, and in fact depended on ratings agency simulations; (c) SCA did not insure the seniormost tranche of the CDO in the Merrill deals, but the second most senior tranche; and (d) several deals had far in excess of 32% subprime exposure, and total CDO subprime exposure was actually closer to 28%, rather than 16.6%, when defining subprime to mean borrowers with FICO scores under 640, which SCA claimed to be its stated policy.  (Id. ¶¶ 169-171.)  Plaintiffs allege that SCA would not reveal until March 17, 2008 that the 16.6% figure was based on a FICO score of 625, rather than 640, thus materially understating SCA's exposure to subprime collateral within its CDOs.  (Id. ¶ 170.)

The day after the conference, May 18, 2007, SCA's stock closed at $33.37, up from $32.90.  (Id. ¶ 172.)  In June 2007, SCA's Registration Statement became effective and SCA conducted

21

its secondary public offering, selling $10,627,422 shares at $31 per share.  (Id. ¶ 173.)  The Registration Statement incorporated by reference the 2006 10-K and first quarter 10-Q, and was signed by Giordano and Shea and listed Goldman Sachs, J.P. Morgan and Merrill Lynch as underwriters.  (Id.)

e.   July 23, 2007 Form 8-K and July 24, 2007 Conference Call

On July 23, 2007, SCA issued a press release, filed with the SEC on Form 8-K, reporting its financial results from the second quarter, including $22.2 million in mark-to-market losses.  (Id. ¶ 174.)  SCA recorded an 81% increase in new structured finance business compared to the prior year due, in large part, to new contracts to insure Consumer ABS, including directly-insured RMBS.  (Id.)  SCA recorded no increases to case basis reserves, and no ABS CDOs were flagged for special monitoring.  (Id.)  The press release quoted Giordano as saying that, "Our insured portfolio continues to perform well despite market conditions over subprime mortgages."  (Id.)

The next day, July 24, 2007, SCA had a conference call with analysts to discuss the second quarter results. (Compl. ¶ 175.) Giordano stated that SCA had now insured $14.7 billion worth of ABS CDOs containing more than 50% RMBS, and that these CDOs were

backed by roughly 21% other CDOs. (Id.) Giordano further stated that SCA had signed eight "high-grade CDOs of ABS transactions and all were Super-Senior attachment points." (Id.) Regarding the $22.2 million decrease in the value of SCA's credit default swaps, which Shea attributed mainly to the ABS CDOs, Shea emphasized that the loss "is a function of market changes and fair value and not the result of claims, incurred losses or any deterioration of the underlying credit quality." (Id. ¶ 176.)

In response to an analyst's question about the methods SCA used for determining expected losses, Giordano emphasized that SCA reached its own estimates, distinct from those reached by the ratings agencies, and that SCA's estimates were "more conservative . . ." (Compl. ¶ 181.) Regarding SCA's investment in RMBS, Giordano stated that SCA was now willing to insure RMBS with 2006 vintage collateral (i.e., RMBS backed by loans issued in 2006) because SCA could take protective measures to "exclud[e] early payment defaults and other non-performing loans from the pools with 2006 that we are insuring." (Id. ¶ 183.) SCA did not disclose that on the CDO side, almost all of the RMBS, including subprime RMBS, backing the 22 ABS CDO transactions with more than 50% RMBS collateral were 2006 and 2007 vintage, and because of the CDO structure, SCA could

23

neither exclude individual nonperforming loans in the pools, nor even analyze loans on an individual basis.  (Id.)

When an analyst asked during the call how familiar SCA was with the collateral underlying each CDO, Giordano responded, "As part of our CDO underwriting process, we do have visibility into the underlying collateral, both in RMBS form and in terms of any securities issues by other CDOs that the managers whom we're backing wish to put into their portfolios. . . .  We do review that."  (Id. ¶ 184.)  However, when asked a few minutes later for information about the ratings of the 21% of the collateral underlying the CDOs that consisted of other CDOs, Giordano had no answer.  He responded,

> "I wouldn't — it would be difficult for me to quantify it, but I think it would be a fairly small part, because we are looking for CDO managers who, generally, like us, are pretty cautious in approaching that collateral. We do rely on that CDO-squared bucket on the underlying ratings to a great extent, where, in most of it — over three-quarters — would be AA or AAA. But managers employ a variety of strategies in terms of the underlying collateral that they invest in there. So it is a — it's difficult for us to quantify that."

(Id.)  A couple weeks later, SCA would reveal, after researching the issue for the first time, that 58% of the CDOs backing the ABS CDOs were mezzanine rated, i.e., represented middle tranches in the hierarchy of loss absorption.  (Id. ¶ 184.)

24

Plaintiffs allege that the statements made in the press release and conference call were false and misleading because: (a) SCA had failed to create adequate loss reserves in light of the alteration of its portfolio; (b) SCA understated its mark-to-market losses by failing to monitor the collateral underlying ABS CDOs backed by more than 50% RMBS, and failing to consider current market conditions; (c) SCA stated that it was monitoring the collateral underlying its CDOs and assessing the value of its credit default swaps on a monthly basis when it was not; (d) SCA did not disclose that for six of the ABS CDO deals it had signed in 2007 — i.e., six of the seven Merrill deals — it had insured not the most senior tranche, but the secondmost senior tranche; (e) SCA did not exercise prudent risk selection; (f) the mark-to-market losses were, in fact, reflective of the deteriorating quality of the portfolio; (g) SCA's internal models were not distinct from those used by the ratings agencies, and in fact depended on ratings agency simulations; and (h) the overcollateralization triggers did not serve as "robust" protections for the CDOs embedded within the collateral backing SCA's ABS CDO exposure.  (Id. ¶ 185.)

SCA's stock price fell from $28.73 on July 23, 2007 to $24.37 on July 24, 2007, Plaintiff alleges as a "reacti[on] to

the losses reported by SCA as well as the uncertainty as to the effect of the housing market on SCA's business.  (Id. ¶ 188.)

Plaintiffs allege that, according to both a former Vice President and Managing Director of SCA, "the extent of analyst interest in SCA's mortgage exposure during the July 24, 2007 conference call took SCA by surprise," leading SCA to host a second call on August 3, 2007 specifically to discuss the mortgage collateral underlying its CDO and RMBS policies.  (Id. ¶ 189.)  According to the former Managing Director, "it was only after the July 2007 call that SCA made a serious effort to research the underlying collateral – only to discover" the data deficiencies of SCA's computer systems.  (Id.)  The Vice President confirms that even though his internal group was responsible for testing the CDOs under various economic scenarios, "SCA had relied so heavily on the agency ratings for deals like the one with Merrill that no such models were seriously run until after the July conference call, in preparation for the August follow-up."  (Id.)  Even then, the CDOs were so complex that the Vice President's group found them difficult to model.  (Id.)

26

### f.   August 3, 2007 Conference Call and Presentation

During a conference call on August 3, 2007, SCA addressed its mortgage exposure both in its directly insured RMBS, and in its CDOs, and "for the first time revealed many more details of its ABS CDO portfolio." (Compl. ¶ 190.)  SCA disclosed that it had currently 22 deals on its books for ABS CDOs with greater than 50% RMBS collateral, and that of the $22.2 million in mark-to-market losses recorded in the second quarter, only $13.3 million was due to those ABS CDO deals.  (Id.)  SCA further revealed, for the first time, that of the CDOs that served as collateral for its ABS CDOs, 58% were mezzanine level.  (Id.)  Finally, Rasul disclosed that the RMBS collateral underlying the CDOs was of the same vintage as the CDO itself – meaning that the CDO deals signed in 2006 and 2007 were collateralized with loans issued in those years.  (Id.)

SCA distributed a PowerPoint presentation, simultaneously on its website and filed with the SEC on Form 8-K, detailing SCA's ABS CDO exposure.  (Compl. ¶ 191.)  Among other things, the presentation showed that out of the $14.7 billion exposure to ABS CDOs with more than 50% RMBS collateral, 96.8% was rated "AAA" with "BBB" and "below investment grade" exposures as $10 million and $4 million, respectively – described on the chart as 0% of the portfolio.  (Id.)

Heberton stressed SCA's diligence and prudence in underwriting and "strong credit discipline", and praised the quality of SCA's stress testing and modeling, promising that before SCA agreed to insure any security, "[W]e subject the deal to a variety of severe stresses to make sure it can withstand multiples of expected loss rates without us paying claims." (Id. ¶ 192.)   Rasul emphasized SCA's "strict limitations" on the amount of subprime collateral in its CDOs, and the accompanying PowerPoint presentation stated that SCA maintained "limits on subprime exposure" within its CDOs.  (Id. ¶ 193.)   Subprime was defined on the call and on the presentation as including borrowers with FICO scores below 640.  (Id.)   SCA emphasized that its underwriting was not dependent on agency ratings; Heberton explicitly stated that "Our underwriting of deals is independent of the rating agencies. We develop our own views based on rigorous analysis of the data and in-depth due diligence with the managers and originators", and the presentation distributed to analysts itself stated, "Underwriting is independent of rating agencies."  (Id.)

