UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE SECURITY CAPITAL ASSURANCE LTD. SECURITIES LITIGATION | 07 Civ. 11086 (DAB) |

## MEMORANDUM OF LAW IN SUPPORT OF THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
Tel. (212) 878-8000
Fax (212) 878-8375

*Attorneys for Defendants Goldman, Sachs
& Co., J.P. Morgan Securities Inc. and
Merrill Lynch, Pierce, Fenner & Smith Inc.*

## Table of Contents

Introduction and Summary .................................................................................................1

Background ........................................................................................................................2

Argument ...........................................................................................................................7

I.      THE AMENDED COMPLAINT DOES NOT ALLEGE AN ACTIONABLE
MISSTATEMENT OF FACT IN THE PROSPECTUS .....................................7

      A.      Claims Related to "Independent" Risk Models Are Not Actionable ......................7

      B.      Claims Related to SCA's Business Practices Are Not Actionable..........................9

II.     PLAINTIFF'S LOSS CAUSATION ALLEGATIONS ARE DEFICIENT ......................11

III.   PLAINTIFF DOES NOT HAVE STANDING TO MAINTAIN ITS
SECTION 12 CLAIM...................................................................................15

IV.   PLAINTIFF'S CLAIMS SHOULD BE DISMISSED WITH PREJUDICE ...................17

Conclusion .......................................................................................................................18

Table of Authorities

Cases

Page(s)

*380544 Canada Inc. v. Aspen Tech. Inc.*,
　　33 F. Supp. 2d 15 (S.D.N.Y. 2009) ............................................................... 17

*Amorosa v. Ernst & Young LLP*,
　　82 F. Supp. 2d 351 (S.D.N.Y. 2010) .............................................................. 11

*Capri v. Murphy*,
　　856 F.2d 473 (2d Cir. 1988) ......................................................................... 16

*Denny v. Barber*,
　　576 F.2d 465 (2d Cir. 1978) ......................................................................... 17

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
　　553 F.3d 187 (2d Cir. 2009)........................................................................... 10

*In re Azurix Corp. Sec. Litig.*,
　　198 F. Supp. 2d 862 (S.D. Tex. 2002) ........................................................... 16

*In re Craftmatic Sec. Litig.*,
　　890 F.2d 628 (3d Cir. 1989)........................................................................... 16

*In re Global Crossing, Ltd. Sec. Litig.*,
　　471 F. Supp. 2d 338 (S.D.N.Y. 2006)............................................................ 11

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
　　272 F. Supp. 2d 243 (S.D.N.Y. 2003)............................................................ 11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
　　568 F. Supp. 2d 349 (S.D.N.Y. 2008)............................................................ 15

*In re Newbridge Networks Sec. Litig.*,
　　767 F. Supp. 275 (D.D.C. 1991) ................................................................... 16

*In re Rhodia S.A. Sec. Litig.*,
　　531 F. Supp. 2d  527 (S.D.N.Y. 2007)............................................................ 12

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
　　351 F. Supp. 2d 334 (D. Md. 2004)................................................................ 17

Page(s)

*In re Royal Ahold N.V. Sec. and ERISA Litig.,*
    384 F. Supp. 2d 838 (D. Md. 2005) ................................................................16

*In re Security Capital Assurance Ltd. Sec. Litig.,*
    2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) ........................................ passim

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) ................................................................11, 14

*Miller v. Lazard, Ltd.,*
    473 F. Supp. 2d 571 (S.D.N.Y. 2007) .........................................................7

*Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.,*
    2010 WL 1379735 (D.N.J. Mar. 30, 2010) ..................................................14

*Pinter v. Dahl,*
    486 U.S. 622 (1988) ................................................................................15

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
    658 F. Supp. 2d 299 (D. Mass. 2009) ..........................................................16

*Steed Finance LDC v. Nomura Sec. Int'l, Inc.,*
    2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ..............................................17

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................................15

*Wilson v. Saintine Exploration & Drilling Corp.,*
    872 F.2d 1124 (2d Cir. 1989) .....................................................................15

Statutes and Rules

15 U.S.C. § 77k(a) ...........................................................................................7

15 U.S.C. § 77l(a)(2) .......................................................................................7

Defendants Goldman, Sachs & Co ("Goldman"), J.P. Morgan Securities Inc. ("JPM") and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") (collectively, the "Underwriter Defendants") respectfully submit this Memorandum of Law in support of their motion to dismiss the claims against the Underwriter Defendants in the First Amended Consolidated Class Action Complaint dated June 29, 2010 (the "Amended Complaint") filed by Plaintiff Employees' Retirement System of the State of Rhode Island. The Declaration of James B. Weidner dated September 10, 2010 ("Weidner Decl.") is also submitted in support of this motion.[1]