SCA assured analysts that it was carefully monitoring the performance of the collateral in its CDOs.  (Id. ¶ 194.) Specifically, Giordano stated that "we actively monitor the performance of the credits we insure to give ourselves the

opportunity to intervene early in the event of deterioration."
(Id.)  The presentation distributed to analysts stated "CDOs
tracked at least monthly based on information received from
trustee and manager".  (Id. ¶ 195.)  Hubbard also stated, "[W]e
are in regular contact with the CDO managers, and so we do have
visibility into the collateral that they're buying into their
ABS CDOs."  (Id.)

Plaintiffs allege that Rasul praised the quality of SCA's
stress tests, but "unwittingly revealed" the disconnect between
SCA's stress tests for its CDOs relative to its actual
experience on its directly-insured RMBS.  The presentation
distributed to analysts stated that among its directly-insured
subprime RMBS, SCA was expecting losses of 10.4% for loans
issued in 2006 and 2007, while SCA used 10% as a stress test for
its CDOs.  (Id. ¶ 196.)  Hubbard admitted that SCA simply did
not know what level of subprime losses its ABS CDOs could
withstand beyond the current, existing loss levels.  (Id. ¶
198.)  SCA emphasized the use of overcollateralization triggers
as a mechanism for monitoring its CDO performance, and in the
process of this discussion, repeatedly emphasized that SCA was
exposed only to "senior" liabilities.  (Id. ¶ 203.)

As it had done during prior analyst calls, SCA also sought
to minimize the significance of mark-to-market losses. (Comp. ¶

205.)  Specifically, Giordano told analysts that: "Although we are required to reflect in our income statement unrealized — and I stress unrealized — gains or losses on protection we write in credit derivative form, this is solely due to spread widening, not credit deterioration . . ."  (Id.)  Likewise, Shea assured analysts that: "the second quarter $22.2 million unrealized mark to market loss we reported does not reflect an impairment of any kind, an incurred loss, any claim or any credit deterioration."  (Id. ¶¶ 205-206.)

Plaintiffs claim that the statements made during the August 3, 2007 conference call were false and misleading, additionally, because: (a) SCA was not disciplined in its underwriting, and was not limiting or adequately monitoring the collateral backing its ABS CDOs; (b) although SCA stated that it defined subprime to mean FICO scores below 640, in fact, when it had previously disclosed subprime exposure in May, it had only disclosed exposure associated with FICO scores of 625 or below, understating its true subprime exposure by approximately $1.4 billion; (c) SCA's internal models were not distinct from those used by the ratings agencies; (d) for the Merrill deals, SCA did not insure the seniormost tranche of the CDO, but instead insured the second most senior tranche; and (e) the mark-to-market would not necessarily accrete to zero, and, in fact,

unrealized losses could — and did — become realized losses. (Id. ¶ 208.)  Plaintiffs allege that, "[a]t minimum, SCA's lack of insight into its portfolio made it impossible for SCA to determine one way or the other whether credit quality had deteriorated."  (Id.)

SCA's stock price fell from a closing price of $22.52 on August 2, 2007 to $19.36 on August 6, 2007.  (Id. ¶ 209.)

### g.  August 10, 2007 Form 10-Q

On August 10, SCA filed its 10-Q for the second quarter of 2007, signed by Giordano and Shea.  (Compl. ¶ 211.)  The 10-Q revealed that during the August 3, 2007 call, the mark-to-market losses recorded on the ABS CDOs totaled $13.8 million, not $13.3 million.  (Id. ¶ 211.)  The 10-Q also reported SCA's total exposure to subprime mortgages, both through direct insurance of RMBS and through CDOs backed by RMBS, as $4.8 billion.  (Id. ¶ 212.)  However, with respect to CDOs, that figure included only borrowers with FICO scores below 625, rather than 640, as SCA had stated just a week earlier.  (Id.)  By not counting borrowers with FICO scored between 625 and 640 in the totals, SCA understated its subprime exposure by approximately $1.5 billion.  (Id.)

h.    September 5, 2007 Conference and Presentation

On September 5, 2007, SCA gave a presentation at the Keefe, Bruyette & Woods Inc. Insurance Conference, and posted a PowerPoint presentation to its website in connection with the conference.  (Id. ¶ 213.)  The presentation included a chart listing all of its ABS CDOs with more than 50% RMBS exposure, the percent backed by RMBS, and the percent backed by subprime RMBS, defining subprime to mean borrowers with FICO scores below 640.  (Id.)  Hubbard also stated in the course of the presentation that SCA defined subprime to mean borrowers with FICO scores under 640.  (Id.)  As the subprime exposure listed on the chart of CDOs in reality included only borrowers with FICO scores below 625, SCA significantly understated the subprime exposure in its CDOs.  (Id. ¶ 214.)  According to the data SCA provided, only two CDO deals had more than one-third subprime collateral, when in reality, as would be revealed in March 2008, ten deals – nearly half the deals listed on the chart - exceeded the one-third subprime level.  (Id. ¶ 216.) Plaintiffs allege that during the conference, Defendants again misrepresented other aspects of SCA's business, by boasting about SCA's underwriting and monitoring procedures, including "exhaustive" stress testing, minimizing the significance of SCA's mark-to-market losses, emphasizing overcollateralization

32

triggers, and drawing attention to the "super-senior risk attachment" of its CDOs.  (Id. ¶¶ 217-221.)

Plaintiffs argue that the statements made by Defendants during the conference and in the corresponding presentation were false and misleading again because: (a) SCA materially understated its subprime exposure and misrepresented its policies for controlling for subprime risk in the CDOs it insured; (b) SCA was not properly monitoring its CDO exposure or conducting appropriate stress tests; (c) SCA did not mitigate risks by selecting high quality originators; (d) the mark-to-market losses were, in fact, reflective of the deteriorating quality of the portfolio; and (e) for the Merrill deals, SCA did not insure the seniormost tranche of the CDO, but instead insured the second most senior tranche.  (Id. ¶ 223.)

Also on September 5, 2007, the SEC stated that it was conducting an investigation into the role of the ratings agencies and their policies for reviewing mortgage-backed securities. (Id. ¶ 224.)

SCA's stock price fell from $20.89 on September 4, 2007 to $19.77 on September 6, 2007.  (Id. ¶ 225.)

33

i. October 16, 2007 Form 8-K

On October 3, 2007, Fitch completed its review of 2006 subprime RMBS and downgraded 1,003 classes of bonds. (Id. ¶ 226.) On October 4, 2007, Moody's reported that subprime mortgage bonds backed by 2007 vintage loans were going delinquent at the fastest rate ever, that 2007 loans were performing worse than 2006 loans, and that 2006 loans hit the 10% loss level nine months after issuance. (Id. ¶¶ 227-228.) In other words, Plaintiffs allege, sufficient data was available in the third quarter of 2007 to show that subprime loans from 2006 were on a trajectory to exceed greatly the 10% level, and 2007 loans were likely to perform even more poorly. (Id. ¶ 228.) On October 5, 2007, Merrill issued a press release stating that it expected to report write-downs of $4.5 billion, net of hedges, of its CDOs and subprime mortgage holdings. (Id. ¶ 229.)

On October 16, 2007, SCA issued a press release filed with the SEC on Form 8-K, announcing that it would record mark-to-market losses in the third quarter of $145 million. (Id. ¶ 230.) In the release, Shea assured investors that, "this unrealized mark-to-market adjustment is not an actual loss, claim, or impairment of SCA's insured portfolio." (Id.) SCA also stated that it would report $140 million of new business,

as measured in adjusted gross premiums, and that it had not established any additional case basis reserves. (Id.)

SCA's stock price closed at $20.81 on October 16, down from $21.39 the previous day. (Compl. ¶ 231.)

On October 17, 2007, Deutsche Bank issued a report on SCA, noting that despite the mark-to-market losses, which were "smaller than we expected," SCA had not added to case basis reserves. (Id. ¶ 232.) The report stated that, "We are not concerned with the aforementioned loss as it is purely accounting driven and does not signify an underlying economic problem, in our view", highlighted SCA's "strong" new business growth, and stated, "We maintain our Buy rating given the company's faster growth rate, attractive valuation, . . . and that subprime mortgage fears should pass without significant losses." (Id.) That day, S&P downgraded 1,713 classes of RMBS backed by subprime, mid-prime, and second-lien loans issued in the first half of 2007 and stated that it was reevaluating CDOs backed by the downgraded CDOs. (Id. ¶ 233.) On October 19, 2007, S&P additionally lowered ratings on 1,413 RMBS classes. (Id. ¶ 234.)

On October 24, 2007, Merrill issued another press release announcing that although it had originally intended to write down $4.5 billion worth of CDO and subprime mortgage assets, it

had revised that figure upward, and had written down $7.9 billion."   (Id. ¶ 235.)