## Introduction and Summary

Having suffered dismissal of its claims against the Underwriter Defendants in the original complaint based on a secondary offering of Security Capital Assurance Ltd.'s ("SCA") common stock on June 6, 2007, Plaintiff now refocuses its amended claims on alleged misrepresentations in SCA's 2006 Annual Report on Form 10-K filed in March 2007 (the "Annual Report"). The Annual Report was incorporated by reference into the prospectus for the offering, and now serves as the sole basis for Plaintiff's renewed claims under Sections 11 and 12 of the Securities Act of 1933 against the Underwriter Defendants. (No claim is made against the Underwriter Defendants under the Securities Exchange Act of 1934.) The revised allegations, however, do nothing to cure the defects of Plaintiff's previous pleading. Accordingly, the claims against the Underwriter Defendants should be dismissed with prejudice.

*First*, the Amended Complaint still does not identify any material misstatement of fact in connection with the offering materials. The Amended Complaint attempts to allege that statements in the Annual Report about "independent" risk analysis models were misleading, but

---

[1] In addition, the Underwriter Defendants adopt and incorporate by reference the arguments made by other defendants, including arguments concerning loss causation, to the extent they relate to the claims against the Underwriter Defendants.

the language in the Annual Report clearly indicates that SCA's models were *not* independent of rating agency models.  Also, allegations concerning SCA's risk management practices are nothing more than hindsight-driven critiques of SCA's business judgment.  The Court has already held that similar critiques cannot support claims against the Underwriter Defendants.

*Second*, just as with the original complaint, it is apparent from the face of the Amended Complaint that Plaintiff cannot establish loss causation.  The purported "corrective disclosures" identified by Plaintiff do not match any of the allegedly untrue statements in the Annual Report. In addition, Plaintiff fails to explain why its losses were caused by these disclosures, rather than by more obvious events that occurred during the same period, such as SCA's negative earnings reports, ratings downgrades by Fitch and Standard & Poor's and, more broadly, the collapse of the housing market.  The same loss causation issues resulted in dismissal of Plaintiff's previous complaint.

*Finally*, the Amended Complaint still does not sufficiently allege that Plaintiff purchased any shares from—or had any other direct contact with—any of the three Underwriter Defendants.  Section 12 of the Securities Act requires a plaintiff to allege that it purchased shares from the defendant, or that the defendant successfully solicited the purchase.  Because Plaintiff has still failed to make such an allegation, the Section 12 claim should be dismissed.

Given that this is Plaintiff's second bite at the apple—and because the Amended Complaint fails to correct the defects identified in the Court's prior decision—Plaintiff's claims against the Underwriter Defendants should be dismissed with prejudice.

### Background

SCA is a monoline insurance company that, during the relevant time period, provided financial guaranty insurance, reinsurance and other credit enhancement through two operating subsidiaries.  On June 6, 2007, SCA participated in a secondary public offering of its common

stock, selling approximately 9.7 million shares for $31 per share (the "Secondary Offering").

The shares sold were owned by XL Insurance (Bermuda) Ltd., which was then SCA's largest

shareholder.  Defendants Goldman, JPM and Merrill were the lead underwriters for the

Secondary Offering, with thirteen other underwriters participating in the syndicate.  (*See*

Weidner Decl. Ex. A, at 43 (listing underwriters).)[2]

      The Secondary Offering took place in the context of well-publicized and growing

concerns about subprime mortgages and their potential impact on the broader economy, albeit

before the complete freefall in the credit markets that occurred several months later.  As the

Amended Complaint itself admits, warnings about the fallout from subprime mortgage-backed

securities appeared in *The Economist* and *Businessweek* in February and March 2007.  (Am.

Compl. ¶¶ 82, 88.)  The credit crisis, however, erupted in full force only after the Secondary

Offering was completed.  According to a Reuters timeline cited in the Amended Complaint (¶

87), on June 20, 2007, two hedge funds managed by Bear Stearns had to sell $4 billion in assets

as a result of bad bets on securities backed by subprime loans.  (*See* Weidner Decl. Ex. B.)  Bear

Stearns was then forced to bail out these two hedge funds with a $3.2 billion loan.  (*Id.* Ex. C.)

On June 28, a London hedge fund, Caliber Global Investment Ltd., that controlled almost $1

billion in mortgage assets, announced plans to close due to losses in its portfolio.  (*Id.* Ex. D.)