### j. October 25, 2007 Form 8-K and October 26, 2007 Conference Call

On October 25, 2007, SCA issued a press release, filed with the SEC on Form 8-K, announcing its results for the third quarter of 2007.   (Id. ¶ 236.)   SCA had reduced its planned write-down from $145 million to $143 million, resulting in a net loss of $89.9 million for the quarter, and adjusted gross premiums of $141.1 million, a 55% improvement over the prior year period.   (Id.)   Although SCA would disclose in a conference call with analysts that it had placed three directly-insured RMBS contracts on its list for special monitoring, SCA's only increases to its unallocated reserves were due to growth in the portfolio, and not to any reassessment of the risks of ABS CDO or direct RMBS exposure.   (Id.)   There were no additions to case basis reserves for ABS CDOs with more than 50% RMBS collateral, or for directly-insured RMBS.   (Id.)   The press release quoted Giordano as saying, "New business production in the third quarter was one of the strongest in our history, fueled by generally higher pricing and stronger credit terms. Our triple-A ratings remain strong despite the stress in the residential

36

mortgage market and we are well positioned to take advantage of the improved environment for new business." (Id.) "Meanwhile", Plaintiffs allege, "in late 2007, home prices had fallen by more than 6% from mid-2006 and existing home sales had fallen by a third. (Id. ¶ 238.)

On October 25, 2007, SCA's stock closed at $13.21, down from $14.41 the previous day. (Id. ¶ 239.)

On October 26, 2007, SCA hosted a conference call for analysts to discuss its third quarter results. After Giordano repeated the net income and mark-to-market losses contained in the press release, SCA stated that it now insured a total of $16.1 billion worth of ABS CDOs, or 24 deals, in which the underlying collateral was more than 50% RMBS. (Id. ¶ 240.) Hubbard stated that the $16.1 billion figure was "high grade" although it included roughly $300 million of older mezzanine CDOs. (Id. ¶ 240, n.10.) SCA did not reveal that it had insured eight separate deals involving the CDOs of Merrill— which had announced nearly $10 billion in write-downs two days earlier. (Id.) Hubbard disclosed that of the 3,700 securities underlying these CDOs, 16.9% had been downgraded by at least one ratings agency, with an additional 4.6% placed on negative watch. (Id. ¶ 241.) The average downgrade was 2.8 notches. (Id.) Additionally, two of the 24 ABS CDOs had tripped

overcollateralization triggers, and Hubbard stated that "Based on the recent downgrades, we anticipate that another three ABS CDOs will be out of compliance with one or more hard coverage tests going forward and will, therefore, trip their triggers…" (Id.)  Nonetheless, SCA reported that it had not placed any of its 24 ABS CDOs on watch for special monitoring, nor had it established case basis reserves for any of them, or updated its loss projections in such a manner as to increase its unallocated reserves.  (Id. ¶ 242.)

Although during the July 2007 conference call, Shea had stated three times that SCA would reassess its actuarial work and its reserves in the third quarter of 2007, Shea now stated with no explanation that, "Looking ahead to the fourth quarter, we will be conducting our annual actuarial analysis . . ." (Id.)  Plaintiffs allege that Shea's failure even to explain why they were delaying the analysis by three months — and thus would not release the results of the analysis until March 2008, or five months after the results were originally promised — "demonstrates that SCA was aware that the analysis would result in tremendous losses or, at minimum, that SCA was aware it simply did not have sufficient insight into its ABS CDO portfolio to conduct the analysis in the first place." (Id.)

38

Plaintiffs allege that "[b]ecause the markets for CDOs and RMBS were virtually frozen, Shea stated that SCA established fair value of its credit default swaps — and thus its mark-to-market losses for the quarter — based on an "internal pricing model" that included "management judgment" and "data inputs" such as credit spreads, "our judgment in regards to market perception of risk," the life span of SCA's contracts, historic rates of return, and "estimated returns required by a market participant in the current market."  (Id. ¶ 243.)  "Through this process", SCA had settled on the $143 million loss figure, 77% of which was attributable to the 24 ABS CDOs and to certain other credit default swaps.  (Id.)  Shea continued to claim that mark-to-market losses were unimportant, and that they would "accrete back to zero."  (Id.)

Despite the tripped overcollateralization triggers, the frozen markets, and the massive write-downs announced by Merrill, SCA continued to insist that its portfolio was strong.  (Id. ¶ 244.)  Hubbard assured analysts that all of SCA's high grade ABS CDO exposure had a "super AAA credit rating" and emphasized that "our super senior attachment levels provide us with an important buffer from a downgrade. . . . On average, 100% of the collateral or every single one of the underlying securities in one of our ABS SCDOs would have to be downgraded

39

three notches in order for our exposure simply to be downgraded to AA." (Id. ¶ 245.)

Finally, Hubbard claimed they were monitoring the situation closely, stating, "[W]e have pretty good visibility into the performance of the collateral that is underneath the deal. . . . [W]e receive monthly trustee reports that give us the high level of detail on how the collateral is performing. . . . And we received similar information for the CDOs that we have guaranteed." (Compl. ¶ 246.) Rasul told analysts that, with respect to the CDO collateral underlying the ABS CDOs, "we obviously have visibility into the inner CDOs." (Id.)

In response to an analyst's question about whether SCA's internal ratings differed from those of the agencies, Hubbard stated, "At this point, there might be a handful of CDOs where there is a difference between our internal rating and the third-party ratings. But as I said before, because of the super senior attachments on our ABS CDOs . . . as a general matter, our ratings track pretty closely the current rating agency ratings." (Id. ¶ 247.)

Plaintiffs allege that these representations were false and/or misleading because: (a) SCA had failed to create adequate loss reserves; (b) SCA understated its mark-to-market losses and the strength of its portfolio by failing to monitor the

collateral underlying ABS CDOs backed by more than 50% RMBS,
failing to conduct appropriate stress tests, and failing to
consider current market conditions; (c) the mark-to-market
losses did, in fact, reflect deterioration and would not accrete
back to zero; (d) SCA did not have visibility into its CDO
portfolio and had failed to monitor the collateral; and (e) for
the Merrill deals, SCA did not insure the seniormost tranche of
the CDO, but instead insured the second most senior tranche.
(Id. ¶ 248.)

     Additionally, during the course of the October 26, 2007
call, Hubbard stated that subprime second-lien RMBS exposure
within the ABS CDOs constituted only 0.4%, on average, of the
underlying collateral. (Id. ¶ 249.)  Plaintiffs allege that
this statement was misleading because the 0.4% figure was
calculated by defining subprime to mean borrowers with FICO
scores below 625; previously, as stated above, SCA had told
investors that it defined subprime to include borrowers with
FICO scores below 640. (Id.)  After the call, Deutsche Bank
issued a report reiterating its "Buy" rating and restating that
its view that the mark-to-market loss was "purely accounting
driven" and did not "signify an underlying economic problem."
(Id. ¶ 250.)

41

Following the call, SCA's stock price rose from $13.21 on October 25, 2007 to $14.09 on October 30, 2007.  (Id. ¶ 252.)

On November 5, 2007, Fitch issued a press release stating that it was reviewing the capital adequacy of financial guarantors in light of its recent ratings actions on CDOs with subprime exposure.   (Compl. ¶ 254.)   Fitch stated that there was a "moderate" probability that SCA would experience pressure on its capital cushion, and it would review the situation over the next four to six weeks.  (Id.)   Three days later, Moody's reported that it was re-estimating the capital adequacy of financial guarantors to reflect deterioration in RMBS performance.  (Id. ¶ 255.)   Moody's reported that there was a "moderate possibility" that XLCA would no longer have sufficient capital to meet the requirements for its Aaa ratings.  (Id.)

### k. November 13, 2007 Press Release

On November 12, 2007, Fitch announced downgrades of 352 tranches.  (Id. ¶ 256.)   The next day, November 13, 2007, SCA issued a press release announcing that among the downgraded securities were two ABS CDO tranches that SCA had insured. (Id.)   The Fitch actions resulted in the formerly-AAA rated tranches to be downgraded to BBB and CCC (non-investment grade), respectively.  (Id.)   The tranches had been insured by SCA in

the first and second quarters of 2007, and both were Merrill deals.  (Id.)

The day after the press release, SCA's stock price closed at $6.64, down from $7.65 the previous day.  (Id. ¶ 257.)

### 1. November 14, 2007 Form 10-Q

On November 14, 2007, SCA filed its 10-Q for the third quarter of 2007, signed by Giordano and Shea, reporting total reserves at $181 million, and for the first time detailing the reserves associated with its "structured finance business" – the area that included CDOs and RMBS.  (Id. ¶ 258.)  For this segment, with exposures of $49 billion, SCA's reserves were only $17 million.  (Id.)  The report also revealed that of the total $143 million in mark-to-market losses, $85 million was associated with the ABS CDOs backed by more than 50% RMBS, and stated that SCA's exposure to subprime RMBS within these ABS CDOs was $3 billion, or 19% of the $16.1 billion worth of these ABS CDOs that it had insured.  (Id.)  SCA did not disclose that this figure was calculated by defining subprime borrowers to mean those with FICO scores below 625, rather than using the 640 cut-off that SCA had previously stated it used.  (Id.)  In fact, SCA's true exposure to subprime RMBS within these ABS CDOs was approximately $4.75 billion, or nearly 30% of the $16.1 billion

of ABS CDOs, meaning that SCA understated its exposure to subprime RMBS by approximately $1.64 billion.   (Id.)