On July 5, UBS ousted its CEO, reportedly due in part to the earlier closure of its hedge fund

group, Dillon Read, after losses due to subprime mortgage investments.  (*Id.* Ex. E.)  Then, on

August 9, 2007, credit markets seized up on a global basis, forcing central banks to pump

---

[2] The Secondary Offering Registration Statement, which incorporates the final Prospectus, became effective on June 5, 2007.  For purposes of the Section 11 claim against the Secondary Offering Underwriters, all of the alleged untrue statements of material fact are contained in the Prospectus, as opposed to other parts of the Registration Statement.

liquidity into the market. (*See id.* Exs. B, F.)  This unfolding crisis had a negative effect on all monoline insurance companies and other backers of mortgage-backed securities during the second half of 2007.

As this Court has observed, Plaintiffs in their original complaint did not "effectively [show] that it was the incremental revelation of Defendants' fraudulent misrepresentations, and not the actions of third parties or other circumstances of the market, that caused the decline in SCA's share price over the Class Period." *In re Security Capital Assurance Ltd. Sec. Litig.*, 2010 WL 1372688, at *32 (S.D.N.Y. Mar. 31, 2010) (hereinafter "*In re SCA*").  The same is true of the Amended Complaint.  As now alleged, in July 2007, as concerns over mortgage-backed securities deepened, SCA's share price declined from the offering price of $31 to around $21 per share. (*See* Am. Compl. ¶¶ 92, 232.)  In the second half of October, Standard & Poor's downgraded numerous classes of residential mortgage-backed securities, a type of security insured or guaranteed by SCA. (*Id.* ¶¶ 244-45.)  By the end of the month, SCA's share price had declined to $14 per share. (*Id.* ¶ 248.)  Then, on November 12, 2007, Fitch downgraded its credit ratings on numerous AAA-rated collateralized debt obligation ("CDO") transactions, two of which were insured by SCA representing a net exposure of $792 million. (*Id.* ¶ 251.)  SCA also announced that Fitch was reviewing another CDO transaction insured by SCA with a net exposure of $573 million.  Later in November, Fitch actually did downgrade the third AAA-rated CDO, and SCA's share price declined to around $4 per share. (*Id.* ¶¶ 258, 260.)

This putative securities class action was filed shortly thereafter, on December 7, 2007. The Court selected the Employees' Retirement System of the State of Rhode Island to serve as lead plaintiff for the putative class.  Plaintiff then filed a Consolidated Amended Class Action Complaint (the "CAC") which alleged, among other things, that the Secondary Offering

Prospectus contained three types of misleading statements:  (i) estimates of loss reserves and unrealized losses on credit derivatives; (ii) statements concerning SCA's "disciplined" approach to investing; and (iii) statements concerning "independent" underwriting procedures.  (*See* CAC ¶¶ 148, 150-51, 161-62, 173.)  Based on these allegations, the CAC asserted claims against the Underwriter Defendants under Sections 11 and 12 of the Securities Act.[3]

The Underwriter Defendants, along with the other defendants, moved to dismiss the CAC.  On March 31, 2010, the Court issued a Memorandum & Order granting those motions, finding that the CAC failed to allege a plausible theory of loss causation.  The Court granted Plaintiff leave to replead, but expressed doubt that the loss causation deficiencies in the CAC could be cured:  "Plaintiffs are on notice of the difficulties they face establishing proximate loss based on specific misrepresentations of individuals in this company, which is one of hundreds dealt a deadly blow by the quicksand of RMBS and CDOs."  *In re SCA*, 2010 WL 1372688, at *33.

Undeterred, Plaintiff filed the Amended Complaint on June 29, 2010.  The Amended Complaint contains the same claims against the Underwriter Defendants under the Securities Act, but the supporting factual allegations have been narrowed.  Plaintiff no longer contends that estimates of loss reserves and unrealized losses are actionable.  Plaintiff has also abandoned its theory based on generic statements about "disciplined" investing.

Plaintiff now contends, however, that certain statements about SCA's risk management practices in the 2006 Annual Report, and incorporated into the offering materials, are actionable.

---

[3] The CAC also asserted Securities Act claims against Merrill and two other defendants based on an exchange offer that took place in November 2007.  Those claims have been dropped in the Amended Complaint.

Specifically, Plaintiff claims that the following statements, each of which Plaintiff emphasizes in bold face, were misleading:

- "[SCA's] underwriters generally apply computer-based models to stress test cash flows in their assessment of the risk inherent in a particular transaction . . . . Stress models may also be developed internally by our underwriting department and reflect both empirical research as well as information gathered from third parties, such as rating agencies, investment banks or servicers." (Am. Compl. ¶ 157.)