The 10-Q also reviewed the recent Fitch downgrades of two of its ABS CDO tranches and the fact that a third was under review, and also disclosed that as of November 12, 2007, Moody's had placed six of SCA's ABS CDO tranches on "watch for downgrade," with a net par exposure of $2.7 billion.   (Id. ¶ 259.)   Still, the 10-Q reiterated that no ABS CDOs had been placed on SCA's watch list as of September 30, 2007.   (Id.)

In discussing SCA's method for calculating fair value of credit default swaps, the 10-Q stated that: "In periods prior to September 30, 2007, management principally considered price indices published by non-affiliated financial institutions in forming our best estimate of the fair value of our credit default swap contracts."   (Id. ¶ 161.)   Plaintiff alleges that "[t]his was important to investors, because an alternative mechanism for fair valuation — one that involves 'estimates' based on discussions with counterparties and management judgment — is significantly more subjective than reliance on market indices, and thus is inherently less reliable."   (Id. ¶ 262.)

Despite SCA's statement in its 10-Q that it relied on market indices, the fair value calculations in the third quarter 10-Q were based not on market indices, but on management

44

judgment.  (Id. ¶ 263.)  As SCA would reveal on March 17, 2008, when it filed its 2007 10-K:

> "Of our net liability relating to credit derivatives at December 31, 2007, 47.1%, 2.3%, 48.8%, and 1.8%, respectively, reflects estimates based primarily on price discovery resulting from discussions and negotiations to commute certain of our CDS contracts, market indices, management's judgment in regard to the rate of return required by a market participant to transfer the risk . . . and other factors."

(Id. ¶ 264.)  In other words, according to the 2007 10-K, the swaps in the third quarter had not been valued according to market indices, as the 10-Q had stated, but instead were literally 95.9% based on management judgment.  (Id.)

### m. November 18, 2007 S-4/A

On November 18, 2007, SCA filed a Form S-4/A with the SEC in connection with the Exchange Offer, thereby registering the Preferred Shares with the SEC.  (Compl. ¶ 266.)  The Exchange Offer incorporated by reference SCA's 2006 10-K, first quarter 10-Q, second quarter 10-Q and third quarter 10-Q, and Plaintiff alleges was therefore false and/or misleading for the same reasons already alleged.  (Id. ¶ 266.)

On November 21, 2007, Fitch downgraded the third ABS CDO tranche insured by SCA, representing $573 million of exposure,

from AAA to BBB-.  SCA's stock price closed at $4.28, as compared to $4.74 the previous day.  (Id. ¶ 267.)

On November 26, 2007, the President and CEO of XL Capital resigned his position from the SCA Board of Directors; shares of SCA rose from $4.44 on November 26, 2007 to $7.06 on November 30, 2007.  (Compl. ¶ 268.)  On November 29, 2007, SCA management spoke at a conference and discussed actions it was taking to shore up its capital base, including potential reductions in new business and/or increased conservatism in signing new deals, obtaining new reinsurance, raising debt, and raising equity. (Id. ¶ 269.)

Between December 12 and December 19, 2007, all three ratings agencies announced unfavorable actions on SCA and its subsidiaries.  (Compl. ¶ 270.)  On December 12, 2007, Fitch announced that after reviewing SCA's exposure to RMBS and CDOs backed by RMBS, it had concluded that SCA fell $2 billion short of capital adequacy requirements for an AAA rating, and a number of SCA's insured CDOs "would now be rated in either the 'BBB' category, or non-investment [CCC] grade."  (Id.)  Fitch also stated that for several of the problematic transactions — which would eventually be disclosed as the Merrill transactions — "SCA effectively insured a non-senior layered tranche . . . of the original 'AAA' capital structure."  (Id.)

On December 14, 2007, Moody's announced that XLCA had been placed on review for possible downgrade as a result of higher expected losses due to RMBS and CDO exposure.  (Id.)  Moody's analysis showed that while XLCA was adequately capitalized for "base case" losses, it fell below capital adequacy requirements under stress scenarios due to the ABS CDOs' sensitivity to cumulative losses in the RMBS collateral.  (Id.)

On December 19, 2007, S&P announced that it was considering downgrading SCA due to the results of updated stress tests on SCA's RMBS and CDO exposure.  (Id.)

Between December 12, 2007 and December 20, 2007, SCA's stock price fell from $5.45 to $4.00 per share.  (Id. ¶ 272.)

Plaintiff alleges that "[d]espite the ratings agency actions, the mark-to-market losses, the departure of executives, and the general turmoil in the market," SCA signed an additional deal in the fourth quarter of 2007 to insure an ABS CDO tranche of approximately $800 million that was more than 50% RMBS.  (Id. ¶ 274.)  With this deal, SCA's total exposure to ABS CDOs with more than 50% RMBS collateral reached $16.8 billion, and contrary to SCA's stated policy of limiting subprime exposure to one-third of any deal, this tranche was backed by 76.1% subprime RMBS.  (Id.)

47

On January 23, 2008, SCA issued a press release, filed with the SEC on Form 8-K, stating that it no longer planned to raise new capital due to "uncertainty and instability" in the industry.  (Compl. ¶ 275.)  The next day, Fitch downgraded XLCA from AAA to A, and SCA from AA to BBB, with ratings to remain on ratings watch negative. (Id.)  Fitch stated that the new ratings reflected "significant uncertainty with respect to the company's franchise, business model and strategic direction; uncertain capital markets and the impact of SCA's recent decisions on future financial flexibility; the company's future capital strategy; ultimate loss levels in its insured portfolio; and the challenges in the financial guaranty market overall."  (Id.)  SCA's stock price fell from $3.79 on January 23, 2008 to $2.63 on January 24, 2008.  (Id. ¶ 276.)

On February 7, 2008, Moody's cut XLCA's ratings six notches, concluding that SCA would require in excess of $6 billion to meet capital adequacy requirements for AAA ratings, as compared to its current resources of $3.6 billion.  (Id. ¶ 277.)   SCA's stock price fell from $2.77 on February 6, 2008 to $2 on February 8, 2008. (Id. ¶ 278.)

n. February 29, 2008 to March 17, 2008: The Full Truth is
   Revealed

Plaintiffs allege that "[t]he truth about SCA's financial
condition was finally revealed in a series of disclosures
regarding its fourth quarter and full year results." (Compl. ¶
279.) On February 29, 2008, SCA filed a notice with the SEC
that it would delay filing its annual report on Form 10-K for
2007. (Id.) The notice stated that SCA was expecting to report
approximately $1.5 billion in losses on the fair value of its
credit default swaps, and that SCA's auditors were considering
whether to include a going concern warning in their audit
opinion. (Id.) On March 4, 2008, Moody's announced that it was
placing SCA and XLCA on review for possible downgrades due to
SCA's filing. (Id. ¶ 280.)

Between February 28, 2008 and March 6, 2008, SCA's stock
price dropped from $1.64 to $0.60 per share. (Id. ¶ 281.)

On March 13, 2008, SCA issued a press release, filed with
the SEC on Form 8-K, announcing $1.2 billion in losses for the
fourth quarter of 2007. (Id. ¶ 282.) The press release also
announced that SCA had terminated seven of its ABS CDO contracts
with an unnamed counterparty (later revealed as Merrill) due to
the counterparty's alleged repudiation of its obligations under
the contract. (Id. ¶ 283.) These seven deals alone represented

49

$204.9 million of SCA's mark-to-market losses and $427.4 million of its net case loss reserves for the quarter. (Id.) Finally, the release announced that SCA was no longer writing new business, and would not pay dividends on either its common shares or its Preferred Shares. (Id. ¶ 284.)

On March 14, 2008, SCA hosted a conference call to discuss its fourth quarter results. (Compl. ¶ 285.) During the call, Giordano conceded that when accounting for its ABS CDO exposure during the quarter, SCA

> "look[ed] at a much broader array of pricing information not previously considered. This new information included deterioration and rating downgrades of the ABS CDOs, an extensive ground up internal risk assessment of the ABS CDO portfolio, total evaluations of certain CDS [credit default swap] policies, price discovery associated with our discussion with counterparties regarding potential commutation or restructuring of certain CDO contracts."

(Id.) In other words, Plaintiffs allege,

> "Giordano admitted that despite the turmoil in the markets earlier in the year, despite SCA's extensive assurances regarding the care with which it monitored its portfolio and evaluated its exposure, despite the fact that other companies had reevaluated their risk and acknowledged massive losses several months earlier, it was not until the fourth quarter — several months after it had originally told investors it would conduct a full review — that SCA reassessed its exposure to ABS CDOs and evaluated its credit default swaps."

(Id.) (emphasis in original).

50

Three days later, on March 17, 2008, the final day of the Class Period, SCA filed its 10-K for 2007 and posted a PowerPoint presentation on its website detailing its CDO exposure as of December 31, 2007.  (Id. ¶ 288.)  A small footnote at the bottom of the presentation disclosed that "Subprime RMBS includes securities with a FICO score of 640 or below. . . . In previous disclosures, a FICO threshold of 625 had been used by SCA to categorize securities as subprime." (Id.)  Plaintiff alleges that this PowerPoint presentation has since been removed from the website.  (Id. n.13.)  By using a FICO score of 625 in earlier disclosures and falsely telling investors that SCA used a 640 threshold, SCA was able to understate its subprime exposure by approximately $1.64 billion. (Id. ¶ 289.)  The presentation also showed that the portfolio was now 26.3% AAA rated, with 5.1% BBB rated and 15.4% CCC rated, below investment grade.  (Id. ¶ 290.)  On the day of these disclosures, SCA's stock price closed at $0.72, down from $0.79 the previous day.  (Id. ¶ 291.)