- "Future performance expectations are determined from historical performance as well as the social, political and economic factors affecting the underlying assets and the asset class . . . . Generally, the default risk is assessed by the historic performance of the assets underlying the transaction." (*Id.* ¶ 158.)

- "Tailored surveillance strategies have been developed for each type of exposure, depending on the credit risk inherent in the exposure . . . . For structured securities, we generally collect data, often monthly or quarterly, and compare actual default and delinquency statistics to those generated by our models." (*Id.* ¶ 159.)

- "We have created computerized models to track performance of certain other large direct business lines including CDOs and credit derivatives on corporate debt. These systems incorporate risk tracking tools such as credit spreads and ratings which are obtained from third parties and incorporated into computerized risk tracking systems." (*Id.*)

- "The credit default swap portfolio consists of structured pools of corporate obligations that were awarded investment-grade ratings at the deals' inception. On a net par basis, approximately 98.3% of the portfolio is rated "AAA" with the remaining 1.73% allocated to other investment-grade ratings." (*Id.* ¶ 160.)

Plaintiff does not attempt to articulate, on a statement-by-statement basis, why each of these statements was allegedly misleading. Instead, Paragraph 162 of the Amended Complaint states, in omnibus fashion, why Plaintiff contends that all of the statements were misleading. *First*, Plaintiff claims these statements were misleading because SCA's risk analysis models were not in fact "distinct" and "independent" from rating agency models. (*See id.* ¶ 162(ii), (v), (vi).) *Second*, Plaintiff claims these statements were misleading because SCA allegedly lacked access to certain data and metrics, including historical data, that would have allowed SCA "to

appropriately stress test and risk model" its portfolio.  (*See id.* ¶ 162(i), (iii), (iv).)  As discussed in detail below, neither of these theories can withstand a thorough review of the Annual Report or support a claim under the Securities Act.

In addition, in an attempt to plead loss causation for its Securities Act claims, Plaintiff now asserts that the alleged misrepresentations in the Annual Report "were gradually revealed to the market beginning on July 24, 2007."  (*Id.* ¶ 224.)  As with the previous complaint, the allegations made to support Plaintiff's theory of loss causation are insufficient for reasons that are clear on the face of the Amended Complaint.

## <u>Argument</u>

### I.    THE AMENDED COMPLAINT DOES NOT ALLEGE AN ACTIONABLE MISSTATEMENT OF FACT IN THE PROSPECTUS.

Plaintiff asserts claims against the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act.  To state a claim under either of these provisions, the Amended Complaint must allege that the Prospectus "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading."  *See* 15 U.S.C. §§ 77k(a) & 77l(a)(2).  An untrue statement of fact is considered material if a reasonable investor "would attach importance to it in making an investment decision."  *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 578 (S.D.N.Y. 2007).  Applying these standards, the Amended Complaint fails to allege any misstatement in the Annual Report that could give rise to liability under the Securities Act.

### A.    Claims Related to "Independent" Risk Models Are Not Actionable.

Plaintiff now claims that the Annual Report (and therefore, the offering materials which incorporated it) was materially misleading because:  "SCA's internal risk analysis models were not distinct from those used by the rating agencies, and in fact depended on ratings agency

simulations" and "SCA either did not have, or could not employ, reliable risk and credit analysis models and stress tests that were independent from, and superior to, the rating agencies' models." (Am. Compl. ¶ 162(ii), (vi).)

The problem with these allegations is that the Annual Report never stated that SCA's risk analysis models were distinct from, independent of, or superior to the rating agencies' models. To the contrary, the Annual Report actually discloses that SCA's internal models incorporated and relied upon information from the rating agencies. For example, as Plaintiff itself admits, the Annual Report states that "[SCA] underwriters generally apply computer-based models to stress test cash flows in their assessment of the risk inherent in a particular transaction. . . . Stress models may also be developed internally by our underwriting department and reflect *both* empirical research *as well as* information gathered from third parties, *such as rating agencies*, investment banks or services." (Am. Compl. ¶ 157 (quoting Annual Report) (emphasis added).) This passage plainly discloses that (i) only some of SCA's stress models are developed internally and (ii) the stress models developed internally incorporate information gathered from the rating agencies.