### o. Financial statements

Plaintiffs allege that throughout the Class Period, SCA misrepresented that its financial statements were presented in conformance with GAAP.  (Id. ¶ 298.)  Plaintiffs allege that

SCA's materially false and misleading financial statements resulted from "a series of deliberate senior management decisions that concealed the truth regarding SCA's actual operating results." (Id. ¶ 300.)  Plaintiffs alleges that the SCA Defendants caused SCA to violate GAAP and SEC rules by, among other things, failing to consider that the mortgage-related securities supporting its insured obligations were deteriorating, necessitating material provisions to increase unallocated reserves and case basis reserves, and material write-downs; failing to consider the adverse news and events about the housing market available as early as the end of 2006, as well as observable market data; and failing to design and implement an internal control system over SCA's financial reporting process.  (Id.; see ¶¶ 301-332.)

### p. Defendants' Alleged State of Mind

Plaintiffs allege that by making false and misleading statements about SCA's ABS CDO exposure, SCA and the Individual Defendants knowingly and/or recklessly deceived Plaintiffs and the investing public as to the true value of SCA.  (Compl. ¶ 334.)  Plaintiffs allege that during the Class Period, SCA and the Individual Defendants "touted themselves as experts in the field of financial guaranty insurance," and represented that

52

they had fully investigated and stress tested each security
before agreeing to insure it.  (Id.)  Plaintiffs allege that
Defendants were aware of the deterioration in the housing market
and the increasingly risky loans that had been issued, and were
aware that they had insured $3.1 billion in "non-senior" ABS CDO
tranches, yet did not alter their loss assumptions or place any
ABS CDO contract on special monitoring until the end of the
Class Period.  (Id.)  "Thus", Plaintiffs allege, Defendants made
statements "with full knowledge of their falsity, or with
reckless disregard for their falsity."  (Id.)

     Plaintiffs allege that Defendants "aggressively entered the
market to insure ABS CDOs" in the latter half of 2006 and
throughout 2007 because SCA wanted to stimulate revenues and
raise its income.  (Id.)  Plaintiffs allege that SCA "had a
particular reason to sign ABS CDO contracts in late 2006 and
early 2007", that is, it wanted to "present the impression of
explosive growth in anticipation of its forthcoming secondary
offering," which was to take place on or about June 6, 2007.
(Id. ¶ 335.)  In the secondary offering, XL Capital, through its
wholly-owned subsidiary, XL Insurance, sold 9, 680,022 million
of its SCA shares, reducing its holdings from 63% of SCA's
common stock to 47.5%.  (Id.)  Plaintiff alleges that although
the proceeds of the sale went to XL Capital and not SCA, "SCA,

given its close ties to XL Capital, was eager increase [sic] its stock price and thus the price of the shares sold in the offering." (Id.) Plaintiff alleges, as asserted in SCA's 2006 10-K and 2007 10-K, that XL Capital exercised significant influence over SCA both before and after the secondary offering. (Id. ¶¶ 336-37.)

## DISCUSSION

I.  Legal Standard for a Motion to Dismiss under Rule 12(b)(6)

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> "when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged.  The
> plausibility standard is not akin to a 'probability
> requirement,' but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are 'merely
> consistent with' a defendant's liability, it 'stops
> short of the line between possibility and plausibility
> of 'entitlement to relief.'"

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 556-57).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels

54

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks omitted). "In keeping with these principles," the Supreme Court has stated,

> "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

Iqbal, 129 S.Ct. at 1950.

In ruling on a 12(b)(6) motion, a court may consider the complaint as well as "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Communc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).


II.  Section 10(b) Claim (Count Six)

Section 10(b) of the Securities Act makes it unlawful to "use or employ, in connection with the purchase or sale of any

55

security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." 15 U.S.C. § 78j(b). Rule 10b-5 implementing § 10(b) prohibits "mak[ing] an untrue statement of material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. . . ." 17 C.F.R. § 240.10b-5.

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Communc'ns, 493 F.3d at 105 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)). Securities fraud claims are governed by the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires a party averring fraud or mistake to state with particularity "the circumstances constituting [the] fraud or mistake." Fed. R. Civ. P. 9(b); see Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000).

Defendants do not challenge all of the elements of Plaintiffs' Section 10(b) claim. Defendants do not challenge

56

that the Complaint alleges the purchase or sale of securities,
or that it alleges Plaintiffs' reliance.  Defendants contend
that Plaintiffs have not alleged elements (1), (2), and (5),
that is, that Defendants made material misstatements or
omissions, that Defendants acted with scienter, and that
Plaintiffs' reliance on Defendants' alleged misstatements or
omissions was the proximate cause of their injuries.


    a. Scienter

    To allege sufficiently the element of scienter, a plaintiff
must "state with particularity facts giving rise to a strong
inference that the defendant acted with" scienter, that is, "'a
mental state embracing [the] intent to deceive, manipulate, or
defraud.'"  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551
U.S. 308, 319, 321 (2007) (quoting Ernst & Ernst v. Hochfelder,
425 U.S. 185, 194 (1976)).  The strength of the inference
"cannot be decided in a vacuum", and "[t]o determine whether the
plaintiff has alleged facts that give rise to the requisite
'strong inference' of scienter, a court must consider plausible
nonculpable explanations for the defendant's conduct, as well as
inferences favoring the plaintiff."  Tellabs, 551 U.S. at 323-
324.  The inference of scienter "need not be irrefutable" but
"must be more than merely ' reasonable' or 'permissible'-it must

57

be . . . cogent and at least as compelling as any opposing
inference one could draw from the facts alleged." Id. at 324.
In determining whether this standard has been met, a court must
consider "whether all of the facts alleged, taken collectively,
give rise to a strong inference of scienter, not whether any
individual allegation, scrutinized in isolation, meets that
standard." Id. at 323; see also South Cherry Street, LLC v.
Hennessee Group, LLC, 573 F.3d 98, 111 (2d Cir. 2009).

The Second Circuit has established that the scienter
element "can be satisfied by a strong showing of reckless
disregard for the truth", that is, "conscious recklessness-
i.e., a state of mind approximating actual intent, and not
merely a heightened form of negligence". South Cherry, 573 F.3d
at 109 (citations omitted) (emphasis in original). Defendants'
conduct must be "highly unreasonable and . . . an extreme
departure from the standards of ordinary care to the extent that
the danger was either known to the defendant or so obvious that
the defendant must have been aware of it." Id. (citing In re
Carter-Wallace, Inc. Securities Litigation, 220 F.3d 36, 39 (2d
Cir. 2000)) (emphasis in original). A strong inference of
scienter may arise from well-pled allegations that defendants:

> "(1) benefited in a concrete and personal way from the
> purported fraud . . .; (2) engaged in deliberately
> illegal behavior . . .; (3) knew facts or had access
> to information suggesting that their public statements

were not accurate . . .; or (4) failed to check
information they had a duty to monitor . . . ."

Novak, 216 F.3d at 311. To demonstrate the requisite fraudulent

intent for scienter, however, a complaint must do more than

"allege goals that are 'possessed by virtually all corporate

insiders,' such as the desire to maintain a high credit rating

for the corporation or otherwise sustain the appearance of

corporate profitability or the success of an investment, or the

desire to maintain a high stock price in order to increase

executive compensation."   South Cherry, 573 F.3d at 109 (citing

Novak, 216 F.3d at 308).

Reviewing the Complaint in its entirety, see Tellabs, 551

U.S. at 323, the Court finds no allegations that any of the

Individual Defendants benefited "in a concrete and personal way"

from the alleged fraud. Defendants have demonstrated through

their SEC filings that no SCA officer or director sold a single

share of SCA stock during the entire class period. (SCA Mem. at

19; Greenfield Decl., Ex. J.) To the contrary, a number of SCA

insiders, including several of the Individual Defendants,

continued to purchase increasing numbers of shares even as the

stock price continued to fall. (Id.) That Defendants increased

their holdings during the Class Period, and did not sell their

stock prior to a price drop "suggest[s] the absence of any

nefarious motives". Plumbers & Steamfitters Local 773 Pension
Fund v. Canadian Imperial, --- F.Supp.2d ----, 2010 WL 961596,
at *9 (S.D.N.Y. Mar. 17, 2010); see In re eSpeed, Inc. Sec.
Litig., 457 F.Supp.2d 266, 289 (S.D.N.Y. 2006) (lack of stock
sales tends to negate inference of scienter); In re Bristol-
Meyers Squibb Sec. Litig., 312 F.Supp.2d 549, 561 (S.D.N.Y.
2004) (defendants' increased holdings during the class period
were "wholly inconsistent with fraudulent intent").