Plaintiff's claim of a "misstatement" is thus utter fiction: the Annual Report said specifically that SCA may develop internal models and that the models *would* reflect information from third parties "such as ratings agencies"—*not*, as Plaintiff claims, that the models were "independent from," let alone "superior to," those of the ratings agencies.[4]

---

[4] The use of rating agency information was also made explicit in the following passage from the Annual Report, also quoted in the Amended Complaint:

We have created computerized models to track performance of certain other large direct business lines including CDOs and credit derivatives on corporate debt. *These systems incorporate risk tracking tools such as credit spreads and ratings which are obtained from third parties and incorporated into computerized risk tracking systems.*

Plaintiff also asserts that SCA had emphasized "that its underwriting was not dependent on agency ratings." (Am. Compl. ¶ 199.)  But the statements quoted in the Amended Complaint to support this allegation were made not in the Annual Report, but rather during an August 3, 2007 analyst call—nearly two months after the secondary offering that forms the basis for claims against the Underwriter Defendants.  Simply put, these August 2007 statements are irrelevant to the Securities Act claims against the Underwriter Defendants, which relate only to an offering several months earlier.[5]

### B.  Claims Related to SCA's Business Practices Are Not Actionable.

The remainder of the alleged misleading statements in the Annual Report amount to thinly-veiled hindsight criticisms of SCA's business practices, which the Court has already determined are not actionable. *In re SCA*, 2010 WL 1372688, at **27-28.  For example, the Annual Report describes the general use by SCA of computer-based models to stress test cash flows and to assess risk.  (*See, e.g.*, Am. Compl. ¶ 157.)  Plaintiff claims that such statements were misleading because SCA "lacked access to relevant data" and "did not have reliable historical performance metrics." (*Id.* ¶ 162(i), (iv).)  Tellingly, there is no allegation that SCA did not, in fact, use computer-based models to stress test cash flows.  Rather, the Amended Complaint suggests that the statements in the Annual Report were misleading because SCA's computer-based models were either poorly designed or poorly implemented.  This is nothing

---

(*Id.* ¶ 159 (emphasis added).)

[5] Analyzing only statements by SCA after July 24, 2007—*i.e.*, well after the Secondary Offering was completed on June 6, 2007—the Court previously found that "assertion[s] that SCA had developed and utilized its own, distinct internal models for assessing the risks presented by subprime exposure" are actionable. *In re SCA*, 2010 WL 1372688, at *28.  This finding, however, does not apply to the earlier, and different, statements in the Annual Report, which were not discussed in the Court's decision.

more than a critique of SCA's business acumen, which the Court has already found to be inadequate to support a claim of misrepresentation. *See In re SCA*, 2010 WL 1372688, at *28.

Plaintiff's language in Paragraph 162 of the Amended Complaint underscores this point. Plaintiff alleges that "SCA was unable to *appropriately* stress test and risk model its RMBS, ABS and CDO portfolios." (Am. Compl. ¶ 162(i) (emphasis added).)  In other words, the stress testing was done, just not done "appropriately."  Similarly, Plaintiff states that SCA was "negligent" in its reliance on rating agency data. (*Id.* ¶ 162(iii).)  These are criticisms of SCA's business practices, not allegations of false or misleading statements in the Annual Report.

Even if it could be argued that general statements about risk management practices in the Annual Report carry with them an implied statement that SCA's risk management practices were "appropriate" or "reliable," those modifiers would amount to mere puffery.  The Court has already observed that the words "disciplined," "conservative" and "robust" are "classic examples of puffery." *In re SCA*, 2010 WL 1372688, at *28.  Terms like "appropriate" and "reliable" are in the same vein. *See ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (finding that similar statements "did not, and could not, amount to a guarantee that [defendant's] choices would prevent failures in its risk management practices").  Whether these terms are express or implied, they are puffery just the same.

In short, Plaintiff's continued complaints about SCA's business judgment and management practices are no more sufficient now than in its earlier complaint and cannot sustain the Securities Act claims against the Underwriter Defendants.

10

## II.    PLAINTIFF'S LOSS CAUSATION ALLEGATIONS ARE DEFICIENT.

The Court expressly put Plaintiff "on notice of the difficulties [it] face[s] establishing proximate loss" in this litigation. *In re SCA*, 2010 WL 1372688, at *33. Plaintiff has, once again, failed by a wide margin to carry this burden as against the Underwriter Defendants.

To plead loss causation—*i.e.*, the causal connection between a material misrepresentation and an economic loss—a plaintiff must allege that the misrepresentation "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2nd Cir. 2005). In a case under the Securities Act, a defendant may raise the plaintiff's failure to plead loss causation as a defense on a Rule 12(b)(6) motion to dismiss if the defense "is apparent on the face of the complaint." *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 347-48 (S.D.N.Y. 2006); *see also Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 371-72 (S.D.N.Y. 2010) (applying loss causation defense on 12(b)(6) motion and dismissing Securities Act claims); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-55 (S.D.N.Y. 2003) (same). The Securities Act claims brought against the Underwriter Defendants in the Amended Complaint should be dismissed for the same reason the Court previously dismissed those claims—because "the absence of loss causation is apparent from Plaintiffs' own allegations." *In re SCA*, 2010 WL 1372688, at *32.