As to SCA,[4] Plaintiffs assert that SCA early in the Class
Period wanted to "present the impression of explosive growth in
anticipation of its forthcoming secondary offering," on or about
June 6, 2007, during which XL Capital, through its wholly-owned
subsidiary, XL Insurance, sold 9,680,022 million of its SCA
shares, reducing its holdings from 63% of SCA's common stock to
47.5%. (Compl. ¶ 335.) Plaintiffs allege that although the
proceeds of the sale went to XL Capital and not SCA, "SCA, given
its close ties to XL Capital, was eager increase [sic] its stock
price and thus the price of the shares sold in the offering."
(Id.) Even if the Court were to accept Plaintiffs' contention
that SCA was so motivated, this Court has held that "the desire
to inflate stock prices or the desire to maintain a false veneer
of corporate profitability" is not "sufficiently concrete to

---

[4] Plaintiffs have not named either of the XL Defendants in their
Section 10(b) claim. (See Compl. ¶¶ 387-397.)

allege motive." In re Rhodia, 531 F.Supp.2d at 549 (quoting Kalnit, 264 F.3d at 139).

Because Plaintiffs have not alleged that any of the Defendants had a motive and opportunity to commit fraud, and make no allegations of deliberately illegal behavior by the Defendants, the Court turns to the third and fourth Novak categories regarding recklessness. See Plumbers & Steamfitters, 2010 WL 961596, at *9. Under Second Circuit law as stated in Novak, a plaintiff may raise a strong inference of scienter where the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." 216 F.3d at 311. "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." Id. at 309. Plaintiffs may not proceed with allegations of "fraud by hindsight", and allegations that defendants "should have anticipated future events and made certain disclosures earlier than they actually did" do not support a strong inference of scienter. Id. "Where Plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id.

Plaintiffs allege generally that during the Class Period, "[b]ecause of their positions with SCA, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects through internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees and through reports and other information provided to them in connection therewith" and that "[b]ecause of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified in this complaint had not been disclosed to, and were being concealed from, the investing public, including Plaintiffs, and that materially and affirmatively false and misleading statements as specified in this complaint were being made to the public." (Compl. ¶ 26.) Plaintiffs allege that "[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in SCA's public filings, press releases, and other publications are the collective actions of the narrowly defined group of Defendants." (Id. ¶ 28.)

Plaintiffs' broad allegations that Defendants received and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter.  See Plumbers & Steamfitters, 2010 WL 961596, at *10 (citing Steinberg v. Ericsson LM Telephone Co., 2008 WL 5170640, at **13-14 (S.D.N.Y. Dec. 10, 2008)); see also In re Sotheby's Holdings, Inc., 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well-established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.") (citations omitted).  Further, scienter allegations must be pled with particularity; the PSLRA and Rule 9(b) preclude attribution of knowledge or intent from one defendant to another.  See In re Citigroup, Inc. Sec. Litig., 330 F.Supp.2d 367, 381 (S.D.N.Y. 2004).

Plaintiffs allege under "scienter allegations", (see Compl. ¶¶ 333-338) that SCA and the Individual Defendants "touted themselves as experts in the field of financial guaranty insurance"; represented that they had fully investigated and stress tested each security before agreeing to insure it; were aware of the deterioration in the housing market and the increasingly risky loans that had been issued; and were aware that they had insured $3.1 billion in "non-senior" ABS CDO

63

tranches, yet did not alter their loss assumptions or place any ABS CDO contract on special monitoring until the end of the Class Period.  (Id. ¶ 333.)  "Thus", Plaintiffs allege, Defendants made statements "with full knowledge of their falsity, or with reckless disregard for their falsity."  (Id.)

Any allegation that Defendants' statements and omissions were made recklessly because Defendants were aware of the housing market crisis fails because "[k]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate or defraud."  Plumbers & Steamfitters, 2010 WL 961596, at *10 (citing In re PXRE Group Ltd. Sec. Litig., 600 F.Supp.2d 510, 540 (S.D.N.Y. 2009)).  Plaintiffs were just as aware of the housing market crisis as they allege Defendants were, but they did not act on that information to sell their stock as the price declined.  As Plaintiffs themselves have alleged, the housing crisis was popular news by the end of 2006 and early 2007.  (See Compl. ¶¶ 79-82.)  Plaintiffs had the same information that they allege Defendants had, and as sophisticated investors, should have been equally able to respond to it.  Defendants, "like so many other institutions" floored by the housing market crisis "could not have been expected to anticipate the crisis with the accuracy Plaintiff[s] enjoy[] in hindsight".  Plumbers & Steamfitters, 2010 WL 961596,

64

at *11 (citing Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753,
761 (7th Cir. 2007)).  Indeed, under Tellabs, the inference
Plaintiffs ask this Court to draw from Defendants' statements
and omissions must be considered against "cogent" and
"compelling" alternative explanations for their deficiency,
including, in this case, a fundamental misunderstanding and
underestimate of the true risks presented by investment in the
housing market, particularly with regard to opaque CDOs.

Plaintiffs' own allegations reveal that prior to July 24,
2007, Defendants were woefully unaware of the true risk
presented by their investment in CDOs, and did not know the
facts or have the information necessary to know that their
statements might be inaccurate.  Plaintiffs allege that
according to both a former Vice President and Managing Director
of SCA, "the extent of analyst interest in SCA's mortgage
exposure during the July 24, 2007 conference call took SCA by
surprise", and according to the former Managing Director, "it
was only after the July 2007 call that SCA made a serious effort
to research the underlying collateral - only to discover" the
data deficiencies of SCA's computer systems.  (Compl. ¶ 189)
(emphases added).  The Vice President confirms that even though
his internal group was responsible for testing the CDOs under
various economic scenarios, "SCA had relied so heavily on the

65

agency ratings for deals like the one with Merrill that no such
models were seriously run until after the July conference call,
in preparation for the August follow-up." (Id.) Because before
the July 24, 2007 call, Defendants were unaware of facts
suggesting that their public statements might be inaccurate, see
Novak, 216 F.3d at 311, any allegations of misrepresentations
made on or before July 24, 2007 fail for lack of scienter.


### b. Material Misrepresentations or Omissions

Plaintiffs' Complaint makes specific allegations of
misrepresentations against Defendants with respect to at least
fourteen press releases, telephone calls, conferences, and/or
other statements made by Defendants during the Class Period: 1)
SCA's 2006 Form 10-K, (2) the April 23, 2007 Form 8-K and April
24, 2007 Analyst Call, (3) the May 14, 2007 Form 10-Q, (4) the
May 16, 2007 Second Public Offering Registration Statement and
May 17, 2007 Conference, (5) the July 23, 2007 Form 8-K and July
24, 2007 Conference Call, (6) the August 3, 2007 Conference Call
and Powerpoint Presentation, (7) the August 10, 2007 Form 10-Q,
(8) the September 5, 2007 Conference and Presentation, (9) the
October 16, 2007 Form 8-K, (10) the October 25, 2007 Form 8-K
and October 26, 2007 Conference Call, (11) the November 13, 2007
Press Release, (12) the November 14, 2007 Form 10-Q, (13) the

November 18, 2007 S-4/A, and (14) the February 29, 2008 through March 17, 2008 Final Disclosures.  Plaintiffs also allege misrepresentations in SCA's financial statements throughout the Class Period.

Principally, Plaintiffs complain of the following categories of misrepresentations and omissions in Defendants' statements: (1) that Defendants understated the level of RCA's exposure to subprime RMBS in its CDO holdings and misrepresented its policies for limiting and controlling for subprime risk in the CDOs it insured; (2) that Defendants maintained inadequate loss reserves; (3) that Defendants purported to utilize internal risk assessment models that were distinct from those employed by the ratings agencies; (4) that Defendants claimed to exercise "discipline" in their underwriting; (5) that Defendants claimed to insure senior tranches only; and (6) that Defendants minimized the significance of SCA's mark-to-market losses.

To plead a claim of securities fraud, a plaintiff must specifically allege a material misrepresentation of fact that was known to be false at the time it was made.  Allegations of "fraud by hindsight" do not constitute fraud.  Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978).  A statement or omission is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

67

reasonable investor as having significantly altered the 'total mix' of information made available." Halperin v. eBanker USA.Com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).

Mere allegations of mismanagement do not state a claim for securities fraud. O & G Carriers, Inc. v. Smith, 799 F.Supp. 1528, 1540 (S.D.N.Y. 1992) (citation omitted). As the Second Circuit has observed, "section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception." Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982) (citing Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 473, 479 (1977)); see also In re Citigroup, Inc. Securities Litigation, 330 F.Supp.2d 367, 375 (S.D.N.Y. 2004) ("Plaintiffs' section 10(b) claim . . . amounts to nothing more than a charge that [Defendant]'s business was mismanaged. . . . [A]llegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b)."). A securities fraud claim likewise may not be based on optimistic statements or puffery. See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 811 (2d Cir. 1996) ("general announcements by [Defendant] that it was 'optimistic' about its

68

earnings and 'expected' . . . to perform well" are "puffery [that] cannot have misled a reasonable investor . . . and cannot constitute actionable statements under the securities laws.").