*First*, the "corrective disclosures" that purportedly triggered Plaintiff's losses were not even related to, and therefore self-evidently did not correct, the alleged misleading statements in the Annual Report, which are the only statements relevant to the claims against the Underwriter Defendants. Plaintiff alleges that it incurred losses when SCA disclosed that (i) the Company "used a 10% stress test level (i.e. modeling an expectation of a 10% loss) on [its] subprime

RBMS portfolio" (Am. Compl. ¶ 237); (ii) the Company had significant exposure to mezzanine

grade ABS CDOs (*id.* ¶¶ 235-36), and (iii) the Company did not know the amount of CDO-

squared transactions insured by SCA that was dependent on collateral rated BBB (*id.* ¶ 227).[6]

Plaintiff characterizes these disclosures as "admissions" and "revelations" that SCA did not apply

"cautious, conservative and strict propriety risk models or stress testing procedures." (*Id.* ¶ 226.)

None of these disclosures by SCA contradicts or corrects the allegedly misleading

statements identified by Plaintiff in the Annual Report.  For example, the Annual Report does

not state that SCA used a stress test level greater than 10%.  By the same token, the Annual

Report does not deny that SCA had exposure to mezzanine grade ABS CDOs or CDO-squared

transactions dependent on collateral rated BBB.  The alleged misleading statements in the

Annual Report concerned completely different topics:  the independence of SCA's risk analysis

models from rating agency models and SCA's lack of access to certain data and metrics.  This

mismatch between the alleged misleading statements and the alleged corrective disclosures

renders Plaintiff's theory of loss causation unavailing.  *See In re Rhodia S.A. Sec. Litig.*, 531 F.

Supp. 2d  527, 545 (S.D.N.Y. 2007) (limiting plaintiffs' securities claims because they failed to

satisfy the "loss causation requirement" that the "disclosure causing injury address[] the specific

fact allegedly concealed.").[7]

---

[6] Plaintiff also alleges it incurred losses when SCA disclosed that it had "falsely" told investors that the Company defined "subprime borrowers" as those borrowers with Fair, Isaac & Company ("FICO") credit scores of 640 and below, when in actuality, the Company's threshold was 625. (Am. Compl. ¶¶ 272-73.)  These allegations are irrelevant to the Securities Act claims against the Underwriter Defendants as Plaintiff does not (and cannot) allege that the 2006 Annual Report or the Registration Statement incorporating it contain any misrepresentations with regard to FICO scores.  Moreover, the alleged "truth" concerning the FICO scores was not "revealed" until March 2008 (*See* Am. Compl. ¶ 272) and therefore cannot in any event establish loss causation during the Class Period, which ends on December 20, 2007. (Am. Compl. ¶ 1.)

[7] Plaintiff also asserts that SCA made a corrective disclosure by revealing its "lack of insight" into the collateral underlying its CDOs. (Am. Compl. ¶ 228.)  Of course, a "lack of insight" is not actionable

*Second*, Plaintiff alleges that at the same time these "corrective disclosures" were made other events occurred—such as SCA's negative earnings announcements—which provide a far more compelling explanation for the decline in SCA's stock price. For instance, on July 24, 2007 —the date Plaintiff alleges SCA made its first corrective disclosure—the "Company reported that its quarterly mark-to-market loss had tripled from the prior quarter to $22.2 million." (Am. Compl. ¶ 227.) Similarly, on October 18, 2007—the date of another supposed corrective disclosure—SCA announced mark-to-market losses in the third quarter of $145 million. (*Id.* ¶ 241.) Later stock price declines purportedly due to "corrective disclosures" coincide with the publication of additional earnings reports (*id.* ¶ 254) and Standard & Poor's and Fitch's announcements of ratings downgrades on assets backed by subprime mortgages, including assets insured by SCA (*id.* ¶¶ 245, 250). In sum, negative developments that were unrelated to any statements in the Annual Report provide a complete explanation for the declines in SCA's share price identified in the Amended Complaint.[8]

*Third*, Plaintiff hypothesizes, without any basis, that investors, rather than simply seeing and reacting to SCA's negative earnings reports, actually realized that statements in the Annual Report were false. (*See* Am. Compl. ¶ 248 ("[T]he stock resumed its decent [*sic*] on heavy