Considering only those misrepresentations attributed to Defendants after July 24, 2007, the Court finds that many of Plaintiffs' allegations amount to complaints of mismanagement, puffery, and allegations of "fraud by hindsight" that do not constitute fraud, and are not actionable under § 10(b). Plaintiffs' repeated assertions that SCA failed to maintain adequate loss reserves and to monitor the collateral underlying its CDOs, and understated mark-to-market losses are criticisms of Defendants' business judgment and management of SCA, not fraudulent misrepresentions.  Plaintiffs' allegations that SCA made material misrepresentations when it referred to its underwriting approach as "disciplined" and "conservative" and its overcollateralization triggers as "robust" in the face of deterioration are classic examples of puffery.  See In re JP Morgan Chase Sec. Litig., 363 F.Supp.2d 595, 633 (S.D.N.Y. 2005) ("The particular misstatements that plaintiffs allege – generalizations regarding integrity, fiscal discipline and risk management - amount to no more than puffery.") (citing Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996)). Further, once disclosures have been made in SEC filings, they

69

cannot be carried forward and later alleged by Plaintiffs as fraudulent statements.  As such, Plaintiffs' allegations that Defendants' concealed investment in lower than the most senior tranches fail once Defendants disclosed such investment.

Only two categories of alleged misrepresentations emerge from Plaintiffs' pleading as material misrepresentations of fact known by Defendants to be false when they were made: (1) Defendants' repeated misrepresentation that it was classifying all borrowers with FICO scores under 640 as "subprime", when it really counted only those borrowers with scores under 625, understating its subprime exposure; and (2) Defendants' repeated assertion that SCA had developed and utilized its own, distinct internal models for assessing the risks presented by subprime exposure.  Accepting Plaintiffs' allegations as true, both of these representations were clearly known by Defendants to be false when made.  These misrepresentations, insofar as they were allegedly made by Defendants after July 24, 2007, are actionable under § 10(b).

### c. Loss Causation

To prove loss causation, Plaintiffs must show that the losses they sustained resulted from Defendants' alleged fraud. "Loss causation is the causal link between the alleged

70

misconduct and the economic harm ultimately suffered by the plaintiff." Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 157 (2d Cir. 2007) (quoting Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172 (2d Cir. 2005)). Establishing loss causation is critical because Section 10(b) is not meant to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 345 (2005).

Under Section 10(b)'s loss causation requirement, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell, 396 F.3d at 173 (citation omitted). It must be the materialization of the concealed risk that caused the plaintiff's loss. In re Rhodia S.A. Securities Litigation, 531 F.Supp.2d 527, 545 (S.D.N.Y. 2007) (citing Lentell, 396 F.3d at 173). "[I]t is axiomatic that [a] concealed fact cannot cause a decrease in the value of a stock before the concealment is made public." In re eSpeed, 457 F.Supp.2d at 296.

In this case, Plaintiffs seek to recover for the losses they allegedly sustained when the value of SCA's stock declined, due, Plaintiffs allege, to Defendants' misrepresentations. Defendants submit that Plaintiffs have not demonstrated that

71

their alleged misrepresentations were the proximate cause of
Plaintiffs' losses, because the price of SCA's stock declined
steadily over the course of the Class Period, <u>while</u> Plaintiffs
allege that the misrepresentations were being made, and <u>before</u>
the "truth was revealed" to the public.  (SCA Mem. at 21.)
Plaintiffs respond that the concealed risk that caused
Plaintiffs' loss - SCA's poor monitoring and valuation, which
"made its CDO contracts appear safer and more valuable than they
were" - "materialized over time" as SCA admitted to some, though
not all, of its losses and the defects in its monitoring, and as
rating agencies disclosed SCA's internal weaknesses.  (Pl.'s
Opp. to SCA Mem. at 22.)  Plaintiffs contend that SCA's stock
price dropped as the market responded over time to the negative
information that was gradually revealed.  (<u>Id.</u>)  Plaintiffs
admit that SCA's stock price had fallen all the way to $2 before
the "full truth" about SCA's alleged concealments was revealed
in a series of disclosures between February 29, 2008 to March
13, 2008.  (Compl. ¶¶ 278-279.)

Where courts have held that materializations of risks other
than public disclosures resulted in shareholders' losses, those
materializations were sudden and caused the stock value to
plummet abruptly.  <u>In re Rhodia</u>, 531 F.Supp.2d at 546 (citing <u>In</u>
<u>re Parmalat Securities Litigation</u>, 375 F.Supp.2d 278, 284

(S.D.N.Y. 2005)) ("the plaintiffs in <u>Parmalat</u> were able to isolate a particular incident- i.e., the announcement that Parmalat would not be able to pay maturing bonds-which caused the drop in their shares' values."). Lead Plaintiffs here allege a slow, steady decline in SCA's securities, not a "sharp drop" resulting from the announcement of concealed facts. The Complaint, in fact, tracks the gradual decline in SCA's share price alongside its account of Defendants' alleged misrepresentations over the course of the Class Period. Plaintiffs argue that the Complaint's allegations concomitantly demonstrate the gradual revelation of the truth, which incrementally caused the drop in stock prices, and Plaintiffs' loss. Even if the Court were to accept this causal inference in the face of many other plausible explanations for the gradual decline in stock price, including the general housing market crisis, Plaintiffs' Complaint fails even to demonstrate a correlation between "revealed" facts and a decline in SCA's stock price. For example, Plaintiff alleges that SCA's stock price fell from $20.89 on September 4, 2007 to $19.77 on September 6, 2007 after a September 5, 2007 conference call and presentation during which Plaintiffs allege Defendants made a number of misrepresentations regarding SCA's level of subprime exposure, "strict controls" on subprime exposure, "senior"

position, and exhaustive stress testing, and do not allege that any "truths" were revealed.  (See Compl. ¶¶ 213-225.) Plaintiffs likewise cite a drop in SCA stock price on October 25, 2007, to $13.21 from $14.41 the previous day, following a press release issued by SCA in which SCA announced the reduction in its planned write down, and an improvement over the prior year period.  (See Id. ¶¶ 236-239.)  Yet following an October 26, 2007 conference call during which Defendants stated that SCA insured a total of $16.1 billion worth of ABS CDOs in which the underlying collateral was more than 50% RMBS; disclosed that of the 3,700 securities underlying these CDOs, 16.9% had been downgraded by at least one ratings agency, with an additional 4.6% on negative watch; noted that two of the CDOs had tripped overcollateralization triggers, and predicted three additional CDOs would soon be added to that number, among other disclosures, SCA's stock price rose from $13.21 on October 25, 2007 to $14.09 on October 30, 2007.  (Id. ¶¶ 240-252.)

Moreover, "'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to

74

intervening events.'"  Lentell, 396 F.3d at 174 (quoting First

Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir.

1994) (alterations in original)).  Indeed, rather than pleading

facts which, if proven, would show that Plaintiffs' loss was

caused by the Defendants' alleged misstatements, as opposed to

the intervening events of the housing market crisis and actions

by third parties, Plaintiffs' allegations themselves incorporate

intervening events and actors, and at times present (rather

inexplicably) wide event windows that welcome into their

narrative noise and information from other events that make it

difficult to isolate the impact of Defendants alleged

misrepresentations, and their revelation to the market.[5]

---

[5] Even though Plaintiffs are not expected to conduct an event
study on a Motion to Dismiss, event study methodology is
instructive here.  An event study is a statistical technique
that estimates the stock price impact of occurrences such as
mergers, earnings announcements, and so forth.  The basic notion
is to disentangle the effects of two types of information on
stock prices-information that is specific to the firm under
question and information that is likely to affect stock prices
marketwide.  The first step in an event study is selecting an
event window, that is, the period when information about the
event becomes available to the stock market and thus may affect
the relevant company's stock price.  The efficient market
hypothesis is influential in determining the length of the event
window.  Because the efficient market hypothesis, supported by
considerable empirical evidence, suggests that stock prices
react quickly to the release of new information, in many cases,
the event window will be relatively short – as short as one
trading day.  In determining the length of an event window, an
important trade-off exists: the longer the event window, the
more likely that the window includes the period during which all
the new information about the event is released; however, long

Looking to Plaintiffs' allegations after July 24, 2007 only, Plaintiffs first allege that after an August 3, 2007 conference call and presentation, SCA's stock price fell from a closing price of $22.52 on August 2, 2007 to $19.36 on August 6, 2007.  (Compl. ¶ 209.)  Plaintiffs next catch up with SCA's stock value on September 4, 2007, when it had increased to $20.89 per share.  (Id. ¶ 225.)  In the intervening month, Plaintiffs allege only one disclosure – SCA's 10Q for the second quarter of 2007, which revealed that the mark-to-market losses recorded on the ABS CDOs totaled $13.8 million, not $13.3 million, as previously stated.  (Id. ¶ 211.)  Plaintiffs give no explanation for a rise in stock price from August 6, 2007 to September 4, 2007.  Plaintiffs allege that SCA's stock price then fell from $20.89 on September 4, 2007 to $19.77 on September 6, 2007, after a September 5, 2007 conference and presentation during which SCA presented a chart listing its 22 ABS CDOs with more than 50% RMBS, but continued to understate its subprime exposure (vis a vis its alleged play with the FICO scores).  (See Compl. ¶¶ 213-225.)  Plaintiffs do not explain why they do not report the SCA stock value as of September 5,

---

event windows may include noise and information from other events, making it difficult to isolate the impact of the relevant event.  Mark Mitchell and Jeffry M. Netter, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, 49 BUS. LAW. 545, 556-558 (1994).