---

as a material misrepresentation or omission. In any event, the sole basis for Plaintiff's assertion is an allegation that on a July 24, 2007 earnings conference call, the CEO of SCA—Paul S. Giordano—initially hesitated in answering an analyst's detailed question about the ratings of the "collateral underlying the CDOs that consisted of other CDOs." (*Id.*) Even if this hesitation were enough to plead a corrective disclosure, and it is not, Mr. Giordano ended up providing a knowledgeable response by stating that the ratings for "over three-quarters" of the "CDO-squared bucket on the underlying ratings . . . would be AA or AAA." (*Id.*)

[8] Plaintiff attempts to tie these earnings reports and downgrade announcements to the misstatements it alleges by repeatedly asserting that the reports and announcements "revealed . . . that SCA had not been ahead of the curve with its independent risk modeling capabilities." (Am. Compl. ¶ 247; *see also id.* ¶¶ 252, 258 (same).) But, not only are these "revelations" far too attenuated, they also do not in any event correct the alleged misrepresentations in the 2006 Annual Report, as the Report did not state that SCA's risk models were independent of the ratings agencies in the first place.

trading . . . because investors ascertained for themselves that SCA methodologies for guarding its high risk portfolios from risk could not be believed."); *id.* ¶ 242 ("[T]he large mark-to-market loss [after publication of earnings report], signaled that SCA's conservative independent risk modeling, and its limited exposure to subprime collateral, were likely not as previously represented.").) These speculative allegations, which do not explain why investors would reach such conclusions, plainly do not meet the requisite pleading standard. *See Lentell*, 396 F.3d at 174 (If the connection "between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is attenuated . . . a fraud claim will not lie."); *Nat'l Junior Baseball League v. Pharmanet Dev. Group Inc.*, 2010 WL 1379735, at *37 (D.N.J. Mar. 30, 2010) ("The allegations as they stand now, only show that [defendant's] stock price dropped predominately as a result of announcements of disappointing financial results rather than disclosures of any misrepresentations or omissions.").

*Finally*, and at bottom, the Amended Complaint, like the earlier complaint, does not differentiate between losses incurred due to disclosure of the alleged fraud and those caused more generally by the collapse of the housing market. To the contrary, Plaintiff itself references the subprime market collapse in explaining its losses. (*See, e.g.,* Am. Compl. ¶ 231 (alleging analyst attributed SCA's July 24, 2007 stock price loss to "the meltdown in the subprime market"); *id.* ¶ 246 (alleging SCA's stock price declined when Merrill announced a "write down [of] $4.5 billion worth of CDO and subprime mortgage assets" because Merrill expected "market conditions for subprime mortgage-related assets to continue to be uncertain").) Because Plaintiff does not make the necessary distinction between the alleged fraud and well-publicized intervening events, Plaintiff cannot establish loss causation. *See In re SCA*, 2010 WL 1372688, at *30; *see also Lentell*, 396 F.3d at 174 ("[W]hen the plaintiff's loss coincides with a

14

marketwide phenomenon causing comparable losses to other investors, the prospect that the

plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not

adequately pled facts which, if proven, would show that its loss was caused by the alleged

misstatements as opposed to intervening events.") (internal quotation and alterations omitted); *In*

*re Merrill Lynch & Co. Research Reports Sec. Litig.,* 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008)

(dismissing securities claims for lack of loss causation where "the Complaint does not assert

facts that distinguish between the alleged fraud and the market-wide collapse of Internet stocks

as the cause of [plaintiff's] losses.").

> The Amended Complaint should be dismissed as against the Underwriter Defendants for
these reasons as well.

## III.    PLAINTIFF DOES NOT HAVE STANDING TO MAINTAIN ITS SECTION 12 CLAIM.

> Setting aside Plaintiff's failures to allege an actionable misrepresentation or loss

causation, Plaintiff's claim under Section 12 of the Securities Act (Count II) should be dismissed

because the Amended Complaint, like the prior complaint, fails to allege that Plaintiff has

standing to maintain such a claim against any of the Underwriter Defendants.  A plaintiff has the

burden to allege facts in the complaint that would establish standing.  *See, e.g., Warth v. Seldin,*

422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant clearly to allege facts

demonstrating that he is a proper party to invoke judicial resolution of the dispute and the

exercise of the court's remedial powers.").