2007, and, at the same time, allege another September 5, 2007 event likely to have played a role in the stock price decline between September 4 and 6, 2007.  That is, Plaintiffs allege that "[a]lso on September 5, 2007, the SEC stated that it was conducting an investigation into the role of the ratings agencies and their policies for reviewing mortgage-backed securities" – an event also likely to have affected investor confidence, and the market for SCA stock.

Plaintiffs skip ahead another month before next addressing the price of SCA stock.  That is, Plaintiffs allege next in time that on October 16, 2007, SCA's stock price closed at $20.81, down from $21.39 the previous day, following a press release issued by SCA on October 16, 2007.  (Id. ¶ 231.)  Plaintiffs do not explain why SCA stock price would have increased between September 6, 2007 and October 15, 2007.  Plaintiffs then jump to October 25, 2007, when SCA's stock closed at $13.21, down from $14.41 on October 24, 2007.  (Compl. ¶ 239.)  In this instance, as noted earlier, Defendants released a press release on October 25, 2007 in which SCA actually raised its earnings estimate, announcing the reduction of planned write-downs and the improvement of its adjusted gross premium for structured finance, and releasing other optimistic forecasts.  (Id. ¶¶ 236-237.)  As to why the stock price declined, Plaintiffs offer the

housing market externality that as of fall 2007, home prices had
fallen by more than 6% from mid-2006, and existing-home sales
had fallen by a third.  (Id. ¶ 238.)

SCA's stock price then rose from $13.21 on October 25, 2007
to $14.09 on October 30, 2007, inexplicably following an October
26, 2007 call in which Defendants made a number of damaging
disclosures.  (Id. ¶¶ 240-252.)  Plaintiffs fail to offer any
causal explanation for a stock price increase linked to
Defendants' alleged fraud.

Plaintiffs next allege that SCA's stock price closed at
$6.64 on November 14, 2007, down from $7.65 on November 13,
2007. (Id. ¶ 257.)  There is no alleged fraudulent statement by
Defendants to explain how the price went from $14.09 on October
30, 2007 to $7.65 on November 13, 2007.  However, on November
12, 2007, Plaintiffs allege that Fitch had announced downgrades
of 352 CDO tranches, and that on November 13, 2007, SCA issued a
press release announcing that among the downgraded securities
were two ABS CDO tranches that SCA had insured.  (Id. ¶¶ 258-
259.)  Plaintiffs allege that on November 21, 2007, Fitch
downgraded the third ABS CDO tranche insured by SCA,
representing $573 million of exposure, and that SCA's stock
price closed at $4.28, as compared to $4.74 the previous day.
(Id. ¶ 267.)  Plaintiffs allege no facts suggesting that it was

78

Defendants' alleged concealment of its investment in these
tranches rather than Fitch's announcements, that caused the
declines in SCA's stock value.  Plaintiffs allege that on
November 26, 2007, when the President and CEO of XL Capital
resigned his position, the shares of SCA rose from $4.44 on
November 26, 2007 to $7.06 on November 30, 2007, (id. ¶ 268) a
stock drop linked to a specific event that is decidedly not
among Defendants' alleged misrepresentations.

Between December 12, 2007 and December 20, 2007, SCA's
stock price fell further, from $5.45 to $4.00 per share, a
period in which Plaintiffs allege that no misrepresentations by
Defendants were revealed, but that the credit agencies lowered
SCA's rating due to SCA's exposure to RMBS and CDOs backed by
RMBS.  (Compl. ¶¶ 270-272.)  Plaintiffs allege that on January
23, 2008, SCA issued a press release stating that it no longer
planned to raise new capital due to "uncertainty and
instability" in the industry, (id. ¶ 275), and that SCA's stock
price then fell from $3.79 on January 23, 2008 to $2.63 on
January 24, 2008.  (Id. ¶ 276.)  On February 7, 2008, Moody's
cut XCLA's ratings six notches, concluding that SCA would
require in excess of $6 billion to meet capital adequacy
requirements for AAA ratings, and SCA's stock price fell from
$2.77 on February 6, 2008 to $2 on February 8, 2008.  (Id. ¶

79

277-278.)  On February 29, 2008, SCA filed a notice with the SEC

that it was expecting to report approximately $1.5 billion in

losses on the fair value of its credit swaps.  (Id. ¶ 279.)  On

March 4, 2008, Moody's announced it was placing SCA and XLCA on

review for possible ratings downgrades due to SCA's filing. (Id.

¶ 280.)  Plaintiffs allege that between February 28, 2008 and

March 6, 2008, SCA's stock price dropped from $1.64 to $.60 per

share, but draw no distinct causal link between either

Defendants' February 29, 2008 disclosure or Moody's announcement

that plausibly suggests that one or the other, or any other

event in the wide window between February 28, 2008 and March 6,

2008, was responsible for the stock price drop.

Plaintiffs have not with this Complaint effectively shown

that it was the incremental revelation of Defendants' fraudulent

misrepresentations, and not the actions of third parties or

other circumstances of the market, that caused the decline in

SCA's share price over the Class Period.  Plaintiffs leave wide

periods unaccounted for, and select inconsistent date spreads

and wide event windows that permit market noise, and suggest

Plaintiffs may be cherrypicking dates that suit their argument -

that is, that dates that produce drops in stock prices.

Plaintiffs here have not sufficiently alleged that the facts

that were revealed incrementally before February 29, 2008 caused

80

the gradual decline in SCA's stock price.  Further, Plaintiff

has failed even to demonstrate that SCA's disclosure on February

29, 2008 of $1.5 billion in losses on the fair market value of

its credit default swaps, and its further disclosures of "the

full truth" on March 13, March 14, and March 17, 2008 caused the

final, miniscule declines in SCA's stock price, which dropped

incrementally at the same pace it had over the course of the

Class Period.  Plaintiffs allege only that "[b]etween February

28, 2008 and March 6, 2008," SCA's stock price dropped from

$1.64 to $.60 per share, and that on March 17, 2008, SCA's stock

price closed at $.72, down from $.79 the previous day.  (Compl.

¶¶ 281, 291.)  In the absence of any sharp drop, Plaintiffs have

not demonstrated that Defendants' disclosures, and not the

market failures, caused these final declines in SCA's stock.

Accordingly, Plaintiffs' § 10(b) claims, asserted in Count

Six, are dismissed for failure to demonstrate loss causation.


III. <u>Section 15 and Section 20 Claims (Counts Five and Seven)</u>

To state a claim for control person liability under

Sections 15 and 20(a), Plaintiffs must allege (a) a primary

violation by a controlled person, (b) actual control by the

defendant, and (c) the controlling person's culpable

participation in the primary violation.  See <u>In re Bristol</u>

81

Meyers Squibb Co. Sec. Litig., 2008 WL 3884384, at *20 (S.D.N.Y. Aug. 20, 2008).[6] Because Plaintiffs have with this Complaint failed to plead a primary violation, as set forth above, Defendants' Motions to Dismiss Counts Five and Seven of the Complaint is GRANTED.

## IV. Section 11 and 12(a)(2) Claims (Counts One through Four)

Although the absence of loss causation is an affirmative defense under Sections 11 and 12(a)(2), when "it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper." In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) (citation omitted). Because the absence of loss causation is apparent from Plaintiffs' own allegations, Plaintiffs' Section 11 and 12(a)(2) claims are also dismissed on this basis.

## V. Leave to Replead

Even when a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." Fed.

---

[6] There is a split in this District as to whether "culpable participation" must be pleaded to state a claim under Section 15. Compare In re Am. Bank. Note Holographics, Inc. Sec. Litig., 93 F.Supp.2d 424, 441 (S.D.N.Y. 2000) with Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 618 (S.D.N.Y. 2008).

R. Civ. P. 15(a). A court may dismiss without leave to amend when amendment would be futile. Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (internal citations omitted), rev'd on other grounds, 544 U.S. 197, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Id. (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

On these inter- and intra- industry-wide phenomena, it is not likely that Plaintiffs will be able to establish loss causation. Nonetheless, because the Court finds that amendment might not be futile, Plaintiffs are granted leave to amend their Complaint.

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (Docket ## 41, 42, 50 & 53) are GRANTED. Plaintiff is granted ninety (90) days from the date of this Memorandum & Order to file an Amended Complaint. Defendants shall answer or otherwise respond to Plaintiffs' Amended Complaint, if filed, within sixty (60) days of being served with the Amended Complaint.

While it is premature to close the door on the possibility
that Plaintiffs may be able ultimately to prevail should their
Amended Complaint demonstrate the plausibility of loss causation
and state with the requisite specificity the scienter
requirements as to each Defendant, for alleged
misrepresentations in the period after July 24, 2007 only,
Plaintiffs are on notice of the difficulties they face
establishing proximate loss based on specific misrepresentations
of individuals in this company, which is one of hundreds dealt a
deadly blow by the quicksand of RMBS and CDOs.

SO ORDERED.

Dated:    New York, New York

          March 31, 2010

                              _Deborah A. Batts_

                              Deborah A. Batts
                         United States District Judge

84