> Under Section 12, a plaintiff has standing to sue only the party from which the plaintiff

purchased the security at issue, or a party that successfully solicited the purchase.  *See Pinter v.*

*Dahl,* 486 U.S. 622, 643, 647 (1988) (holding that liability under Section 12(1) applies only to

those who pass title, or those who solicit securities purchases); *Wilson v. Saintine Exploration &*

*Drilling Corp.*, 872 F.2d 1124, 1126-27 (2d Cir. 1989) (applying the § 12(1) analysis in *Pinter* to

what is now § 12(a)(2)); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) (same).  To show

standing based on the solicitation of a purchase, there must, at a minimum, be some direct

contact between the plaintiff and defendant.  *See In re Newbridge Networks Sec. Litig.*, 767 F.

Supp. 275, 281 (D.D.C. 1991) ("Here, absent any allegation of direct contact of any kind

between defendants and plaintiff-purchasers, the Court rules as a matter of law that defendants

are not statutory sellers."); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 892 (S.D. Tex.

2002) (same); *see also In re Royal Ahold N.V. Sec. and ERISA Litig.*, 384 F. Supp. 2d 838, 843

(D. Md. 2005) (dismissing Section 12 claims against two underwriter defendants where "there

was no direct personal or telephone contact" between the plaintiff and the underwriters).  Mere

involvement in the creation of a prospectus is not enough to establish direct contact between a

plaintiff and defendant.  *See In re Craftmatic Sec. Litig.*, 890 F.2d 628, 636 (3d Cir. 1989);

*Newbridge*, 767 F. Supp. at 281.

     In this case, there is no allegation that Plaintiff had any direct contact with Goldman,

JPM or Merrill in connection with the Secondary Offering.  The Amended Complaint alleges

only that "the Underwriter Defendants offered and sold SCA stock directly to Plaintiff and the

Class members in the Secondary Offering." (Am. Compl. ¶ 295.)  This allegation is too vague

and conclusory to satisfy the standing requirement.  There were *thirteen other* underwriters

participating in this SCA offering. (*See* Weidner Decl. Ex. A, at 43.)  If there had been a direct

contact between Plaintiff and any of the three named Underwriter Defendants, Plaintiff should be

in a position to describe that contact.  *See Plumbers' Union Local No. 12 Pension Fund v.

Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 305 (D. Mass. 2009) ("If plaintiffs did in

fact purchase the [securities] directly from the defendants, they should have said so.  An evasive

circumlocution does not suffice as a substitute."); *Steed Finance LDC v. Nomura Sec. Int'l., Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) ("Plaintiff has also failed to allege any specific acts by [defendant] to directly solicit it to purchase the [securities] . . . . Had the facts been otherwise, presumably plaintiff would have known."); *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 406 (D. Md. 2004) (allegation that defendant underwriters sold stock to plaintiff "must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser.").

The Amended Complaint, however, does not describe a single meeting, telephone call or e-mail exchange between Plaintiff on the one hand and Goldman, JPM or Merrill on the other, much less a successful solicitation or sale, as is required for standing under Section 12. This omission is particularly telling, given that the Underwriter Defendants raised this same argument in their previous motion to dismiss. (*See* Docket Entry #51, at 14-15.) The obvious inference is that Plaintiff cannot, in good faith, make such an allegation. In short, Plaintiff lacks standing to sue any of the Underwriter Defendants under Section 12.

## IV.   PLAINTIFF'S CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

The allegations in the Amended Complaint are not different, in substance, from those contained in the previous complaint. There is no reason to believe that further amendment would allow Plaintiff to state a valid claim against the Underwriter Defendants, any more than Plaintiff has failed to do despite this Court's having identified defects in Plaintiff's original pleading. Accordingly, the claims against the Underwriter Defendants should be dismissed with prejudice. *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (declining to permit further amendment where the court had already "put plaintiff's counsel on the plainest notice of what was required"); *380544 Canada Inc. v. Aspen Tech. Inc.*, 633 F. Supp. 2d 15, 37 (S.D.N.Y. 2009) (dismissing

plaintiffs' claims with prejudice after plaintiffs failed to correct identified deficiencies in their complaint).  Plaintiff should not be allowed a third bite at the apple.

## **Conclusion**

For all the foregoing reasons, Plaintiff's claims under Sections 11 and 12(a)(2) of the Securities Act against the Underwriter Defendants (Counts I and II) should be dismissed with prejudice.

Dated: September 10, 2010

CLIFFORD CHANCE US LLP

By: _____
     James B. Weidner
     Jeff E. Butler
     Todd A. Spiegelman

31 West 52nd Street
New York, NY 10019
Tel. (212) 878-8000
Fax  (212) 878-8375

*Attorneys for Defendants Goldman, Sachs*
*& Co., J.P. Morgan Securities Inc. and*
*Merrill Lynch, Pierce, Fenner & Smith Inc.*